# EXHIBIT A

## INTER-COMPANY SERVICES AGREEMENT

This **Inter-Company Services Agreement** (together with all Exhibits attached hereto, this "**Agreement**") is entered into as of N̲o̲v̲e̲m̲b̲e̲r̲ ̲2̲1̲,̲ ̲2̲0̲1̲5̲ (the "**Effective Date**") by and between **ENVY BRANDING, LLC,** a New York limited liability company with an address of 848 Old Quaker Hill Road, Pawling, NY 12564 ("**Envy**"), **THE WILLIAM GERARD GROUP, LLC,** a Pennsylvania limited liability company with an address of 6929 Rosewood Street, Pittsburgh, PA 15208 ("**TWGG**") (each a "**Party**" and collectively, the "**Parties**").

### RECITALS

Envy represents owners of intellectual property ("**IP**") in negotiating and consummating deals for the use of such IP in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions (collectively, "**Licensing Opportunities**").

TWGG, represents individuals, business entities and groups (collectively, "**Talent**") in providing services commonly referred to as artist or talent management services; including but not limited to negotiating terms and preparing and approving contracts for Talent; developing and coordinating publicity campaigns; consulting on major business and creative decisions; assembling, directing and coordinating requisite professional advisors; coordinating, selecting and supervising staff and budgets; monitoring and collaborating with all others who have responsibilities for the career of Talent; and receiving, counseling and coordinating requests for endorsements, appearance, and charitable giving (collectively, "**Talent Management Services**").

Each Party believes that its Principal Line of Business may benefit from certain consulting services of the other Party. For purposes of this Agreement, "**Principal Line of Business**" shall mean: (i) for Envy, pursuing Licensing Opportunities for IP Owners; and (ii) for TWGG providing Talent Management Services for Talent.

The Parties desire to set forth the terms and conditions of the provision of consulting services to each other through this Agreement.

1. <u>Term.</u>  The "**Term**" of this Agreement means the period of time from the Effective Date until December 31, 2019 unless extended by the mutual agreement of the Parties or terminated prior to such date in accordance with the terms herein.

2. <u>Principal Lines of Business.</u>  This Agreement shall not limit nor prohibit any Party, at its sole costs and expense, from pursuing its Principal Line of Business with Current Clients (as hereinafter defined) or with Prospective Clients (as hereinafter defined). Each Party shall be solely responsible for all costs and expenses it incurs in its performance of its Principal Line of Business.

3. <u>Referral of Business between the Parties for Current and Future Clients.</u>

(a)  Except as otherwise provided for in this Agreement, with respect to its existing clients as of the Effective Date ("**Current Clients**") and any prospective clients it negotiates with during the Term ("**Prospective Clients**"), each Party shall consider in good faith, the potential benefit to such clients from entering into an agreement with the other Party for the provision of services relating to the other Party's Principal Line of Business and shall, if it deems appropriate in its sole discretion, make referrals to the other Party. Except as set forth in Section 3(b) below, no Party shall have any obligation to refer a

**Exhibit**
**0002**

Current Client or Prospective Client to the other Party nor shall it have any responsibility for such other Party's ability or inability to generate revenue in such other Party's Principal Line of Business.

(b)     Except as otherwise provided for in this Agreement, if, a Party (the "**Referring Party**") determines in good faith that a Current Client or Prospective Client will benefit from entering into an Agreement with the other Party (the "**Servicing Party**") for the Servicing Party's Principal Line of Business, the Referring Party:

(i) shall use commercially reasonable efforts to introduce the Prospective Client or Current Client to the Servicing Party and shall encourage the Prospective Client or Current Client to meet with the Servicing Party to discuss an opportunity for the Servicing Party to represent such Prospective Client or Current Client in the Servicing Party's Principal Line of Business; unless otherwise prohibited by the Referring Party's contractual obligations to Current Clients; and

(ii) shall encourage the Prospective Client or Current Client to directly enter into an agreement with the Servicing Party for the Servicing Party to represent such Prospective Client in the Servicing Party's Principal Line of Business, and

(iii) shall not itself enter into an agreement to provide services in the Servicing Party's Principal Line of Business with such Prospective Client or Current Client unless either (x) the Servicing Party has rejected in writing the opportunity to work with the Prospective Client or (y) the Prospective Client or Current Client has refused in writing to work with the Servicing Party

The Parties shall set forth each client referred to the Servicing Party pursuant to this Section 3(b) and the date such potential client is added on Exhibit A attached hereto.  Each potential client set forth under the Servicing Party's name on Exhibit A shall be a "**Referred Client**" of such Servicing Party.  If a Referred Client is rejected or rejects the opportunity to work with the Servicing Party under clause (iii) above, such Referred Client shall be removed from under the Servicing Party's name on Exhibit A and such potential client shall no longer be a Referred Client under this Agreement; provided such potential client may be added back to Exhibit A upon mutual written consent of the Parties.

(c)     In the event that any Referred Client introduced to the Servicing Party by the Referring Party enters into an agreement with the Servicing Party or makes any payment to the Servicing Party as a result of or in connection with services provided by the Servicing Party to such Referred Client, then such Referred Client shall become a "**Signed Client**" of the Servicing Party, and the Servicing Party shall pay to the Referring Party the sum of five percent (5%) of gross revenue paid by (and not refunded or returned to) the Signed Client to the Servicing Party (or any third party to which the Servicing Party directs such payment to be made) for a period of no less than five (5) years from the date set forth next to such Referred Client on Exhibit A hereto (unless a lower percentage is agreed by the Parties in their sole discretion).  For purposes of clarification, the gross revenue shall be based solely on amounts earned by the Servicing Party with respect to the applicable Signed Client and not on amounts collected by the Servicing Party on behalf of the Referred Client.

(d)     The Parties shall exchange and, subject to accuracy, execute updated versions of Exhibit A together with the accounting process set forth under Section 7 below.

4.  Consulting Services.

(a)     With respect to each Signed Client, during the term of the agreement between the Servicing Party and the Signed Client, each of the Servicing Party and the Referring Party shall keep the

other informed regarding its ongoing discussions and work with the and shall cooperate and consult with (**"Consulting Services"**) the other Party in connection with the work of each Party on behalf of the Client.; provided, however, no Party shall have an obligation to allow the other Party to provide any consulting services to its Current Clients or any of its Prospective Clients.

(b)     A Party providing Consulting Services under this Section 4 shall (i) use commercially reasonable efforts to assist the other Party as reasonably requested by such other Party from time to time, and (ii) shall bear all of its own costs and expenses in connection with its provision of Consulting Services.

(c)     In the event the Servicing Party desires additional assistance with respect to any Signed Client, the Parties may request additional assistance and the other Party may agree, in its sole discretion, to provide such enhanced consulting services and any additional fee paid to the consulting Party with respect to such Signed Client and such additional amount (which shall be a percentage of gross revenue calculated as set forth in Section 3(c) above) shall be set forth next to the Signed Client's name on Schedule A attached hereto.  Any such additional amounts shall be paid for the Term of this Agreement.

(d)     Each Party covenants that it shall provide all services pursuant to its Principal Line of Business to the other Party, to Current Client and Prospective Clients, in compliance with all applicable federal, state and local laws, rules, statutes and ordinances.

5.     Confidential Information; Ownership of Results and Proceeds.

(a)     Each Party agrees at all times during the Term and thereafter in perpetuity to hold in strictest confidence, and not to use, except for the benefit of, and at the request of, the other Party, or to publish or disclose to any person, firm or corporation without written authorization of the other Party, any Confidential Information of that Party.  Each Party acknowledges that **"Confidential Information"** means any and all confidential information, proprietary information and data, trade secrets or know-how, including, but not limited to, research and development information, plans, products, services, licenses, methods, strategies, programs, source code, software, inventions, processes, formulas, theories, technology, designs, drawings, marketing information, costs, pricing, finances or other information of any nature collected by or having become known in the course of a Party's performance of this Agreement or provided or disclosed to the Party by or on behalf of a Party to this Agreement, either directly or indirectly in writing, orally, electronically, or by inspection, or otherwise, relating to such Party and/or its affiliates, companies, agents, executives and/or owners.  Each Party further agrees that Confidential Information does not include any of the foregoing items which have become publicly known or made generally available through no wrongful act of the Party.  Each Party further agrees that all Confidential Information is and shall at all times remain the property of such Party.

(b)     Subject to Section 5(c) below, each Party providing Consulting Services (the **"Consultant"**) agrees that the Party receiving the benefit of the Consulting Services (the **"Recipient"**) shall own all results and proceeds of the performance of Consultant's Consulting Services (collectively, **"Results"**) and that all such Results which are protectable by copyright are "works made for hire", as that term is defined in the United States Copyright Act.   If the Results, or any portion thereof, are deemed not to be "work for hire", Consultant hereby irrevocably conveys, transfers and assigns to Recipient, all right, title and interest in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Results, including without limitation, all of Consultant's right, title and interest in and to the copyrights (and all renewals, revivals and extensions thereof and all past, present and future claims relating thereto) in the Results, including without limitation, all rights of any kind or any nature now or hereafter recognized, including without limitation, the unrestricted right to make modifications, adaptations and revisions to the Results, to exploit and allow others to exploit the Results and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Results, known or unknown, prior to or after the date hereof, including

3

without limitation the right to receive all proceeds and damages therefrom.  In addition, Consultant hereby waives any so-called "moral rights" with respect to the Results that Consultant may have.

(c)   Notwithstanding anything to the contrary contained in Section 5(b), the Parties agree that as between the Parties, all Results developed for a Signed Client for which each of Envy and TWGG provide Consulting Services under this Agreement shall be jointly owned by the Parties; provided, however, no Party shall use any such Results except in connection with services provided for the Signed Client without the prior written consent of the other Party and provided, further, no Party shall transfer, convey, assign, sell, license or lease its interests in any such Results to any other person or entity without the prior written consent on the other Party.

6.   Breach; Termination; Extension.

(a)   Each Party shall have the right at any time, by giving written notice to the other Parties, and without prejudice to such Party's other rights or remedies for breach, to terminate this Agreement if the other Party commits a material breach of any of the provisions of this Agreement; provided, however, such termination shall not be effective unless and until the Party requesting termination of this Agreement has given written notice to the other Parties and, if the reason for termination is curable and does not involve a breach of Section 5 above, the Party responsible for such breach has failed to cure such breach to the reasonable satisfaction of the Party requesting termination of this Agreement within thirty (30) calendar days of receiving such notice.

(b)   Upon request, each Party agrees to negotiate in good faith regarding the extension of the Term.

(c)   If this Agreement is terminated or expires, each Party shall return at its sole cost and expense to all other Parties all Confidential Information and all Results created through the date of termination.  Termination of this Agreement shall not affect any remedies or rights a Party may have against the other Party.

7.   Accounting; Payment; Audit Rights.

(a)   Accounting.  Each Party shall maintain accurate records and other evidence pertaining to the calculation of any consulting fees due to the other Party.  Each Party shall preserve such records for twelve (12) months after termination of this Agreement.

(b)   Payment.  Within ninety (90) days after the last day of each calendar quarter during the Term, each Party shall submit to the other a detailed statement showing the total gross revenue received by it from Current Clients or Prospective Clients for which the other Party has provided consulting services in that calendar quarter, together with payment of the sum due to the other Party as a result of the provided consulting services.  Such payment shall be made in immediately available funds and shall be paid via check or wire transfer.

(c)   Audit.  Each Party shall have the reasonable right to conduct one audit per calendar year during the term of this Agreement, and one audit within two years after the expiration of this Agreement, for the purposes of confirming the accuracy of the payments of consulting fees.  The Party conducting the audit shall bear the cost of any such audit(s).

8.   Representations and Warranties; Indemnification.

(a)   Each Party represents, warrants and agrees that: (i) it has the right, power and authority to enter into this Agreement and to assume and perform all of its obligations hereunder; (ii) it is a duly formed entity in good standing and in compliance with all applicable statutory and administrative laws;

4

and (iii) it will comply with all applicable statutes, laws, rules and other governmental regulations in any dealings with or on behalf of each other. Each Party hereby further represents and warrants that the Results (other than those portions of the Results provided by the other Party) are and shall be original and do not and shall not infringe or violate the rights of any other person or entity under any laws, including, but not limited to any copyrights, trademark, trade secret and/or patent laws, rights of publicity, privacy or like or different rights anywhere in the world; and (2) have not been and will not be based upon any other works, information or material, the proprietary rights to which are held by any other person or entity or which would in any way require any additional license from such Party or any other person or entity in order for such Party to fully enjoy all rights in and to the rights and privileges contemplated under this Agreement.

(b)     Each Party shall indemnify, defend, and hold the other Party, such other Party's parents, affiliates, licensors, licensees, successors, subsidiaries and assigns, and the employees, agents, officers and directors of the foregoing, harmless from and against any and all claims, actions, liabilities, losses, costs, damages or expenses (including reasonable attorneys' fees and costs) arising out of or based upon (i) the indemnifying Party's breach or alleged breach of any term or condition of this Agreement, (ii) any action, omission, statement or other conduct by the indemnifying Party in the exercise of its rights or the performance of its duties and obligations hereunder, (iii) the services pursuant to the Principal Line of Business provided by the indemnifying Party to its Current Clients, Prospective Clients or Signed Clients.

(c)     Neither Party makes any representation, warranty or covenant regarding its ability to generate any revenue with respect to any of its clients or the other Party's ability to receive any revenue under this Agreement.

9.   Miscellaneous.

(a)     Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement, including the validity, interpretation, construction and performance of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in such state without regard to such state's conflicts of law principles. Each Party hereto irrevocably consents to the exclusive jurisdiction of the state and federal courts located in New York, New York. EACH PARTY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

(b)     Assignment and Transfer. Neither Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party.

(c)     Other Obligations. Each Party represents and warrants that neither the retention of it by the other Party, nor its performance of its obligations hereunder will conflict with or violate or otherwise are inconsistent with any other agreements to which it is or has been a party or with any other obligations, legal or otherwise, which it may have.

(d)     Entire Agreement. This Agreement contains the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersedes, cancels and annuls any prior or contemporaneous written or oral agreements, understandings, commitments, and practices between them respecting the subject matter hereof. In the event of any conflict between Section 1 through 7 of this Agreement and any Exhibit attached hereto, the terms contained in Section 1 through 7 shall control unless the Exhibit makes explicit reference to the term or condition being replaced with the conflicting provision of such Exhibit.

(e)     Amendment. This Agreement may be amended only by a writing that makes express reference to this Agreement as the subject of such amendment and that is signed by each Party.

(f)    Severability.   If any term, provision, covenant or condition of this Agreement or part thereof, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant, or condition shall remain in full force and effect, and any such invalid, unenforceable or void term, provision, covenant or condition shall be deemed, without further action on the part of the parties hereto, modified, amended and limited to the extent necessary to render the same and the remainder of this Agreement valid, enforceable and lawful.

(g)    Construction.    Should any provision of this Agreement require interpretation or construction, it shall be interpreted or construed according to its fair meaning and not strictly for or against either Party, both agreeing that the presumption providing that a document or agreement is to be interpreted or construed more strictly against the Party who or which prepared such document or agreement shall not apply because both Parties have availed themselves of the opportunity to participate in the preparation of all provisions of this Agreement.

(h)    Non-waiver.   No failure or delay by either Party in exercising any right, option, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, option, power or privilege.  Neither any course of dealing nor any failure, delay, or neglect of either Party hereto in any instance to exercise any right, option, power, or privilege hereunder or under law shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, option, power, or privilege.  All waivers by either Party hereto must be contained in a written instrument signed by the Party to be charged.

(i)    Notices.   Any notice, request, consent, or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if in writing, and if and when sent by certified or registered mail, return receipt requested, to such Party's address as set forth in this Agreement and by email to the addresses:  Nemerov@EnvyBranding.com  or  William@TheWilliamGerardGroup.com  as applicable.  Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given as provided herein, shall be deemed to be receipt of the notice, request, consent, or approval sent.  A copy of all notices given to TWGG shall be sent to Andrea Geraghty, Meyer, Unkovic & Scott, LLP, Henry W. Oliver Building, Suite 1300, 535 Smithfield Street, Pittsburgh, PA 15222.  A copy of all notices given to Envy shall be sent to Dain Landon, Esq., 848 Old Quaker Hill Road, Pawling, New York 12564 and email to DainLandon@TheLandonFirm.com.

(j)    Independent Contractor.  Each Party is and shall be for all purposes independent contractors and not employees or partners of the other Party.  Neither Party shall have the authority to act for, represent, bind or obligate the other Party and nothing contained herein shall be deemed or construed to create a partnership or joint venture between Envy and TWGG.

(k)    Limitation of Liability.  No claim may be made by any Party hereunder against any other Party hereto or any affiliate, director, member, manager, officer, employee, attorney or agent thereof for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions or relationships contemplated by this Agreement or any other transaction, relationship, act, omission, or event arising or occurring in connection therewith.  Each Party waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; provided, however, that this provision shall not limit the liability of any Party to indemnify another Party under the indemnification requirements of this Agreement.

(l)    Survival.     The representations, warranties, acknowledgements, releases, and indemnification given by each of the Parties shall survive the termination of this Agreement.

6

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed on its behalf by a duly authorized officer as of the date and year first written above.

ENVY BRANDING, LLC

By:_____

Name: Sara Nemerov
Title: Managing Member

THE WILLIAM GERARD GROUP, LLC

By:_____

Name: William G. Dzombak
Title:  Managing Member

7

Exhibit A

### ENVY CLIENTS FOR WHOM TWGG CONSULTS

| Client | Date | Revenue Share Due to TWGG (pursuant to Sections 3(c) and 4(c)) | |
|--------|------|-------------------------|------------------------|
| | | **3(c) Referral Fee** | **4(c) Consulting Fee** |
| Chelsea Houska | October 1, 2015 | 0% | 50% |
| Alex King | October 1, 2015 | 0% | 50% |
| | | | |
| | | | |

### TWGG CLIENTS FOR WHOM ENVY CONSULTS

| Client | Date | Revenue Share Due to ENVY (pursuant to Sections 3(c) and 4(c)) | |
|--------|------|-------------------------|------------------------|
| | | **3(c) Referral Fee** | **4(c) Consulting Fee** |
| Chelsea Houska | October 1, 2015 | 0% | 50%* |
| Alex King | October 1, 2015 | 0% | 50%* |
| | | | |
| | | | |

* To prevent "double dipping", Envy's fee shall be calculated on gross revenue paid by a Signed Client to TWGG *less* any management fee earned as a result of any licensing or endorsement deal done by Envy under its representation deal with such Signed Client.  For example, if Envy brings a licensing deal to Alex King that earns Alex King $100, Envy shall not share under this Agreement in any management fee paid to TWGG out of such $100.

Agreed to by:

**ENVY BRANDING, LLC**

By: _Sara Nemerov_
Name: Sara Nemerov
Title: Managing Member

**THE WILLIAM GERARD GROUP, LLC**

By:_____
Name: William G. Dzombak
Title: Managing Member

8

## INTER-COMPANY SERVICES AGREEMENT

This **Inter-Company Services Agreement** (together with all Exhibits attached hereto, this "**Agreement**") is entered into as of _____ (the "**Effective Date**") by and between **ENVY BRANDING, LLC**, a New York limited liability company with an address of 848 Old Quaker Hill Road, Pawling, NY 12564 ("**Envy**"), **THE WILLIAM GERARD GROUP, LLC**, a Pennsylvania limited liability company with an address of 6929 Rosewood Street, Pittsburgh, PA 15208 ("**TWGG**") (each a "**Party**" and collectively, the "**Parties**").

## RECITALS

Envy represents owners of intellectual property ("**IP**") in negotiating and consummating deals for the use of such IP in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions (collectively, "**Licensing Opportunities**").

TWGG, represents individuals, business entities and groups (collectively, "**Talent**") in providing services commonly referred to as artist or talent management services; including but not limited to negotiating terms and preparing and approving contracts for Talent; developing and coordinating publicity campaigns; consulting on major business and creative decisions; assembling, directing and coordinating requisite professional advisors; coordinating, selecting and supervising staff and budgets; monitoring and collaborating with all others who have responsibilities for the career of Talent; and receiving, counseling and coordinating requests for endorsements, appearance, and charitable giving (collectively, "**Talent Management Services**").

Each Party believes that its Principal Line of Business may benefit from certain consulting services of the other Party. For purposes of this Agreement, "**Principal Line of Business**" shall mean: (i) for Envy, pursuing Licensing Opportunities for IP Owners; and (ii) for TWGG providing Talent Management Services for Talent.

The Parties desire to set forth the terms and conditions of the provision of consulting services to each other through this Agreement.

1. <u>Term</u>. The "**Term**" of this Agreement means the period of time from the Effective Date until December 31, 2019 unless extended by the mutual agreement of the Parties or terminated prior to such date in accordance with the terms herein.

2. <u>Principal Lines of Business</u>. This Agreement shall not limit nor prohibit any Party, at its sole costs and expense, from pursuing its Principal Line of Business with Current Clients (as hereinafter defined) or with Prospective Clients (as hereinafter defined). Each Party shall be solely responsible for all costs and expenses it incurs in its performance of its Principal Line of Business.

3. <u>Referral of Business between the Parties for Current and Future Clients</u>.

(a)  Except as otherwise provided for in this Agreement, with respect to its existing clients as of the Effective Date ("**Current Clients**") and any prospective clients it negotiates with during the Term ("**Prospective Clients**"), each Party shall consider in good faith, the potential benefit to such clients from entering into an agreement with the other Party for the provision of services relating to the other Party's Principal Line of Business and shall, if it deems appropriate in its sole discretion, make referrals to the other Party. Except as set forth in Section 3(b) below, no Party shall have any obligation to refer a

Current Client or Prospective Client to the other Party nor shall it have any responsibility for such other Party's ability or inability to generate revenue in such other Party's Principal Line of Business.

(b)   Except as otherwise provided for in this Agreement, if, a Party (the "**Referring Party**") determines in good faith that a Current Client or Prospective Client will benefit from entering into an Agreement with the other Party (the "**Servicing Party**") for the Servicing Party's Principal Line of Business, the Referring Party:

(i) shall use commercially reasonable efforts to introduce the Prospective Client or Current Client to the Servicing Party and shall encourage the Prospective Client or Current Client to meet with the Servicing Party to discuss an opportunity for the Servicing Party to represent such Prospective Client or Current Client in the Servicing Party's Principal Line of Business; unless otherwise prohibited by the Referring Party's contractual obligations to Current Clients; and

(ii) shall encourage the Prospective Client or Current Client to directly enter into an agreement with the Servicing Party for the Servicing Party to represent such Prospective Client in the Servicing Party's Principal Line of Business, and

(iii) shall not itself enter into an agreement to provide services in the Servicing Party's Principal Line of Business with such Prospective Client or Current Client unless either (x) the Servicing Party has rejected in writing the opportunity to work with the Prospective Client or (y) the Prospective Client or Current Client has refused in writing to work with the Servicing Party

The Parties shall set forth each client referred to the Servicing Party pursuant to this Section 3(b) and the date such potential client is added on Exhibit A attached hereto. Each potential client set forth under the Servicing Party's name on Exhibit A shall be a "**Referred Client**" of such Servicing Party. If a Referred Client is rejected or rejects the opportunity to work with the Servicing Party under clause (iii) above, such Referred Client shall be removed from under the Servicing Party's name on Exhibit A and such potential client shall no longer be a Referred Client under this Agreement; provided such potential client may be added back to Exhibit A upon mutual written consent of the Parties.

(c)   In the event that any Referred Client introduced to the Servicing Party by the Referring Party enters into an agreement with the Servicing Party or makes any payment to the Servicing Party as a result of or in connection with services provided by the Servicing Party to such Referred Client, then such Referred Client shall become a "**Signed Client**" of the Servicing Party, and the Servicing Party shall pay to the Referring Party the sum of five percent (5%) of gross revenue paid by (and not refunded or returned to) the Signed Client to the Servicing Party (or any third party to which the Servicing Party directs such payment to be made) for a period of no less than five (5) years from the date set forth next to such Referred Client on Exhibit A hereto (unless a lower percentage is agreed by the Parties in their sole discretion). For purposes of clarification, the gross revenue shall be based solely on amounts earned by the Servicing Party with respect to the applicable Signed Client and not on amounts collected by the Servicing Party on behalf of the Referred Client.

(d)   The Parties shall exchange and, subject to accuracy, execute updated versions of Exhibit A together with the accounting process set forth under Section 7 below.

4. Consulting Services.

(a)   With respect to each Signed Client, during the term of the agreement between the Servicing Party and the Signed Client, each of the Servicing Party and the Referring Party shall keep the

2

other informed regarding its ongoing discussions and work with the and shall cooperate and consult with ("**Consulting Services**") the other Party in connection with the work of each Party on behalf of the Client.; provided, however, no Party shall have an obligation to allow the other Party to provide any consulting services to its Current Clients or any of its Prospective Clients.

(b)    A Party providing Consulting Services under this Section 4 shall (i) use commercially reasonable efforts to assist the other Party as reasonably requested by such other Party from time to time, and (ii) shall bear all of its own costs and expenses in connection with its provision of Consulting Services.

(c)    In the event the Servicing Party desires additional assistance with respect to any Signed Client, the Parties may request additional assistance and the other Party may agree, in its sole discretion, to provide such enhanced consulting services and any additional fee paid to the consulting Party with respect to such Signed Client and such additional amount (which shall be a percentage of gross revenue calculated as set forth in Section 3(c) above) shall be set forth next to the Signed Client's name on Schedule A attached hereto.  Any such additional amounts shall be paid for the Term of this Agreement.

(d)    Each Party covenants that it shall provide all services pursuant to its Principal Line of Business to the other Party, to Current Client and Prospective Clients, in compliance with all applicable federal, state and local laws, rules, statutes and ordinances.

5.    Confidential Information; Ownership of Results and Proceeds.

(a)    Each Party agrees at all times during the Term and thereafter in perpetuity to hold in strictest confidence, and not to use, except for the benefit of, and at the request of, the other Party, or to publish or disclose to any person, firm or corporation without written authorization of the other Party, any Confidential Information of that Party.  Each Party acknowledges that **"Confidential Information"** means any and all confidential information, proprietary information and data, trade secrets or know-how, including, but not limited to, research and development information, plans, products, services, licenses, methods, strategies, programs, source code, software, inventions, processes, formulas, theories, technology, designs, drawings, marketing information, costs, pricing, finances or other information of any nature collected by or having become known in the course of a Party's performance of this Agreement or provided or disclosed to the Party by or on behalf of a Party to this Agreement, either directly or indirectly in writing, orally, electronically, or by inspection, or otherwise, relating to such Party and/or its affiliates, companies, agents, executives and/or owners.  Each Party further agrees that Confidential Information does not include any of the foregoing items which have become publicly known or made generally available through no wrongful act of the Party.  Each Party further agrees that all Confidential Information is and shall at all times remain the property of such Party.

(b)    Subject to Section 5(c) below, each Party providing Consulting Services (the **"Consultant"**) agrees that the Party receiving the benefit of the Consulting Services (the **"Recipient"**) shall own all results and proceeds of the performance of Consultant's Consulting Services (collectively, **"Results"**) and that all such Results which are protectable by copyright are "works made for hire", as that term is defined in the United States Copyright Act.   If the Results, or any portion thereof, are deemed not to be "work for hire", Consultant hereby irrevocably conveys, transfers and assigns to Recipient, all right, title and interest in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Results, including without limitation, all of Consultant's right, title and interest in and to the copyrights (and all renewals, revivals and extensions thereof and all past, present and future claims relating thereto) in the Results, including without limitation, all rights of any kind or any nature now or hereafter recognized, including without limitation, the unrestricted right to make modifications, adaptations and revisions to the Results, to exploit and allow others to exploit the Results and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Results, known or unknown, prior to or after the date hereof, including

3

without limitation the right to receive all proceeds and damages therefrom.  In addition, Consultant hereby waives any so-called "moral rights" with respect to the Results that Consultant may have.

(c)    Notwithstanding anything to the contrary contained in Section 5(b), the Parties agree that as between the Parties, all Results developed for a Signed Client for which each of Envy and TWGG provide Consulting Services under this Agreement shall be jointly owned by the Parties; provided, however, no Party shall use any such Results except in connection with services provided for the Signed Client without the prior written consent of the other Party and provided, further, no Party shall transfer, convey, assign, sell, license or lease its interests in any such Results to any other person or entity without the prior written consent on the other Party.

6.  Breach; Termination; Extension.

(a)    Each Party shall have the right at any time, by giving written notice to the other Parties, and without prejudice to such Party's other rights or remedies for breach, to terminate this Agreement if the other Party commits a material breach of any of the provisions of this Agreement; provided, however, such termination shall not be effective unless and until the Party requesting termination of this Agreement has given written notice to the other Parties and, if the reason for termination is curable and does not involve a breach of Section 5 above, the Party responsible for such breach has failed to cure such breach to the reasonable satisfaction of the Party requesting termination of this Agreement within thirty (30) calendar days of receiving such notice.

(b)    Upon request, each Party agrees to negotiate in good faith regarding the extension of the Term.

(c)    If this Agreement is terminated or expires, each Party shall return at its sole cost and expense to all other Parties all Confidential Information and all Results created through the date of termination.  Termination of this Agreement shall not affect any remedies or rights a Party may have against the other Party.

7.  Accounting; Payment; Audit Rights.

(a)    Accounting.  Each Party shall maintain accurate records and other evidence pertaining to the calculation of any consulting fees due to the other Party.  Each Party shall preserve such records for twelve (12) months after termination of this Agreement.

(b)    Payment.  Within ninety (90) days after the last day of each calendar quarter during the Term, each Party shall submit to the other a detailed statement showing the total gross revenue received by it from Current Clients or Prospective Clients for which the other Party has provided consulting services in that calendar quarter, together with payment of the sum due to the other Party as a result of the provided consulting services.  Such payment shall be made in immediately available funds and shall be paid via check or wire transfer.

(c)    Audit.  Each Party shall have the reasonable right to conduct one audit per calendar year during the term of this Agreement, and one audit within two years after the expiration of this Agreement, for the purposes of confirming the accuracy of the payments of consulting fees.  The Party conducting the audit shall bear the cost of any such audit(s).

8.  Representations and Warranties; Indemnification.

(a)    Each Party represents, warrants and agrees that: (i) it has the right, power and authority to enter into this Agreement and to assume and perform all of its obligations hereunder; (ii) it is a duly formed entity in good standing and in compliance with all applicable statutory and administrative laws;

4

and (iii) it will comply with all applicable statutes, laws, rules and other governmental regulations in any dealings with or on behalf of each other.  Each Party hereby further represents and warrants that the Results (other than those portions of the Results provided by the other Party) are and shall be original and do not and shall not infringe or violate the rights of any other person or entity under any laws, including, but not limited to any copyrights, trademark, trade secret and/or patent laws, rights of publicity, privacy or like or different rights anywhere in the world; and (2) have not been and will not be based upon any other works, information or material, the proprietary rights to which are held by any other person or entity or which would in any way require any additional license from such Party or any other person or entity in order for such Party to fully enjoy all rights in and to the rights and privileges contemplated under this Agreement.

(b)    Each Party shall indemnify, defend, and hold the other Party, such other Party's parents, affiliates, licensors, licensees, successors, subsidiaries and assigns, and the employees, agents, officers and directors of the foregoing, harmless from and against any and all claims, actions, liabilities, losses, costs, damages or expenses (including reasonable attorneys' fees and costs) arising out of or based upon (i) the indemnifying Party's breach or alleged breach of any term or condition of this Agreement, (ii) any action, omission, statement or other conduct by the indemnifying Party in the exercise of its rights or the performance of its duties and obligations hereunder, (iii) the services pursuant to the Principal Line of Business provided by the indemnifying Party to its Current Clients, Prospective Clients or Signed Clients.

(c)    Neither Party makes any representation, warranty or covenant regarding its ability to generate any revenue with respect to any of its clients or the other Party's ability to receive any revenue under this Agreement.

9.  Miscellaneous.

(a)    Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement, including the validity, interpretation, construction and performance of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in such state without regard to such state's conflicts of law principles.  Each Party hereto irrevocably consents to the exclusive jurisdiction of the state and federal courts located in New York, New York. EACH PARTY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

(b)    Assignment and Transfer.  Neither Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party.

(c)    Other Obligations.  Each Party represents and warrants that neither the retention of it by the other Party, nor its performance of its obligations hereunder will conflict with or violate or otherwise are inconsistent with any other agreements to which it is or has been a party or with any other obligations, legal or otherwise, which it may have.

(d)    Entire Agreement.  This Agreement contains the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersedes, cancels and annuls any prior or contemporaneous written or oral agreements, understandings, commitments, and practices between them respecting the subject matter hereof.  In the event of any conflict between Section 1 through 7 of this Agreement and any Exhibit attached hereto, the terms contained in Section 1 through 7 shall control unless the Exhibit makes explicit reference to the term or condition being replaced with the conflicting provision of such Exhibit.

(e)    Amendment.  This Agreement may be amended only by a writing that makes express reference to this Agreement as the subject of such amendment and that is signed by each Party.

(f)     Severability.  If any term, provision, covenant or condition of this Agreement or part thereof, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant, or condition shall remain in full force and effect, and any such invalid, unenforceable or void term, provision, covenant or condition shall be deemed, without further action on the part of the parties hereto, modified, amended and limited to the extent necessary to render the same and the remainder of this Agreement valid, enforceable and lawful.

(g)     Construction.     Should any provision of this Agreement require interpretation or construction, it shall be interpreted or construed according to its fair meaning and not strictly for or against either Party, both agreeing that the presumption providing that a document or agreement is to be interpreted or construed more strictly against the Party who or which prepared such document or agreement shall not apply because both Parties have availed themselves of the opportunity to participate in the preparation of all provisions of this Agreement.

(h)     Non-waiver.  No failure or delay by either Party in exercising any right, option, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, option, power or privilege.  Neither any course of dealing nor any failure, delay, or neglect of either Party hereto in any instance to exercise any right, option, power, or privilege hereunder or under law shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, option, power, or privilege.  All waivers by either Party hereto must be contained in a written instrument signed by the Party to be charged.

(i)     Notices.  Any notice, request, consent, or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if in writing, and if and when sent by certified or registered mail, return receipt requested, to such Party's address as set forth in this Agreement and by email to the addresses: Nemerov@EnvyBranding.com or William@TheWilliamGerardGroup.com as applicable.  Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given as provided herein, shall be deemed to be receipt of the notice, request, consent, or approval sent.  A copy of all notices given to TWGG shall be sent to Andrea Geraghty, Meyer, Unkovic & Scott, LLP, Henry W. Oliver Building, Suite 1300, 535 Smithfield Street, Pittsburgh, PA 15222. A copy of all notices given to Envy shall be sent to Dain Landon, Esq., 848 Old Quaker Hill Road, Pawling, New York 12564 and email to DainLandon@TheLandonFirm.com.

(j)     Independent Contractor.  Each Party is and shall be for all purposes independent contractors and not employees or partners of the other Party.  Neither Party shall have the authority to act for, represent, bind or obligate the other Party and nothing contained herein shall be deemed or construed to create a partnership or joint venture between Envy and TWGG.

(k)     Limitation of Liability.  No claim may be made by any Party hereunder against any other Party hereto or any affiliate, director, member, manager, officer, employee, attorney or agent thereof for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions or relationships contemplated by this Agreement or any other transaction, relationship, act, omission, or event arising or occurring in connection therewith.  Each Party waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; provided, however, that this provision shall not limit the liability of any Party to indemnify another Party under the indemnification requirements of this Agreement.

(l)     Survival.     The representations, warranties, acknowledgements, releases, and indemnification given by each of the Parties shall survive the termination of this Agreement.

6

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed on its behalf by a duly authorized officer as of the date and year first written above.

ENVY BRANDING, LLC


By:_____
Name: Sara Nemerov
Title: Managing Member


THE WILLIAM GERARD GROUP, LLC

By:_____
Name: William G. Dzombak
Title:  Managing Member

7

**Exhibit A**

### ENVY CLIENTS FOR WHOM TWGG CONSULTS

| Client | Date | Revenue Share Due to TWGG (pursuant to Sections 3(c) and 4(c)) | |
|--------|------|---------------------|---------------------|
| | | 3(c) Referral Fee | 4(c) Consulting Fee |
| Chelsea Houska | October 1, 2015 | 0% | 50% |
| Alex King | October 1, 2015 | 0% | 50% |
| | | | |
| | | | |

### TWGG CLIENTS FOR WHOM ENVY CONSULTS

| Client | Date | Revenue Share Due to TWGG (pursuant to Sections 3(c) and 4(c)) | |
|--------|------|---------------------|---------------------|
| | | 3(c) Referral Fee | 3(c) Referral Fee |
| Chelsea Houska | October 1, 2015 | 0% | 50%* |
| Alex King | October 1, 2015 | 0% | 50%* |
| | | | |
| | | | |

* To prevent "double dipping", Envy's fee shall be calculated on gross revenue paid by a Signed Client to TWGG *less* any management fee earned as a result of any licensing or endorsement deal done by Envy under its representation deal with such Signed Client. For example, if Envy brings a licensing deal to Alex King that earns Alex King $100, Envy shall not share under this Agreement in any management fee paid to TWGG out of such $100.

Agreed to by:

**ENVY BRANDING, LLC**

By:_____
Name: Sara Nemerov
Title: Managing Member

**THE WILLIAM GERARD GROUP, LLC**

By:_____
Name: William G. Dzombak
Title: Managing Member

8



Ms. Chelsea Houska
26694 462ⁿᵈ Avenue
Hartford, South Dakota 57033

Re:   Memorandum of Understanding for Representation Rights for Chelsea Houska

Dear Chelsea:

This letter is in reference to that certain Memorandum of Understanding for Representation
Rights dated as of January 1, 2015 (the "Envy Deal").

In order to coordinate the Envy Deal with that certain Management Agreement you have signed
with The William Gerard Group, LLC, this letter serves as our agreement that the "Term" under
the Envy Deal shall initially be scheduled to expire on July 1, 2019.

This letter shall be a fully binding agreement and shall supersede any conflicting terms in the
original Envy Deal.  Except as modified by this letter, the Envy Deal shall remain in full force and
effect.  Unless and until such other agreement is signed by you and us expressly superseding the
Envy Deal, the Envy Deal, as amended by this letter shall be treated as Definitive Agreements
and shall be the binding agreement between you and us, and each of you and we shall perform in
accordance with its terms.  This letter shall be governed by and construed in accordance with the
laws of New York without reference to its conflicts of laws rules.

Please sign below to confirm your agreement with the terms of this letter.

Sincerely,

Envy Branding, LLC

By:
Name: Sara Nemerov
Title: CEO

Agreed to by:

Chelsea Houska

**Exhibit
0003**

**MEMORANDUM OF UNDERSTANDING**
ENVY BRANDING, LLC
AND
CHELSEA HOUSKA

As of January 1, 2015

Ms. Chelsea Houska
26694 462nd Avenue
Hartford, South Dakota 57033

Re:   Memorandum of Understanding for Representation Rights for Chelsea Houska

Dear Chelsea:

Thank you for contacting us and asking us to help.

We are pleased to submit this Memorandum of Understanding ("**MOU**") between ENVY BRANDING, LLC ("**Agent**") on the one hand and you, CHELSEA HOUSKA, ("**Licensor**") on the other hand.  By signing this MOU, each of us is agreeing that these terms will form the basis of a long-form agreement regarding the exclusive license of certain representation rights by Licensor to Agent (the "**Rep Agreement**").  Each of the aforementioned parties hereto shall be individually referred to as a "**Party**" and collectively, as the "**Parties**".

1.     Preparation of Definitive Agreements.  Agent will prepare a definitive Rep Agreement and any other necessary ancillary agreements, all of which will be based on the basic terms set forth in the term sheet attached as Exhibit A hereto and reviewed by each Party and its counsel.  The Rep Agreement and any ancillary agreements shall be referred to as the "**Definitive Agreements.**"  The Definitive Agreements will contain standard and adequate representations and warranties, conditions to closing, indemnities, and other provisions customary in similar transactions.

2.     Fees

       (a)     Advance.  Upon execution of the MOU, Licensor shall pay Agent a non-refundable advance of $0 (the "**Advance**") which shall be recoupable against the Fees and Royalties due to Agent under the Section "Fees/Royalties" below.

       (b)     Retainer.  Upon execution of the MOU, Licensor shall begin paying Agent a non-refundable retainer of $0 per month (the "**Retainer**") which shall be payable on the 1st of each calendar month during the term of the Rep Agreement and shall be recoupable against the Fees and Royalties due to Agent under the Section "Fees/Royalties" below.

3.     General.  The MOU may be amended or modified only by a writing duly executed by each Party.  The MOU shall be construed and governed by the laws of the State of New York, and without reference to the conflict of laws principles of any jurisdiction.  Licensor agrees that its representations and warranties set forth in the Section "Miscellaneous" below are hereby incorporated into this MOU by this reference.  The Parties agree that any and all claims or litigious matters arising under or with respect to the MOU or relating thereto shall be heard and determined by the state and federal courts located in the County and State of New York, and the Parties irrevocably agree to submit themselves to the exclusive and personal jurisdiction of those courts and irrevocably waive any and all rights any such Party may now or hereafter have to object to such jurisdiction.

[Remainder of page intentionally left blank]

We look forward to working with you.

Very truly yours,

ENVY BRANDING, LLC


By:_____
Name: Sara Nemerov
Title: Managing Member


The foregoing is agreed to and accepted by:



_____
Chelsea Houska

2

**EXHIBIT A**

**KEY TERMS FOR REPRESENTATION RIGHTS AND RESPONSIBILITIES**

| | |
|---|---|
| **PARTIES:** | ENVY BRANDING, LLC ("**Agent**") on the one hand and CHELSEA HOUSKA ("**Licensor**") on the other hand. |
| **PROPERTY:** | All names, likenesses, voices, signatures, copyrights, trade dresses, trademarks, trade names, service marks, logos, symbols, emblems, designs, artwork, colors, identifications, characters, elements, and designations and all other protectable ideas, discoveries and inventions of (or related to) Licensor in whatever form, including, without limitation, the SMITTEN trademark and all designs and marks associated with such trademark, whether now existing or created during the Term, and all derivative works thereof (collectively, the "**Property**"). |
| **LICENSE:** | Subject to the terms hereof, Licensor hereby licenses to Agent the exclusive worldwide right during the Term to represent the Property and to use the Property in any manner for the purpose of locating, negotiating and consummating Licensing Agreements. "**Licensing Agreements**" shall mean any and all licensing opportunities for the use of the Property in, in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions.  During the Term, you shall not use, or authorize any third party to use, the Property in with any Licensing Agreements other than through Agent.  Furthermore, during the Term, Licensor agrees that Licensor shall not create, license, promote, endorse, invest in, partner with or otherwise engage with any other brand, whether owned by Licensor or any other party except through Agent. |
| | Agent shall have the right to retain and use subagents (each, a "**Subagent**") in its sole discretion and at its sole cost and expense.  Agent shall provide Licensor with a term sheet containing the principal proposed deal terms of any Licensing Agreement (licensee, product categories/nature of sponsorship or endorsement, term, territory, royalty and guarantee) prior to Agent's execution of any Licensing Agreement, and Licensor shall have the right to approve such deal terms in its reasonable discretion; provided, if written disapproval is not received by Licensor in ten (10) business days from receipt of Agent's request, such request shall be deemed approved and Agent shall have the right to sign any required documents on Licensor's behalf as Licensor's attorney-in-fact. |
| **CONSULTANTS:** | Agent shall use commercially reasonable efforts to retain the services of The William Gerard Group, LLC (an entity in which William Dzombak is a principal), SMAC Entertainment, LLC (an entity in which Constance Schwartz is a principal) as independent contractors to consult on the services being provided by Agent hereunder and shall provide Licensor no less than thirty (30) days' advance written notice in the event such consulting services are terminated. |
| **CREATIVE APPROVALS:** | Agent shall be responsible for facilitating creative approval of all products and services designed, manufactured, advertised or sold under any Licensing Agreement by submitting materials to Licensor, and Licensor shall be responsible for the prompt approval of such materials. |
| **TERM:** | The "**Term**" shall run from January 1, 2015 (the "**Start Date**") until December 31, 2019 (the "**Initial Expiration Date**") unless extended in accordance with the terms and conditions of the Rep Agreement.  No later than six (6) months prior to the Initial Expiration Date, the Parties shall enter into good faith negotiations regarding the extension of the Term beyond the Initial Expiration Date and the terms of such extension.  Agent shall have the right to move the Initial Expiration Date forward (but not backward) in its sole discretion upon written notice to Licensor.  Notwithstanding |

3

anything to the contrary contained in the Rep Agreement, the expiration or termination of the Rep Agreement shall not have any effect on any Licensing Agreements or definitive deal memos therefor presented prior to such expiration or termination (including, without limitation, any executed during the period following the termination notice and prior to the effectiveness of such termination) and Agent shall continue to receive payment on such Licensing Agreements including all extensions, renewals and modifications thereof for the life of any such deal.

Furthermore, in the event of termination or expiration of the Rep Agreement, for a period of one (1) year, Licensor shall not enter into any Licensing Agreement with any party to any Licensing Agreement or any prospective licensee named in any unconsummated License Agreement or term sheet prepared prior to such termination or expiration or Licensor shall compensate Agent on such deal as if the Rep Agreement had not expired or been terminated.

**LICENSES AND ACCOUNTING:** Agent shall be responsible for drafting and negotiating all Licensing Agreements, all of which shall be consistent with the terms and conditions of this Agreement. Licensor shall be responsible for approving and executing all Licensing Agreements submitted to it by Agent within seven (7) days of Agent's submission to Licensor of same for execution. Licensing Agreements shall require that payments thereunder be sent to Agent, and Agent shall account to Licensor on a calendar quarterly basis (within sixty (60) days of the end of each calendar quarter during the Term) with respect to any payments received from licensees (and not returned, refunded or returnable or refundable) under any Licensing Agreements during the applicable calendar quarter.

**DILIGENT EFFORTS:** During the Term, Agent shall use diligent efforts to exploit the representation rights granted hereunder in the Property during the Term; provided, however, Agent makes no representation or warranty about its ability to successfully license the Property and does not guarantee that its efforts will result in the generation of any revenue. During the Term, Licensor shall use diligent efforts to maintain and enhance the value of the Property and to promote the Property (e.g., making public appearances to support product launches under Licensing Agreements).

**FEES/ROYALTIES:** Upon execution of the MOU, Licensor shall have paid Agent an agreed upon Advance and shall begin paying Agent the agreed upon Retainer. Such Advance and all Retainer payments shall be recoupable against all other fees and royalties due to Agent under the Rep Agreement; provided, however, the Advance and all Retainer payments are non-refundable. Agent and Licensor shall share all money paid to and all cash credited to Agent or any affiliate of Agent (and not returned, refunded or returnable or refundable) under any Licensing Agreement, net of Approved Agent Expenses (as defined below), according to the split of 65% and 35% in favor of Licensor; provided, however, such split shall instead be 60% and 40% in favor of Licensor for deals where Agent uses a Subagent outside the United States. Without limiting the generality of the Section "Talent Fees" below, all fees and royalties paid to Licensor hereunder are inclusive of all third party fees, royalties and payments arising from, relating to or caused by the execution of any Licensing Agreement.

For purposes of clarification, no in-kind payment of any kind (including, without limitation, any advertising or marketing credit) received by or credited to a party shall be considered either "money paid to" or "cash credited to" such party.

**RECOUPMENT:** Notwithstanding anything to the contrary contained in the Rep Agreement, Agent shall have the right to recoup its direct, third party out of pocket expenses (excluding overhead) in connection with the exploitation of its rights under the Rep Agreement (**"Approved Agent Expenses"**), from any amounts paid to Agent under any Licensing Agreement hereunder provided that such expenses do not exceed, during any calendar year, the greater of (i) ten percent (10%) of the gross amounts payable to Agent, Licensor or their affiliates under all Licensing Agreements, or (ii) Five Thousand Dollars ($5,000), without Licensor's written approval.

**TALENT FEES:** Other than Agent's payment of the royalty split to Licensor hereunder, Licensor shall bear all costs and expenses for all participation payments of any person or entity or to any guild with respect to or in connection with the use of any name, image, voice or likeness contained in the Property used on or in connection with the exploitation of the rights by Agent under the Rep Agreement and shall be solely responsible for accounting to any third party participants in such revenues.

**INDEMNIFICATION:** The Rep Agreement shall contain standard indemnification provisions, to be agreed upon between the Parties, including, without limitation, indemnification covering (i) Licensor's representations, warranties and covenants under the Agreement (including, without limitation, Licensor's representation and warranty that it is free to enter into the Rep Agreement and that the Property (a) is original and does not and shall not infringe or violate the rights of any other person or entity under any laws, including but not limited to any copyright, trademark, trade secret and or patent laws, rights of publicity, privacy or the like or different rights anywhere in the world; and (b) have not been and will not be based upon any other works, information, or material, the proprietary rights of which are held by any other person or entity) and (ii) Agent's representations, warranties and covenants under the Rep Agreement, including, without limitation, Agent's representation and warranty that it shall provide all services provided under the Rep Agreement in a professional manner and in compliance with all applicable laws.

**INSURANCE:** Licensor shall maintain liability insurance, E&O insurance and other insurance policies, naming Agent as an additional insured, in the form and at levels mutually agreed to by the Parties but in no event less than the levels standard for the owners of such intellectual property rights being represented by Agent.

**MISCELLANEOUS:** No Party shall have any right to assign or transfer its rights under the Rep Agreement without the prior written consent of the other Parties except in connection with a sale of all or substantially all such Party's equity or assets (and in the case of Agent, except in the case where Sara Nemerov continues to oversee Licensing Agreements for the Property). Each Party hereby represents and warrants that it has the right and authority to enter into the Rep Agreement, to grant the rights it grants thereunder, and to perform the duties and obligations it assumes thereunder.

The Definitive Agreements shall have representations, warranties and covenants common to agreements of their size and scope and agreed to between the Parties in good faith negotiations. Licensor represents and warrants that it is not currently in negotiations with or under any obligation to Warner Music Group Inc. ("**WMG**") or any affiliate of WMG with respect to any of the rights granted hereunder and has not been in any such negotiations or under any such obligation during the period of time in which it is exploring a relationship with Agent. Furthermore, Licensor represents and warrants that it is free to enter into this Rep Agreement and the Definitive Agreements and to grant any and all rights granted hereunder and that it is under no obligation to any other party that would be violated by this MOU or the Rep Agreement or that would prohibit it in any way from entering into the MOU or Rep Agreement or require the payment of any additional fees or require it to secure any additional approval or consent.

The Definitive Agreements shall be governed under New York law and the parties shall submit to the exclusive jurisdiction and venue of the courts located in New York state and New York county. Licensor's remedies for any breach of the Rep Agreement or of any representation or warranty made by Agent or covenant by Agent are limited to the termination of this Rep Agreement. Licensor waives any right it may have (except with respect to any unlawful use of the Property) to enjoin or interfere with any use by Agent, its licensees or assigns of the Property.