# Exhibit B

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
3   -------------------------------------X
4   ENVY BRANDING, LLC,
5                    Plaintiff,
6            - against -
7   THE WILLIAM GERARD GROUP, LLC;
8   WILLIAM G. DZOMBAK; CHELSEA DEBOER
9   NEE HOUSKA; COLE DEBOER; and
10  C&A ENTERPRISES,
11                   Defendants.
12  Case No.:   20 Civ 3182 (PGG)
13  -------------------------------------X
14
15              REMOTE PROCEEDINGS
16                WILLIAM DZOMBAK
17           THURSDAY, AUGUST 18, 2022
18                  10:10 A.M.
19
20
21
22
23  Reference No.:   PA 5344243
24  Reported By:  Rita Persichetty
25

```
 1    A P P E A R A N C E S:
 2    (All appearances via Veritext Virtual)
 3
 4    KLEHR HARRISON HARVEY BRANZBURG LLP
 5    Attorneys for Plaintiff
 6         1835 Market Street, Suite 1400
 7         Philadelphia, Pennsylvania 19103
 8    BY:  MATTHEW J. McDONALD, ESQ.
 9         PHONE:  212.569.4287
10         EMAIL:  mmcdonald@klchr.com
11
12    LEWIS BRISBOIS BISGAARD & SMITH LLP
13    Attorneys for Defendant Dzombak
14         77 Water Street
15         New York, New York 10005
16    BY:  PETER T. SHAPIRO, ESQ.
17            - and -
18         PHUONG NGUYEN, ESQ.
19         EMAIL:  Peter.shapiro@lewisbrisbois.com
20
21
22
23
24
25
```

```
                                                         Page 3
 1    A P P E A R A N C E S:

 2

 3    MEYER UNKOVIC & SCOTT

 4    Attorneys for the Witness

 5         535 Smithfield Street, Suite 1300

 6         Pittsburgh, Pennsylvania 15222

 7    BY:  FRANK RAPP, ESQ.

 8

 9

10    ALSO PRESENT:  ANDREA GERAGHTY, ESQ. In House

11    CAROLYN MENARD, SARA NEMEROV, COLE DEBOER, RANDY

12    HOUSKA

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      A.    I believe we were shutting down C&A.
2      Q.    Why were you shutting down C&A
3  Enterprises?
4      A.    As Chelsea had more kids and didn't
5  want to all be in one place and to spread it
6  out.
7      Q.    Well, Mr. and Mrs. DeBoer's other
8  children had already been involved in projects
9  before C&A Enterprises was shut down, right?
10     A.    I don't know if they were involved
11 with C&A.  I don't know that.
12     Q.    Well, who are -- what are the names of
13 Mr. and Mrs. DeBoer's children?
14     A.    Aubree, Lane, Walker, and Watson,
15 sorry.
16     Q.    And Envy Branding did work for Watson,
17 right?
18     A.    I do not recall.  I don't know.
19     Q.    Okay.  Well, would you be surprised to
20 learn that there are agreements that Envy
21 Branding handled that involved Watson and
22 Aubree?
23     A.    I don't know.
24     Q.    Watson was -- there were agreements
25 being entered into with respect to Watson prior

Page 117

```
 1    to the formation of Dakota Lane, right?
 2         A.   I don't recall that.
 3         Q.   Okay.  Isn't it true Dakota Lane was
 4    formed and C&A Enterprises wound down in order
 5    to attempt to hide the money from Envy Branding?
 6         A.   That is not true, no.
 7         Q.   Oh, I see.  So it's just coincidence
 8    that just as Envy Branding stated it was going
 9    to file a law suit, C&A Enterprises -- or Dakota
10    Lane gets created and the same business for
11    which Envy Branding has an ongoing right to fees
12    begins being picked up by Dakota Lane?  That's
13    just a coincidence?
14         A.   I didn't say it was a coincidence, no,
15    but we did start a separate company.
16         Q.   And the company was started in part
17    because there was the hope that by shifting the
18    same agreements to Dakota Lane from C&A
19    Enterprises it would act as some sort of shield
20    for any claim that Envy Branding may have,
21    right?
22              MR. SHAPIRO:  Objection to form.
23         A.   Not necessarily, no.  We were just
24    opening another company as well as there were a
25    lot of agreements going on and some of them were
```

Page 118

1    in a weird spot as we didn't have clarity or
2    instruction from Envy.
3         Q.   Didn't have clarity or instruction
4    from Envy six months after you terminated the
5    relation with Envy and picked up those deals for
6    yourself?
7         A.   Some of them, yeah, because the money
8    had already been paid and hadn't been paid
9    through to Chelsea so we were trying to figure
10   out the situation.
11        Q.   What does that have to do with whether
12   C&A Enterprises would still be the counterparty?
13        A.   I'm not sure I understand your
14   question.
15        Q.   Well, we're talking about why Dakota
16   Lane was formed and deals shifted from C&A
17   Enterprises to Dakota Lane, and you're talking
18   about ambiguity where you stood with monies owed
19   to or from Envy.
20             What does that have anything to do
21   with C&A Enterprises being shut down --
22             MR. SHAPIRO:  Objection to form.
23        A.   Can you finish your question, I was
24   talking over you.  I apologize.
25        Q.   No, it's okay.  It was a long

1       question, it's understandable.
2                 The question is -- no.  Actually,
3       we'll just ask a new question.
4                 Dakota Lane was formed in part so
5       agreements could be transferred to a new entity
6       with which Envy Branding cannot dealt, correct?
7                 MR. SHAPIRO:  Objection to form.
8            A.   Can you repeat the question, please?
9            Q.   Dakota Lane was formed in part so that
10      way deals that Envy had previously worked upon
11      could be transferred to a new entity, correct?
12           A.   Dakota Lane was formed to put new
13      deals in place that were fully working so we can
14      move forward with them, and we didn't want to
15      put deals in a place that there was an ongoing
16      dispute in.
17           Q.   Right.  You wanted to shift the
18      revenue away from C&A Enterprises, that way if
19      Envy Branding ever secured a judgment it
20      couldn't sue C&A Enterprises, it couldn't get
21      anything from C&A, right?
22                MR. SHAPIRO:  Objection to form.
23           A.   Not necessarily, no.
24           Q.   What business does C&A Enterprises do
25      today?

Page 120

1     A.    I don't think any.
2     Q.    I see.  And what happened to the
3  monies that were paid to C&A Enterprises?
4     A.    I'm not sure.
5     Q.    They were all distributed, right?
6     A.    I would assume so, yeah.
7     Q.    I see.  So in other words, C&A
8  Enterprises currently has no assets with which
9  to pay a judgment, correct?
10    A.    That would be correct.
11    Q.    Right.
12          THE WITNESS:  Can we take a
13       five-minute break, please?
14          MR. McDONALD:  Certainly.  Let's take
15       a break.
16          And, Peter, we'll just be -- just so
17       you know, we'll be filing a motion to amend
18       to add the new entities and to bring
19       fraudulent conveyance claims as well.
20          (Short recess taken.)
21    A.    C&A no longer does business but I do
22  not have knowledge if there's assets in the
23  company or not.
24    Q.    But it's your belief that there are no
25  assets?

1      A.   I don't know.
2      Q.   Well, you testified a moment ago that
3   you believed they would have taken all the
4   assets out.  Is there anything changed in the
5   last ten minutes to change that belief?
6      A.   I just am not an owner in it so I
7   actually don't know.
8      Q.   I see.  So what changed in the last
9   ten minutes, though, to make you change your
10  belief that there would be no assets left in C&A
11  Enterprises?
12     A.   Because I don't have the knowledge of
13  it.
14     Q.   And what brought that to your
15  attention in the last ten minutes?
16     A.   That was thinking it was something
17  different than what it was.
18     Q.   What does that mean?  What were you
19  thinking that it was and now what are you
20  thinking that it is?
21     A.   I just had a misunderstanding of what
22  you were asking, so that's my answer.
23     Q.   What did you think I was asking?
24     A.   I was thinking that you were asking
25  about transferring assets that I would have

Page 142

1      So what building materials did the
2   DeBoers receive as part of their building a
3   house in the 2019 to 2021 time frame?
4      A.   The time frame was 2020, started in
5   2020.
6      Q.   Okay.  So what materials did they
7   receive as part of promotions, branding,
8   licensing, et cetera?
9      A.   Not home furnishings, is that what
10  you're saying, with building materials.
11     Q.   Yeah, beyond just rugs, the actual
12  building materials that they received.
13     A.   The only thing they would have
14  received is paint and railings.
15     Q.   Okay.  So the paint was with --
16  Sherwin-Williams paint?
17     A.   Yes.
18     Q.   And what -- who provided the railings?
19     A.   Who provided what?
20     Q.   The railings.
21     A.   I don't recall the name of the railing
22  company currently.
23     Q.   Okay.  What was the arrangement
24  between Down Home DeBoers and Montgomery's
25  Interiors?

Page 143

1           A.   They probably provided some home
2      furnishings.  I'm not sure exactly what.
3           Q.   Okay.  What about --
4           A.   I don't recall.
5           Q.   Okay.
6           A.   And I was incorrect earlier when I
7      said 2019.  It was 2020.
8           Q.   Okay.  Who handled the discussions
9      with Montgomery's on behalf of Down Home
10     DeBoers?
11          A.   Probably myself or Michele from our
12     team.
13          Q.   Okay.  That's Michele Fafard?
14          A.   That is correct.
15          Q.   And was a written agreement eventually
16     reached with Montgomery's?
17          A.   I believe so, yes, but I cannot
18     confirm.
19               MR. McDONALD:  All right.  We call for
20          the production of that agreement.
21               MR. SHAPIRO:  Take it under
22          advisement.
23          Q.   What about Sherwin Williams, was a
24     written agreement entered into with Sherwin
25     Williams?

```
 1        A.   I don't recall, but it certainly could
 2   have.
 3        Q.   Well, Sherwin Williams provided paint
 4   and primer to Down Home DeBoers, correct?
 5        A.   Yes, that is correct.
 6        Q.   And what was Down Home DeBoers
 7   supposed to do in exchange for receiving that
 8   paint and primer?
 9        A.   Some sort of social media post.
10        Q.   And presumably there was some form of
11   written agreement memorializing that exchange?
12        A.   Presumably, yes.
13             MR. McDONALD:  We call for the
14        production of that agreement as well.
15             MR. SHAPIRO:  Take it under
16        advisement.
17        Q.   What about Beddy's, what was Down Home
18   DeBoers relationship with Beddy's, B-E-D-D-Y-S?
19        A.   Home furnishings.
20        Q.   What home furnishings did Beddy's
21   provide?
22        A.   Bed sheets.
23        Q.   Anything else?
24        A.   Not that I recall.  Maybe a comforter
25   but just bed stuff.
```

1      Q.   And they -- beyond just providing the
2   furnishings, they also made payments, correct?
3      A.   I would have to double check.  I don't
4   recall.
5      Q.   Would there be any other reason for
6   Carolyn Menard to be providing Beddy's with a
7   W-9 and an address to send checks or ACH?
8      A.   What was the question?
9      Q.   Would there be any other reason --
10     A.   No.
11     Q.   -- for -- okay.
12          So is it fair to say if Ms. Menard was
13  providing payment information and a W-9 it's
14  because there was some form of payment was being
15  made by Beddy's to TWGG and the DeBoers?
16     A.   It's an assumption but I can't
17  confirm.
18     Q.   Fair to assume there would be a
19  written agreement memorializing whatever that
20  deal was?
21     A.   Yes.
22          MR. McDONALD:  Call for the production
23     of that agreement as well.
24          MR. SHAPIRO:  Take it under
25     advisement.

```
                                                          Page 180
 1
 2                    C E R T I F I C A T E
 3
 4     STATE OF New York)
                                 :ss
 5     COUNTY OF RICHMOND)
 6
 7          I, RITA M. PERSICHETTY, a Notary Public within
 8     and for the State of New York, do hereby certify:
 9          That WILLIAM DZOMBAK, the witness whose
10     deposition is hereinbefore set forth, was duly sworn
11     by me and that such deposition is a true record of
12     the testimony given by such witness to the best of
13     my ability.
14          I further certify that I am not related to any
15     of the parties to this action by blood or marriage;
16     and that I am in no way interested in the outcome of
17     this matter.
18          IN WITNESS WHEREOF, I have hereunto set my hand
19     this 25th day of August, 2022.
20                                _____
21                                RITA M. PERSICHETTY
22
23
24
25
```