# Exhibit C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

```
----------------------------------------------------------- x
                                                            :
ENVY BRANDING, LLC                                          :
                                                            :
                              Plaintiff,                    :
                                                            :        Index No. 20-cv-3182
                   v.                                       :
                                                            :
THE WILLIAM GERARD GROUP, LLC;                             :
WILLIAM G. DZOMBAK; CHELSEA DEBOER                         :        [PROPOSED] AMENDED
nee HOUSKA; COLE DEBOER; C & A                             :        COMPLAINT
ENTERPRISES, DAKOTA LN LLC, DOWN                           :
HOME DEBOER'S LLC, DEBOER HOLDING                          :
COMPANY LLC, and AUBREE SAYS LLC                           :
                                                            :
                              Defendants.                   :
----------------------------------------------------------- X
```

Plaintiff Envy Branding, LLC ("Envy") for its claims against Defendants The William

Gerard Group, LLC ("TWGG"), William G. Dzombak ("Dzombak"), Chelsea DeBoer nee Houska

("Chelsea")  C & A Enterprises[1] ("C&A" and collectively with Chelsea, "Houska"), Cole DeBoer

("DeBoer"), Dakota Ln LLC ("Dakota Ln"), Down Home DeBoer's LLC ("DHB"), DeBoer

Holding Company LLC ("DHC"), and Aubree Says LLC ("Aubree Says" and together TWGG,

Dzombak, Chelsea, C&A, DeBoer, Dakota Ln, DHB, and DHC, the "Defendants"), aver and allege

as follows:

## NATURE OF THE ACTION

---

[1]      C&A appears on certain documents with a series of different names including, but not
limited to: (i) C & A Enterprises; (ii) C&A Enterprises, LLC; and (iii) C&A Enterprises LLC.  For
the avoidance of doubt, the Defendant is intended to be any and all such companies owned or
operated by Chelsea including, but not limited to, any such single member LLC with a principal
address of 26694 462nd Ave, Hartford, SD 57033.

1.      Envy brings this complaint to assert claims for breach of contract, tortious interference with contract and tortious interference with prospective business advantage. Specifically, Envy entered into a contract with TWGG whereby, in relevant part, it would provide consulting services for certain of TWGG's clients, including Chelsea and DeBoer, in exchange for a portion of all of TWGG's revenue from such clients. Envy further entered into contracts with both Houska and DeBoer to provide certain services directly to them. TWGG, Houska and DeBoer systemically failed to pay any of the contractually required fees. Further, TWGG and Dzombak conspired to interfere with Envy's relationship with Houska and DeBoer by inducing Houska and DeBoer to withhold the payments they owed to Envy and to terminate their relationship with Envy.

2.      In the alternative, to the extent that any of the work performed by Envy for Defendants falls outside of the parties' contracts, then Envy is entitled to the value of the services it performed and to recover in *quantum meruit* and/or for unjust enrichment.

## PARTIES AND JURISDICTION

3.      Envy is a domestic limited liability company headquartered in Pawling, New York. Envy provides licensing and branding services for its clients including, among other things, identifying endorsement opportunities and assisting its clients in fulfilling their obligations.

4.      Upon information and belief, TWGG is a Pennsylvania limited liability company headquartered at 6929 Rosewood St, Pittsburgh, PA 15208. TWGG provides management services to celebrities including, but not limited to, the Shared Clients, which is defined below.

5.      Upon information and belief, Dzombak is a Pennsylvania resident and the managing member of TWGG, with a principal place of business at 6929 Rosewood St, Pittsburgh, PA 15208. Dzombak does business through TWGG, completely dominates and controls TWGG and operates TWGG as an extension of himself. Dzombak treats TWGG as an alter ego for all

relevant purposes, including directing revenue that was owed to TWGG to be paid to Dzombak directly.

6.      Chelsea and DeBoer are married and reside together in Hartford, South Dakota.

7.      Upon information and belief, C&A is a single member limited liability company of which Chelsea is the sole and managing member, through which Chelsea does business and which is completely dominated and controlled by Chelsea.  C&A operates as an extension of Chelsea and an alter ego of Chelsea in all respects.  During the term of the parties' relationships and contracts, the parties agreed, and Chelsea began doing, all business pursuant to the contracts through C&A. The parties further agreed to extend all relevant agreements to include C&A as an alter ego or d/b/a of Chelsea.  C&A Enterprises' principal address is 26694 462nd Ave, Hartford, SD 57033.

8.      Houska and DeBoer appear in various media and were clients of both TWGG and Envy.

9.      Upon information and belief, Dakota Ln is a domestic limited liability company of which Chelsea and DeBoer are the managing members, through which Chelsea and DeBoer do business and which is completely dominated and controlled by Chelsea and DeBoer.  Dakota Ln operates as an extension of Chelsea and DeBoer and is an alter ego of Chelsea and DeBoer in all respects.  Dakota Ln was incorporated in or around March 2020.  Dakota Ln's principal address is 45861 269th Street, Chancellor, South Dakota, 57015.

10.     Upon information and belief, DHB is a domestic limited liability company of which Chelsea and DeBoer are the managing members, through which Chelsea and DeBoer do business and which is completely dominated and controlled by Chelsea and DeBoer.  DHB operates as an extension of Chelsea and DeBoer and is an alter ego of Chelsea and DeBoer in all respects.  DHB

was incorporated in or around March 2020.  DHB's principal address is 45861 269th Street, Chancellor, South Dakota, 57015.

11.     Upon information and belief, DHC is a domestic limited liability company of which Chelsea and DeBoer are the managing members, through which Chelsea and DeBoer do business and which is completely dominated and controlled by Chelsea and DeBoer.  DHC operates as an extension of Chelsea and DeBoer and is an alter ego of Chelsea and DeBoer in all respects.  DHC was incorporated in or around March 2020.  DHC's principal address is 45861 269th Street, Chancellor, South Dakota, 57015.

12.     Upon information and belief, Aubree Says is a domestic limited liability company of which Chelsea and DeBoer are the managing members, through which Chelsea and DeBoer do business and which is completely dominated and controlled by Chelsea and DeBoer.  Aubree Says operates as an extension of Chelsea and DeBoer and is an alter ego of Chelsea and DeBoer in all respects.  Aubrey Says was incorporated in or around January 2021.  Aubree Says is incorporated in Delaware.

13.     Jurisdiction and venue are proper in this court because Envy, Dzombak, TWGG, C&A, Chelsea and DeBoer consented to resolving their disputes in this forum pursuant to forum selection clauses in their contracts, because a substantial portion of the service rendered by Plaintiff center upon and involve this jurisdiction, and because Defendants removed this dispute to this Court pursuant to diversity jurisdiction.

14.     Jurisdiction and venue are similarly proper in this court with respect to Dakota Ln, DHB, DHC, and Aubree Says (the "Concealed Entities") because these entities are alter egos of Chelsea and DeBoer and/or successors of C&A and thus they are bound by the forum selection clauses entered into by Envy, Dzombak, TWGG, C&A, Chelsea and DeBoer.  Furthermore, the

Concealed Entities tortiously interfered with the Plaintiff's contracts with Chelsea and DeBoer, and the resulting breaches are the subject matter of this litigation.

15.     Jurisdiction and venue are also proper in this court because Plaintiff is a resident of New York State and substantially all of the services performed by Plaintiff were performed in New York State.

## FACTS

### A.  Envy's Contract With TWGG, Envy's Performance, and TWGG's Breaches

16.     Envy and TWGG entered into an Inter-Company Services Agreement dated November 24, 2015 (the "TWGG Contract").  The TWGG Contract is attached as Ex. 1.

17.     Exhibit A to the TWGG Contract was subsequently amended in writing.  The first written amendment to Exhibit A to the TWGG Contract is attached as Ex. 2.

18.     The TWGG Contract allowed and required both companies to refer clients to one another for their respective services in exchange for a portion of the revenue generated by the company receiving the referral.  TWGG Contract, ¶ 3.

19.     In relevant part, the TWGG Contract also provided that TWGG and Envy would both retain the other to provide consulting services with respect to Houska and DeBoer.  In exchange, TWGG agreed to pay Envy 50% of all revenue TWGG was entitled to receive from Houska and DeBoer, whether or not TWGG successfully collected any such revenue (the "Envy Consulting Fee").  Contract, ¶ 4 and Exhibit A.

20.     The Envy Consulting Fee included all revenue received by TWGG after the effective date of the TWGG Contract, irrespective of whether TWGG became entitled to receive the revenue prior to execution of the TWGG Contract.  Contract, ¶ 4 and Exhibit A.

21.     TWGG wholly failed to pay any portion of the Envy Consulting Fee.

22. Envy has paid TWGG the entirety of the TWGG Consulting Fee and, to the extent that TWGG asserts a right to any further fee, such fee is substantially outweighed by the unpaid Envy Consulting Fee. Regardless, TWGG breached the TWGG Contract, and terminated the TWGG Contract, and thus is not entitled to any additional fees from Envy.

23. TWGG and Envy agreed that the consulting relationship would extend to Chelsea's and DeBoer's family members and company, including Defendant C&A Enterprises, Layne DeBoer, Watson DeBoer, Randy Houska and/or Aubree Houska-DeBoer (collectively with Chelsea and DeBoer, the "Shared Clients").

24. TWGG's contracts with Houska and DeBoer required TWGG to engage Envy as a consultant to negotiate appearance, endorsement, licensing, royalty and television agreements and related contracts.

25. Upon information and belief, TWGG's contracts with all of the Shared Clients required TWGG to rely on Envy as a consultant to identify potential deals and to negotiate appearance, endorsement, licensing, royalty and television agreements and related contracts for the Shared Clients.

26. From November 2015 through 2019, Envy diligently provided consulting services to TWGG and the Shared Clients, as required by the TWGG Contract.

27. Envy's consulting services in fact included successfully negotiating a wide range of appearance, endorsement, licensing, royalty and television agreements and related contracts, for the Shared Clients and assisting the Shared Clients in fulfilling many of their obligations thereunder, resulting in millions of dollars of revenue.

28. TWGG never provided any consulting services to Envy.

29. TWGG never paid Envy any of the revenue it received from the Shared Clients.

30.     Envy consistently paid TWGG its share of revenue Envy received from the Shared Clients.

31.     Envy consistently demanded payment for its share of TWGG's revenue from the Shared Clients.

32.     In 2019, TWGG stopped acknowledging that Envy may be entitled to compensation for its work.

33.     Not later than January 2019, TWGG and Dzombak began interfering with Envy's relationships with the Shared Clients.

34.     TWGG and Dzombak's interference included, among other things, directing brands and clients to withhold information from Envy that was necessary for Envy to, among other things, (a) provide its services to the Shared Clients, (b) ensure that the Shared Clients fulfilled their obligations and thus did not breach their agreements with brands, (c) ensure that the Shared Clients received appropriate compensation for their services, and (d) verify the amounts Envy was owed by the Shared Clients.

35.     TWGG and Dzombak's interference also included, among other things, advising and assisting the Shared Clients in setting up new corporate entities, including the Concealed Entities, for the purpose of concealing revenue that the Shared Clients were required to pay to Envy.  TWGG and Dzombak directed and assisted the Shared Clients in entering into new agreements with the Brands (as defined below), and/or amendments, modifications, and extensions to existing agreements with the Brands, through the Concealed Entities in an attempt to avoid paying fees owed to Envy and in breach of the Shared Clients contracts with Envy.

36.     Envy is entitled to receive, but has not been paid, the Envy Consulting Fee on sums

paid to the Shared Clients and TWGG from or in relation to the following (collectively the

"Brands"), among other brands, entities, individuals, products and vendors:

- @health_anxiety
- @kaillowry
- @shellmarie
- @thirdeyethoughts
- Artisan Skin Laser
- Ayla Archer
- Big Sexy Hair
- Bombay Hair Wand
- Boutique Rugs
- 5 Love Languages of a Child written by Gary Chapman
- Super Attractor written by Gabrielle Bernstein
- Braun
- Carseat Canopy
- Cat & Nat's Mom Truths written by Cat & Nat
- Coverfx
- Daniel Wellington
- Diff Eyewear
- Diff, LLC
- Dr. Hermason
- Driveatank.com
- Fabletics
- Fab Fit Fun
- Fokkenuts
- Highway3
- Home Chef
- Iconix
- Immunity Blend
- Ingrid and Isabel
- Itzy Ritzy
- Jaclyn Cosmetics
- Jaclyn Hill
- Jeff Roe Star
- John Deere
- Kabcosmetics
- Kitsch
- Kitsch Hats
- Kittenish
- Kylie Cosmetics

- Kylie Jenner
- Laurie Belles
- Lillie & Lottie
- Little Tiny Tots
- Losing Randy
- Loved by Hanna and Eli
- Loving Tan
- Magnolia Home
- Morphe Brushes
- Natasha's Kitchen
- New Remote Productions Inc.
- NG Nutra
- One Memory Lane
- @onepeloton
- Our Faux Farmhouse
- Perfekt Beauty
- Pip and Dibby
- Pothead Hair Products
- @pride_built
- Peloton
- Profile Sanford
- Revel Nail Inc.
- Sanford Health
- ShopBlueDoor
- Shop Gld
- Sintillia
- Song: by Itzy Ritzy, Austin Arnold, Kayla Michelsen titled: South Dakota Sunshine about Chelsea and Cole
- Sparkling Organics Sipp
- Sugar Bear Hair
- Tarte Cosmetics
- Teami Blends
- Teen Mom
- Teen Mom 2
- Timeless Organics
- The Parenting Company
- The Pioneer Women's New Frontier/Plum Cooking Company
- The Vintage Cosco
- Truefeet
- Ulta Beauty
- Urban Decay

- Viacom, Viacom Media Networks, MTV Networks Company, MTV and parent companies, affiliates, subsidiaries and any other entity related to any of these entities
- Vintage Boho Bags
- Winc Wine
- YouTube

37.    TWGG and Dzombak's interference also included directing certain Brands and clients to withhold information from Envy that was necessary for Envy to calculate the amounts it was owed by TWGG.

38.    Upon information and belief, TWGG and Dzombak's interference caused the Shared Clients to breach their agreements with certain Brands, thereby harming both the Shared Clients and Envy.  Such breaches and interference include, but are not limited to, interfering with Houska's performance of certain obligations to Fab Fit Fun, thereby jeopardizing Houska's fee from Fab Fit Fun and Envy's fee thereon.

39.    Envy repeatedly demanded that TWGG and Dzombak stop interfering with its relationships, pay all of the fees owed upon revenues received from the Shared Clients, and direct the Shared Clients and relevant Brands to disclose the information necessary for Envy to perform its services and calculate its fees.

40.    TWGG failed to cure its breaches or stop its continuing breaches of the TWGG Contract in any respect.

41.    TWGG and Dzombak continued to interfere with Envy's relationships with the Shared Clients and the Brands who contracted with the Shared Clients.

42.    In retaliation for the foregoing, and so that TWGG and Dzombak could retain a greater portion of revenue it received by the Shared Clients, TWGG declared Envy was in breach of the TWGG Contract, without any basis for alleging a breach.

10157779.v1

43.     In retaliation for the foregoing, and so that TWGG and Dzombak could retain a greater portion of licensing revenue generated by the Shared Clients, TWGG and Dzombak induced the Shared Clients to notify Envy that they were also terminating all relationships with Envy.

44.     TWGG received substantial revenue from the Shared Clients during the term of the TWGG Contract.

45.     TWGG was entitled to receive, but failed to collect, substantial revenue from the Shared Clients during the TWGG Contract.

46.     Upon information and belief, the Envy Consulting Fee for the term of the TWGG Contract is several million dollars.

47.     TWGG has not paid Envy any portion of the Envy Consulting Fee either for the fees it collected or was entitled to collect but failed to collect.

48.     Envy therefore invoked its contractual audit right to determine the amount of the outstanding Envy Consulting Fee through an audit.  TWGG Contract, ¶ 7.

49.     TWGG refused to permit Envy to conduct an audit.

50.     Upon information and belief, Dzombak directly received certain compensation from the Shared Clients in an effort to hide the revenue from Envy and avoid paying the Envy Consulting Fee.

51.     Upon information and belief, TWGG and/or Dzombak directly provided services to TWGG's clients that fall within Envy's Principal Line of Business and thereby breached the TWGG Contract including, but not limited to, with respect to the Shared Clients and to Wiz Khalifa and the Taylor Gang.

52.    Envy did not reject any clients presented by TWGG, including any of the Shared Clients, Wiz Khalifa, and the Taylor Gang.

53.    Envy is entitled to recover the fees it would have received if it directly provided all services to TWGG's clients that fall within its Principal Line of Business including, but not limited to, all such services with respect to the Brands and all such services TWGG provided to the Shared Clients, Wiz Khalifa, and the Taylor Gang.

54.    TWGG was obligated to refer all of its clients and prospective clients to Envy that, based on a good faith analysis, would benefit from Envy's services, including Wiz Khalifa and the Taylor Gang.  Upon information and belief TWGG, in bad faith, failed to refer clients to Envy that would benefit from Envy's services.  Instead, TWGG and/or Dzombak provided such services and/or recommended third parties to provide such services, in breach of the TWGG Contract, in an effort to increase the compensation TWGG and/or Dzombak received from such services and referrals.

55.    Upon information and belief, Dzombak is liable for all of TWGG's breaches of the TWGG Contact.  Dzombak and TWGG are alter egos of one another.  Dzombak used the corporate form to operate a fraud upon Plaintiff by concealing and directing revenue and services away from TWGG to Dzombak personally for the purpose of hiding such revenue and services from Plaintiff.

**B.  Houska's and DeBoer's Contracts With Envy, Envy's Performance, and Houska and DeBoer's Breaches**

56.    Houska entered into a contract with Envy effective January 1, 2015 (the "Houska Contract").  The Houska Contract is attached as Ex. 3.

57.    DeBoer entered into a contract with Envy effective April 26, 2016.  (the "DeBoer Contract").  The DeBoer Contract is attached as Ex. 4.

58.     Among other things, the Houska Contract required Houska to reimburse Envy for Approved Agent Expenses, as defined therein.   Houska provided Envy with an exclusive worldwide license for all of her intellectual property, including her likeness, image, voice, trade names, and all other protectable ideas in whatever form (as defined more fully in the Houska Contract, the "Property").  Houska was further required  to only enter licensing agreements for the Property through Envy, to allow Envy to exclusively negotiate such agreements, to collect all resulting revenue, and to pay Envy 35% of all fees or royalties earned from the Property for domestic deals and 40% of all fees or royalties for foreign deals in which Envy utilized a subagent (the "Envy-Houska Fees").

59.     Among other things, the DeBoer Contract required DeBoer to reimburse Envy for Approved Agent Expenses, as defined therein.   DeBoer provided Envy with an exclusive worldwide license for all of his intellectual property, including his likeness, image, voice, trade names, and all other protectable ideas in whatever form (as defined more fully in the DeBoer Contract, the "Property").  DeBoer was further required  to only enter licensing agreements for the Property through Envy, to allow Envy to exclusively negotiate such agreements, to collect all resulting revenue, and to pay Envy 35% of all fees or royalties earned from the Property for domestic deals and 40% of all fees or royalties for foreign deals in which Envy utilized a subagent (the "Envy-DeBoer Fees" and collectively with the Envy-Houska Fees, the "Envy Licensing Fees").

60.     Among other things, the parties orally agreed that the Houska Contract and DeBoer Contract extended to licensing for their children, with Chelsea and DeBoer liable for payment of any resulting revenue, and to entities through which any and all of them did business including, and particularly, C&A.

61.     Even without an oral agreement, the express terms of the Houska Contract and DeBoer Contract include all intellectual property rights that they are able to license—which would therefore prohibit them from licensing any intellectual property through C&A or the Concealed Entities unless such licensing was performed through Envy.

62.     Even without an oral agreement, the express terms of the Houska Contract and DeBoer Contract include all intellectual property rights that they are able to license, which would therefore extend to intellectual property they are licensing as guardians of their children.

63.     Houska and/or DeBoer breached their contracts by directing certain Brands to directly pay Houska, DeBoer, one of the other Shared Clients, and/or other persons or entities to avoid paying Envy Licensing Fees.  Houska and DeBoer failed to disclose such directions and payments to Envy and did not pay the Envy Licensing Fees owed upon such sums.

64.     The Houska Contract required Houska to diligently perform contractual commitments arising from agreements entered into pursuant to the Houska Contract.  Houska Contract, Exhibit A, p. 2.

65.     The DeBoer Contract required DeBoer to diligently perform contractual commitments arising from agreements entered into pursuant to the DeBoer Contract.  DeBoer Contract, Exhibit A, p. 2.

66.     Houska and DeBoer both failed to perform, without any cause or reason, many of their responsibilities to the Brands.  This included, but is not limited to, certain responsibilities Houska and/or DeBoer owed to Bombay Hair Wand, Carseat Canopy, Daniel Wellington, Diff, Fab Fit Fun, Highway3, Kitsch, Kitsch Hats, Loving Tan, One Memory Lane, Perfekt Beauty, Profile Sanford, Sintillia, Sparkling Organics Sipp, Sugar Bear Hair, Teami Blends, and Timeless Organics.

67.   Houska's breach of the Houska Contract by failing to diligently perform her contractual responsibilities caused Houska to forfeit certain fees upon which Envy was entitled to receive the Envy-Houska Fee.

68.   DeBoer's breach of the DeBoer Contract by failing to diligently perform his contractual responsibilities caused DeBoer to forfeit certain fees upon which Envy was entitled to receive the Envy-DeBoer Fee.

69.   Envy is entitled to be paid, but has not been paid, certain of the Envy Licensing Fees for, among other deficiencies, the Brands because (a) Houska and/or DeBoer collected payments, directly or indirectly, but failed to pay the Envy Licensing Fees, and/or (b) because Houska and/or DeBoer failed to diligently perform in breach of their respective agreements with Envy.

70.   Envy negotiated certain agreements on behalf of the immediate family of Houska and DeBoer, including their three children, which are also covered by both the Houska Contract and the DeBoer Contract.  Houska and DeBoer failed to pay the Envy Licensing Fees on such transactions.

71.   Upon information and belief, TWGG and Dzombak induced Houska and DeBoer to breach their respective contracts with Envy to harm Envy in retaliation for Envy seeking the compensation it was owed pursuant to the TWGG Contract, and so that they could secure a greater portion of revenue generated through Envy's efforts, thereby depriving Envy of the benefit of its bargain and compensation that Envy earned.

72.   Upon information and belief, TWGG and Dzombak directed third parties, including the Brands, to stop communicating with Envy and to communicate with TWGG and/or Dzombak to prevent Envy from rendering services to the Shared Clients, to prevent Envy from monitoring

the fees it was owed, and so that TWGG and Dzombak could collect fees owed to Envy from the Shared Clients.

**Chelsea and DeBoer Incorporate the Concealed Entities to Hide Revenue from Envy**

73. Through discovery in this action, Plaintiff learned that Defendants failed to disclose the existence of additional entities that appeared to engage in licensing for Chelsea and DeBoer.

74. Specifically, Dzombak testified that Dakota Ln was created after Plaintiff threatened the instant litigation for the purpose of putting new licensing agreements in place where there was not an ongoing dispute with Envy.

75. Thereafter, upon information and belief, C&A was shut down, stripped of all assets, and all existing contracts, including all agreements related to the Property, were either replaced or assigned, de facto or de jure, to the Concealed Entities. Defendants further entered into amendments, modifications and/or extensions of agreements related to the Property through the Concealed Entities.

76. Chelsea and DeBoer, with the assistance of Dzombak and TWGG, now negotiate their branding and licensing agreements with the Shared Clients to be executed by, and paid through, the Concealed Entities.

77. Upon information and belief, Chelsea and DeBoer received, and continue to receive, revenue earned by the Shared Clients upon Property through the Concealed Entities from the Brands.

78. Regardless of the mechanism through which Chelsea and DeBoer entered into or moved licensing and branding agreements to the Concealed Entities, it constitutes a breach of the Houska Contract and the DeBoer Contract. Houska and DeBoer were required to exclusively enter branding and licensing agreements concerning the Property through Envy and pay Envy's fees on

all resulting revenue.  This revenue sharing requirement expressly extended after the expiration of Envy's agreements with each of the Shared Clients, in perpetuity, to any brand that Envy presented during the term of the agreements.  It also extended to all extensions, modifications, and/or amendments to any such licensing and branding agreements even if entered into by the Shared Clients after expiration of their agreements with Envy.

## Veil Piercing as to C&A and the Concealed Entities

79.    Upon information and belief, one or both of Chelsea and DeBoer are the sole owners of C&A and the Concealed Entities.

80.    Upon information and belief, C&A and the Concealed Entities fail to hold board meetings.

81.    Upon information and belief, C&A and the Concealed Entities are dominated and controlled by Chelsea and DeBoer.

82.    Upon information and belief, Chelsea and DeBoer treat C&A and each of the Concealed Entities as an extension of themselves without any separate existence.

83.    Upon information and belief, Chelsea and DeBoer commingled business affairs from C&A and the Concealed Entities with their personal affairs to such a degree that there was no meaningful separation between C&A, the Concealed Entities and Chelsea and DeBoer individual earnings.

84.    Upon information and belief, Chelsea and DeBoer treated the funds from C&A and the Concealed Entities as their own, and used the funds for personal purposes, including withdrawing all assets from C&A for personal use without providing any compensation to C&A.

85.    By example only, the C&A corporate representative designated in response to Plaintiff's 30(b)(6) deposition notice, Randy Houska, Chelsea's father, testified, in sum or

substance, that he is unaware of any difference between Chelesa and C&A and views them as one and the same.

## CLAIMS

### First Claim – Breach of Contract (Against TWGG and Dzombak)

86.     Envy brings this claim for breach of contract against TWGG, and against Dzombak, as TWGG's alter ego, and incorporates by reference herein the foregoing paragraphs and allegations as if restated in full.

87.     TWGG and Envy entered into the TWGG Contract, which is a valid and enforceable written contract as originally executed and as subsequently amended.

88.     The TWGG Contract required TWGG to make certain payments to Envy including, but not limited to, the Envy Consulting Fees.

89.     TWGG failed to pay the Envy Consulting Fees on sums received from the Shared Clients.

90.     TWGG breached the TWGG Contract by providing services to the Shared Clients, Wiz Khalifa, and the Taylor Gang that fell within Envy's Principal Line of Business and by failing to refer such clients to Envy.

91.     TWGG's failure to pay the Envy Consulting Fees constituted a material breach of the TWGG Contract.

92.     TWGG and Dzombak interfered with Envy's ability to provide the consulting services by directing the Shared Clients and the Brands to stop communicating with Envy.  TWGG and Dzombak's actions further prevented Envy from receiving the benefit of its bargain by ensuring that it was paid for the services it rendered.  TWGG thereby breached the covenant of good faith and fair dealing incorporated into the TWGG Contract.  TWGG further breached a requirement within the TWGG Contract that TWGG use commercially reasonable best efforts to

assist Envy in performing its responsibilities and to assist Envy in securing business from the Shared Clients.

93.     Throughout the TWGG Contract, TWGG breached the TWGG Contract by failing to make any quarterly accountings of the revenue it received, or was entitled to receive, from the Shared Clients and failed to disclose the associated amounts due as Envy Consulting Fees.

94.     On October 2, 2019, Envy demanded the right to conduct an audit of TWGG's compliance with the TWGG Contract.  TWGG breached the TWGG Contract by refusing to permit Envy to conduct an audit.

95.     Envy provided TWGG with notice of its breaches of the TWGG Contract and an opportunity to cure.  TWGG refused to cure its breaches.

96.     TWGG terminated the TWGG Contract without providing an opportunity to cure and without a ground to do so.

97.     Based upon the foregoing, Envy suffered damages as a result of TWGG's breaches of contract equal to the full amount of the Envy Consulting Fees for the Shared Clients upon (a) all revenues received by TWGG from the Shared Clients and (b) which TWGG was entitled to receive but failed to collect.  This includes all such sums TWGG and/or Dzombak received in from, or in relation to, Houska through not earlier than October 1, 2020, with respect to DeBoer through not earlier than April 1, 2021 and for each of the Shared Clients not earlier than five years following the date services were first provided to such Shared Client but, in any event, through not earlier than November 24, 2020.

98.     Envy further suffered damages as a result of TWGG's breaches of contract equal to the full amount of fees Envy would have earned if TWGG and Dzombak had not provided services within Envy's Principal Line of Business and had not failed to refer clients and/or

prospective clients to Envy in breach of the TWGG Contract.  Envy's damages are in an amount not less than the fees TWGG and Dzombak earned or received for providing services in Envy's Principal Line of Business or from referrals of such business to third parties, or the amount that such third parties earned as a result of TWGG's and Dzombak's referrals.

99.     Envy further suffered damages as a result of TWGG's breaches of contract equal to Envy's attorneys' fees and costs in investigating TWGG's breach and pursuing this action, all of which would have been avoided if TWGG permitted Envy to conduct an audit and verify the amount TWGG owed without resorting to litigation.

100.     Envy further seeks to recover 9% simple interest upon all unpaid amounts from the date of breach until the date Envy receives payment.

**Second Claim – Breach of Contract (Against Houska and the Concealed Entities)**

101.     Envy brings this claim for breach of contract against Houska and incorporates by reference herein the foregoing paragraphs and allegations as if restated in full.

102.     Houska and Envy entered into the Houska Contract which is a valid and enforceable written contract.

103.     C&A and the Concealed Entities are each alter egos of Chelsea.

104.     The Houska Contract required Houska to make certain payments to Envy including, but not limited to, the Envy-Houska Fees on all fees received from the Brands.

105.     Houska failed to pay Envy-Houska Fees required by the Houska Contract including, but not limited to, all sums received by Houska for her own work and for her children from the Brands that were not paid through Envy.

106.    Upon information and belief, Houska directed certain payments to other Shared Clients and to the Concealed Entities, including payments from certain Brands for her own work and for her children, in an effort to avoid paying the Envy-Houska Fees.

107.    Houska's failure to pay the Envy-Houska Fees for her own work and for her children constituted a material breach of the Houska Contract.

108.    Houska breached the Houska Contract by failing to make diligent efforts to fulfill her obligations including, but not limited to, certain Brands for which Envy would have been entitled to receive the Envy-Houska Fees.

109.    Beginning not later than January 2019, Houska breached the Houska Contract by directing the Brands not to provide information to Envy, not communicate with Envy, and not to send payments to Envy.

110.    Houska breached the Houska Contract by terminating the agreement without providing Envy with notice of an alleged breach and an opportunity to cure.

111.    Envy provided Houska with repeated notice of her breaches of the Houska Contract and an opportunity to cure.  Houska failed to cure her breaches.

112.    To the extent that C&A or the Concealed Entities are found not to be a party to the Houska Contract, they are liable as Chelsea's alter ego.  C&A and the Concealed Entities were formed, operated and controlled by Chelsea and/or DeBoer for the sole purpose of being paid for work performed by Chelsea, DeBoer and their immediate family.  To the extent that Chelsea directed payments for work she performed be paid to Shared Clients, C&A or the Concealed Entities instead of to Chelsea, and such payments would have been subject to the Envy-Houska Fees if paid to Chelsea, then the direction of payments breaches the Houska Contract and operates as a fraud upon Plaintiff.

113.    C&A and Chelsea identified each other as their respective d/b/a's on agreements with respect to the Property, including with the Brands.

114.    Upon information and belief Chelsea and the Concealed Entities identified each other as their respective d/b/a's on agreements with respect to the Property, including with the Brands.

115.    The Term of the Houska Contract, and particularly Envy's exclusive worldwide license, should be deemed tolled by the period of Houska's breach and extend for a period of time equal to the period of Houska's breach.  Houska's breach began not later than January 2019 and continues to this day.  The last date that the Houska Contract is deemed in effect, whether December 31, 2019 or such other date as determined by the Court, is referred to herein as the "Houska Termination Date".

116.    Based upon the foregoing, Envy suffered damages equal to the full amount of the Envy-Houska Fees for Houska's work, and for her children's work including, among other revenue, (a) from the Brands, (b) which was paid to any person or entity other than Envy, including any payments to TWGG, Dzombak, Shared Clients, C&A or the Concealed Entities, (c) which would have been received by Envy if Houska diligently performed her responsibilities as required by the Houska Contract.  Envy's damages include all such Envy-Houska Fees from January 1, 2015 through the Houska Termination Date.  Envy's damages also include all such Envy-Houska Fees after the Houska Termination Date upon deals that were existing, pending, or presented prior to the Houska Termination Date, and all amendments, modifications, extensions or other revisions to any such agreements or pending agreements.  Envy's damages also include all fees Houska or her children receive from any pending or executed deals negotiated by Envy on behalf of Houska

or her children.  Envy also seeks to recover 9% simple interest upon all unpaid amounts from the date of the breach until the date Envy receives payment.

### Third Claim – Breach of Contract (Against DeBoer and the Concealed Entities)

117.    Envy brings this claim for breach of contract against DeBoer and incorporates by reference herein the foregoing paragraphs and allegations as if restated in full.

118.    DeBoer and Envy entered into the DeBoer Contract which is a valid and enforceable written contract.

119.    The Concealed Entities are alter egos of DeBoer.

120.    The DeBoer Contract required DeBoer to make certain payments to Envy including, but not limited to, the Envy-DeBoer Fees on all fees received from the Brands by DeBoer or his children.

121.    DeBoer failed to pay Envy-DeBoer Fees required by the DeBoer Contract including, but not limited to, all sums received from the Brands by DeBoer or his children that were not paid through Envy.

122.    Upon information and belief, DeBoer directed certain payments to other Shared Clients and to the Concealed Entities, including payments from certain Brands owed to DeBoer and his children, in an effort to avoid paying the Envy-DeBoer Fees.

123.    DeBoer's failure to pay the Envy-DeBoer Fees constituted a material breach of the DeBoer Contract.

124.    DeBoer breached the DeBoer Contract by failing to make diligent efforts to fulfill his obligations including, but not limited to, certain Brands for which Envy would have been entitled to receive the Envy-DeBoer Fees.

125.     Beginning not later than January 2019, DeBoer breached the DeBoer Contract by directing the Brands not to provide information to Envy, not communicate with Envy, and not to send payments to Envy.

126.     DeBoer breached the DeBoer Contract by terminating the agreement without providing Envy with notice of an alleged breach and an opportunity to cure.

127.     Envy provided DeBoer with repeated notice of his breaches of the DeBoer Contract and an opportunity to cure.  DeBoer failed to cure his breaches.

128.     To the extent that C&A or the Concealed Entities are found not to be a party to the DeBoer Contract, they are liable as DeBoer's alter ego.  C&A and the Concealed Entities were formed, operated and controlled by Chelsea and/or DeBoer for the sole purpose of being paid for work performed by Chelsea, DeBoer and their immediate family.  To the extent that DeBoer directed payments for work he performed be paid to Shared Clients, C&A or the Concealed Entities instead of to DeBoer, and such payments would have been subject to the Envy- DeBoer Fees if paid to DeBoer, then the direction of payments breaches the DeBoer Contract and operates as a fraud upon Plaintiff.

129.     Upon information and belief DeBoer and the Concealed Entities identified each other as their respective d/b/a's on agreements with respect to the Property, including with the Brands.

130.     The DeBoer Contract automatically renewed for another three-year term upon expiration of its initial term, without termination, on April 28, 2019.

131.     The Term of the DeBoer Contract, and particularly Envy's exclusive worldwide license, should be deemed tolled by the period of DeBoer's breach and extend for a period of time equal to the period of DeBoer's breach.  DeBoer's breach began not later than January 2019 and

continues to this day.  The last date that the DeBoer Contract is deemed in effect, whether April 28, 2019 or such other date as determined by the Court, is referred to herein as the "DeBoer Termination Date".

132.    Based upon the foregoing, Envy suffered damages equal to the full amount of the Envy-DeBoer Fees for DeBoer's work, and for his children's work including, among other revenue, (a) from the Brands, (b) which was paid to any person or entity other than Envy, including any payments to TWGG, Dzombak, Shared Clients, C&A or the Concealed Entities, (c) which would have been received by Envy if DeBoer diligently performed DeBoer's responsibilities as required by the DeBoer Contract.  Envy's damages include all such Envy-DeBoer Fees from April 28, 2016 through the DeBoer Termination Date.  Envy's damages also include all such Envy-DeBoer Fees after the DeBoer Termination Date upon deals that were existing, pending, or presented prior to the DeBoer Termination Date, and all amendments, modifications, extensions or other revisions to any such agreements or pending agreements.  Envy's damages also include all fees DeBoer or his children receive from any pending or executed deals negotiated by Envy on behalf of DeBoer or her children.  Envy also seeks to recover 9% simple interest upon all unpaid amounts from the date of the breach until the date Envy receives payment.

## Fourth Claim – Tortious Interference With Contractual And Business Relationships (Against TWGG and Dzombak)

133.    Envy incorporates by reference herein the foregoing paragraphs and allegations as if restated in full and brings this claim for tortious interference with contractual and business relationships against TWGG and Dzombak.

134.    Envy entered into contractual relationships with the Shared Clients.

135.    TWGG and Dzombak were aware of Envy's contractual and business relationships with the Shared Clients.

136.    Upon information and belief, TWGG and Dzombak tortiously interfered with Envy's contractual and business relationships with the Shared Clients by inducing them to terminate their relationships with Envy without privilege to do so, in retaliation for Envy demanding payment of the Envy-Consulting Fees, and so that TWGG and Dzombak could deprive Envy of the benefit of its bargain and take fees which Envy had earned.  TWGG's and Dzombak's interference included, but is not limited to, interfering with the information available to Envy to prevent Envy from fulfilling certain functions and falsely informing the Shared Clients that Envy.

137.    Specifically, TWGG and Dzombak advised certain Brands not to provide information to Envy which Envy needed to audit the amounts paid by the vendor relative to the amounts owed to the Shared Clients.  Envy was thus unable to determine which sums had been earned, which sums had not yet been earned, which sums needed to be repaid to the Brands, and if any additional sums were owed by the Brands to Envy and the Shared Clients.

138.    TWGG and Dzombak tortiously interfered with Envy's contractual and business relationships with the Shared Clients by inducing the Shared Clients to seek direct payment from Brands and to not fulfill certain obligations to Brands in order to prevent Envy from collecting the Envy Licensing Fees.

139.    TWGG and Dzombak took the foregoing actions to purposely interfere with Envy's contractual and business relations causing an injury in an amount to be determined.

140.    TWGG and Dzombak's conduct was malicious, willful, and wanton and Envy is entitled to an award of damages in an amount to be determined at trial.  Envy's damages include, but are not limited to, the amount of Envy Licensing Fees that Envy would have collected if TWGG and Dzombak had not interfered including, but not limited to, all unpaid Envy-Houska Fees and

Envy-DeBoer Fees and all Envy Licensing Fees that Envy would have received if Houska and DeBoer had diligently performed their responsibilities.

### Fifth Claim – Tortious Interference with Contractual and Business Relationships
### (Against C&A and Concealed Entities)

141.    Envy incorporates by reference herein the foregoing paragraphs and allegations as if restated in full and brings this claim for tortious interference with contractual and business relationships against C&A and the Concealed Entities.

142.    This claim is propounded in the alternative to the extent that C&A and/or the Concealed Entities are not deemed to be alter egos of Chelsea and/or DeBoer which are thus primarily liable for breaches of the Houska Contract and the DeBoer Contract.

143.    Envy incorporates by reference herein the foregoing paragraphs and allegations as if restated in full and brings this claim for tortious interference with contractual and business relationships against C&A and the Concealed Entities.

144.    Envy entered into contractual relationships with the Shared Clients.

145.    C&A and the Concealed Entities were aware of Envy's contractual and business relationships with the Shared Clients.

146.    The Concealed Entities tortiously interfered with Envy's contractual and business relationships with Chelsea and DeBoer by inducing to enter into licensing agreements for the Property without Envy's involvement and without paying the Envy Licensing Fees.

147.    C&A's and the Concealed Entities' interference included, but is not limited to, failing to pay Envy Licensing Fees, concealing agreements related to the Property and resulting revenue from Envy, and instructing the Brands not to communicate with Envy.

148.    C&A and the Concealed Entities took the foregoing actions to purposely interfere with Envy's contractual and business relations causing an injury in an amount to be determined.

149.     C&A's and the Concealed Entities' conduct was malicious, willful, and wanton and Envy is entitled to an award of damages in an amount to be determined at trial.

150.     Envy's damages include, but are not limited to, the amount of Envy Licensing Fees that Envy would have collected if C&A and the Concealed Entities had not interfered including, but not limited to, all unpaid Envy-Houska Fees and Envy-DeBoer Fees.

### Sixth Claim - Unjust Enrichment/Quantum Meruit
### (Against All Defendants)

151.     Envy brings this claim for unjust enrichment/*quantum meruit* against all Defendants and incorporates by reference herein the foregoing paragraphs and allegations as if restated in full.

152.     Envy provided services to Defendants by assisting the Shared Clients in identifying potential deals and negotiating appearance, endorsement, licensing, royalty and television agreements and related contracts.

153.     TWGG and Dzombak received significant financial benefit from Envy's services. TWGG and Dzombak were contractually obligated to retain Envy to provide the services Envy provided to the Shared Clients and thus could not have received any revenue from the Shared Clients without Envy.  TWGG and Dzombak further collected fees from the Shared Clients upon revenue generated by Envy.

154.     Houska and DeBoer received significant financial benefit from Envy's services through the revenue they, and the Shared Clients, received as a result of Envy's services.  Such benefits include, but are not limited to, entering into additional and more lucrative appearance, endorsement, licensing, royalty and television agreements and related contracts.  Such benefits also include negotiating more advantageous terms for the Shared Clients' appearance, endorsement, licensing, royalty and television agreements and related contracts.

155.     Through the Concealed Entities, Chelsea and DeBoer, Dzombak, and TWGG continue to receive significant financial benefit from these services.

156.     Defendants earned, and continue to earn, millions of dollars as a result of Envy's efforts.

157.     It would be against good conscience and equity to allow Defendants to retain the benefits of Envy's services without compensating Envy for the value of the services Envy performed.

158.     Accordingly, to the extent that any of Envy's services to TWGG, Dzombak and the Shared Clients fall outside the terms of the TWGG Contract, the Houska Contract and the DeBoer Contract, Envy seeks to recover damages in an amount to be determined following a trial on the merits equal to the value of the services that Envy performed for TWGG, Dzombak or any of the Shared Clients, plus interest thereon from the date such services were rendered.

**WHEREFORE**, Plaintiff prays that the Court enter judgment in its favor and against Defendants, containing the following relief:

A. A judgment awarding damages against TWGG and Dzombak, in an amount to be determined following a trial on the merits, for all unpaid Envy Consulting Fees on all sums TWGG has received during the term of the TWGG Contract and continuing through not earlier than, with respect to Houska, October 1, 2020, with respect to DeBoer April 1, 2021, and with respect to the Shared Clients the fifth anniversary of Plaintiff's retention or performance of services for them but, in any event, not earlier than November 24, 2020.

B. A judgment awarding damages against TWGG and Dzombak, in an amount to be determined following a trial on the merits, for all Envy Consulting Fees and other revenue that Envy would have received if TWGG complied with the terms of the TWGG Contract by (i) not performing Envy's Principal Line of Business, (ii) referring all clients and prospective clients to Envy that would have benefited from Envy's services, and (iii) providing commercially reasonable best efforts to assist Envy in all of the foregoing;

C. A judgment awarding damages against TWGG and Dzombak, in an amount to be determined following a trial on the merits, for all revenue that TWGG received when performing services within Envy's Principal Line of Business, including all such fees from Wiz Khalifa and the Taylor Gang;

D. A judgment awarding damages against TWGG and Dzombak, in an amount to be determined following a trial on the merits, for all revenue that Envy would have received if TWGG and Dzombak had not interfered with Envy's actual and prospective contractual and business relationships with the Shared Clients including, but not limited to, all sums

set forth in paragraphs E and F and all sums that would have been earned if the Shared Clients had not terminated their relationships with Envy;

E. A judgment awarding damages against Houska, and the Concealed Entities as Houska's alter ego and/or C&A's successor(s) in interest, in an amount to be determined following a trial on the merits, for all unpaid Envy-Houska Fees on all sums received by Houska or Chelsea's children, directly or indirectly through C&A or the Concealed Entities, or which should have been received by Houska or Chelsea's children if all such sums were collected by Houska and Chelsea's children and if Houska had diligently performed her responsibilities as required by the Houska Contract;

F. A judgment awarding damages against DeBoer, and the Concealed Entities as DeBoer's alter ego and/or C&A's successor(s) in interest, in an amount to be determined following a trial on the merits, for all unpaid Envy-DeBoer Fees on all sums received by DeBoer or DeBoer's children, directly or indirectly through C&A or the Concealed Entities, or which should have been received by DeBoer or DeBoer's children if all such sums were collected by DeBoer and DeBoer's children and if DeBoer had diligently performed DeBoer's responsibilities as required by the DeBoer Contract;

G. A judgment against all Defendants in an amount equal to the value of services provided to each of them by Plaintiff in an amount to be determined following a trial on the merits but, in any event, not less than $3,000,000.

H. An award of attorneys' fees and costs that Plaintiff incurred and will incur in investigating and pursuing this action to the fullest extent permitted by law including, but not limited to, against TWGG and Dzombak for failing to permit Plaintiff to conduct an audit; An award

of prejudgment and postjudgment interest upon all damages awarded against any Defendant on each of the foregoing claims at a rate of not less than 9% simple interest;

I.  An award of damages against each Defendant for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment and postjudgment interest;

J.  An award of punitive damages against TWGG and Dzombak; and

K.  Such other and further relief as the Court may deem just and proper.

Dated: August 31, 2020        **KLEHR HARRISON HARVEY BRANZBURG LLP**
New York, NY

By:   _/s/ Matthew J. McDonald_
Matthew J. McDonald, Esq.
5 Penn Plaza, Suite 2353
New York, NY 10001
(215) 569-4287
mmcdonald@klehr.com

*Counsel for Plaintiff*

# Exhibit 1

## INTER-COMPANY SERVICES AGREEMENT

This **Inter-Company Services Agreement** (together with all Exhibits attached hereto, this "**Agreement**") is entered into as of N̲o̲v̲e̲m̲b̲e̲r̲ ̲2̲4̲,̲ ̲2̲0̲1̲5̲ (the "**Effective Date**") by and between **ENVY BRANDING, LLC**, a New York limited liability company with an address of 848 Old Quaker Hill Road, Pawling, NY 12564 ("**Envy**"), **THE WILLIAM GERARD GROUP, LLC**, a Pennsylvania limited liability company with an address of 6929 Rosewood Street, Pittsburgh, PA 15208 ("**TWGG**") (each a "**Party**" and collectively, the "**Parties**").

### RECITALS

Envy represents owners of intellectual property ("**IP**") in negotiating and consummating deals for the use of such IP in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions (collectively, "**Licensing Opportunities**").

TWGG, represents individuals, business entities and groups (collectively, "**Talent**") in providing services commonly referred to as artist or talent management services; including but not limited to negotiating terms and preparing and approving contracts for Talent; developing and coordinating publicity campaigns; consulting on major business and creative decisions; assembling, directing and coordinating requisite professional advisors; coordinating, selecting and supervising staff and budgets; monitoring and collaborating with all others who have responsibilities for the career of Talent; and receiving, counseling and coordinating requests for endorsements, appearance, and charitable giving (collectively, "**Talent Management Services**").

Each Party believes that its Principal Line of Business may benefit from certain consulting services of the other Party.  For purposes of this Agreement, "**Principal Line of Business**" shall mean: (i) for Envy, pursuing Licensing Opportunities for IP Owners; and (ii) for TWGG providing Talent Management Services for Talent.

The Parties desire to set forth the terms and conditions of the provision of consulting services to each other through this Agreement.

1. <u>Term</u>.  The "**Term**" of this Agreement means the period of time from the Effective Date until December 31, 2019 unless extended by the mutual agreement of the Parties or terminated prior to such date in accordance with the terms herein.

2. <u>Principal Lines of Business</u>.  This Agreement shall not limit nor prohibit any Party, at its sole costs and expense, from pursuing its Principal Line of Business with Current Clients (as hereinafter defined) or with Prospective Clients (as hereinafter defined).  Each Party shall be solely responsible for all costs and expenses it incurs in its performance of its Principal Line of Business.

3. <u>Referral of Business between the Parties for Current and Future Clients</u>.

(a)    Except as otherwise provided for in this Agreement, with respect to its existing clients as of the Effective Date ("**Current Clients**") and any prospective clients it negotiates with during the Term ("**Prospective Clients**"), each Party shall consider in good faith, the potential benefit to such clients from entering into an agreement with the other Party for the provision of services relating to the other Party's Principal Line of Business and shall, if it deems appropriate in its sole discretion, make referrals to the other Party.  Except as set forth in Section 3(b) below, no Party shall have any obligation to refer a

Current Client or Prospective Client to the other Party nor shall it have any responsibility for such other Party's ability or inability to generate revenue in such other Party's Principal Line of Business.

(b)   Except as otherwise provided for in this Agreement, if, a Party (the "**Referring Party**") determines in good faith that a Current Client or Prospective Client will benefit from entering into an Agreement with the other Party (the "**Servicing Party**") for the Servicing Party's Principal Line of Business, the Referring Party:

(i) shall use commercially reasonable efforts to introduce the Prospective Client or Current Client to the Servicing Party and shall encourage the Prospective Client or Current Client to meet with the Servicing Party to discuss an opportunity for the Servicing Party to represent such Prospective Client or Current Client in the Servicing Party's Principal Line of Business; unless otherwise prohibited by the Referring Party's contractual obligations to Current Clients; and

(ii) shall encourage the Prospective Client or Current Client to directly enter into an agreement with the Servicing Party for the Servicing Party to represent such Prospective Client in the Servicing Party's Principal Line of Business, and

(iii) shall not itself enter into an agreement to provide services in the Servicing Party's Principal Line of Business with such Prospective Client or Current Client unless either (x) the Servicing Party has rejected in writing the opportunity to work with the Prospective Client or (y) the Prospective Client or Current Client has refused in writing to work with the Servicing Party

The Parties shall set forth each client referred to the Servicing Party pursuant to this Section 3(b) and the date such potential client is added on Exhibit A attached hereto. Each potential client set forth under the Servicing Party's name on Exhibit A shall be a "**Referred Client**" of such Servicing Party. If a Referred Client is rejected or rejects the opportunity to work with the Servicing Party under clause (iii) above, such Referred Client shall be removed from under the Servicing Party's name on Exhibit A and such potential client shall no longer be a Referred Client under this Agreement; provided such potential client may be added back to Exhibit A upon mutual written consent of the Parties.

(c)   In the event that any Referred Client introduced to the Servicing Party by the Referring Party enters into an agreement with the Servicing Party or makes any payment to the Servicing Party as a result of or in connection with services provided by the Servicing Party to such Referred Client, then such Referred Client shall become a "**Signed Client**" of the Servicing Party, and the Servicing Party shall pay to the Referring Party the sum of five percent (5%) of gross revenue paid by (and not refunded or returned to) the Signed Client to the Servicing Party (or any third party to which the Servicing Party directs such payment to be made) for a period of no less than five (5) years from the date set forth next to such Referred Client on Exhibit A hereto (unless a lower percentage is agreed by the Parties in their sole discretion). For purposes of clarification, the gross revenue shall be based solely on amounts earned by the Servicing Party with respect to the applicable Signed Client and not on amounts collected by the Servicing Party on behalf of the Referred Client.

(d)   The Parties shall exchange and, subject to accuracy, execute updated versions of Exhibit A together with the accounting process set forth under Section 7 below.

4.   Consulting Services.

(a)   With respect to each Signed Client, during the term of the agreement between the Servicing Party and the Signed Client, each of the Servicing Party and the Referring Party shall keep the

2

other informed regarding its ongoing discussions and work with the and shall cooperate and consult with ("**Consulting Services**") the other Party in connection with the work of each Party on behalf of the Client.; provided, however, no Party shall have an obligation to allow the other Party to provide any consulting services to its Current Clients or any of its Prospective Clients.

(b)    A Party providing Consulting Services under this Section 4 shall (i) use commercially reasonable efforts to assist the other Party as reasonably requested by such other Party from time to time, and (ii) shall bear all of its own costs and expenses in connection with its provision of Consulting Services.

(c)    In the event the Servicing Party desires additional assistance with respect to any Signed Client, the Parties may request additional assistance and the other Party may agree, in its sole discretion, to provide such enhanced consulting services and any additional fee paid to the consulting Party with respect to such Signed Client and such additional amount (which shall be a percentage of gross revenue calculated as set forth in Section 3(c) above) shall be set forth next to the Signed Client's name on Schedule A attached hereto. Any such additional amounts shall be paid for the Term of this Agreement.

(d)    Each Party covenants that it shall provide all services pursuant to its Principal Line of Business to the other Party, to Current Client and Prospective Clients, in compliance with all applicable federal, state and local laws, rules, statutes and ordinances.

5.  Confidential Information; Ownership of Results and Proceeds.

(a)    Each Party agrees at all times during the Term and thereafter in perpetuity to hold in strictest confidence, and not to use, except for the benefit of, and at the request of, the other Party, or to publish or disclose to any person, firm or corporation without written authorization of the other Party, any Confidential Information of that Party.  Each Party acknowledges that "**Confidential Information**" means any and all confidential information, proprietary information and data, trade secrets or know-how, including, but not limited to, research and development information, plans, products, services, licenses, methods, strategies, programs, source code, software, inventions, processes, formulas, theories, technology, designs, drawings, marketing information, costs, pricing, finances or other information of any nature collected by or having become known in the course of a Party's performance of this Agreement or provided or disclosed to the Party by or on behalf of a Party to this Agreement, either directly or indirectly in writing, orally, electronically, or by inspection, or otherwise, relating to such Party and/or its affiliates, companies, agents, executives and/or owners.  Each Party further agrees that Confidential Information does not include any of the foregoing items which have become publicly known or made generally available through no wrongful act of the Party.  Each Party further agrees that all Confidential Information is and shall at all times remain the property of such Party.

(b)    Subject to Section 5(c) below, each Party providing Consulting Services (the "**Consultant**") agrees that the Party receiving the benefit of the Consulting Services (the "**Recipient**") shall own all results and proceeds of the performance of Consultant's Consulting Services (collectively, "**Results**") and that all such Results which are protectable by copyright are "works made for hire", as that term is defined in the United States Copyright Act.   If the Results, or any portion thereof, are deemed not to be "work for hire", Consultant hereby irrevocably conveys, transfers and assigns to Recipient, all right, title and interest in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Results, including without limitation, all of Consultant's right, title and interest in and to the copyrights (and all renewals, revivals and extensions thereof and all past, present and future claims relating thereto) in the Results, including without limitation, all rights of any kind or any nature now or hereafter recognized, including without limitation, the unrestricted right to make modifications, adaptations and revisions to the Results, to exploit and allow others to exploit the Results and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Results, known or unknown, prior to or after the date hereof, including

3

without limitation the right to receive all proceeds and damages therefrom. In addition, Consultant hereby waives any so-called "moral rights" with respect to the Results that Consultant may have.

(c)     Notwithstanding anything to the contrary contained in Section 5(b), the Parties agree that as between the Parties, all Results developed for a Signed Client for which each of Envy and TWGG provide Consulting Services under this Agreement shall be jointly owned by the Parties; provided, however, no Party shall use any such Results except in connection with services provided for the Signed Client without the prior written consent of the other Party and provided, further, no Party shall transfer, convey, assign, sell, license or lease its interests in any such Results to any other person or entity without the prior written consent on the other Party.

6.   Breach; Termination; Extension.

(a)     Each Party shall have the right at any time, by giving written notice to the other Parties, and without prejudice to such Party's other rights or remedies for breach, to terminate this Agreement if the other Party commits a material breach of any of the provisions of this Agreement; provided, however, such termination shall not be effective unless and until the Party requesting termination of this Agreement has given written notice to the other Parties and, if the reason for termination is curable and does not involve a breach of Section 5 above, the Party responsible for such breach has failed to cure such breach to the reasonable satisfaction of the Party requesting termination of this Agreement within thirty (30) calendar days of receiving such notice.

(b)     Upon request, each Party agrees to negotiate in good faith regarding the extension of the Term.

(c)     If this Agreement is terminated or expires, each Party shall return at its sole cost and expense to all other Parties all Confidential Information and all Results created through the date of termination. Termination of this Agreement shall not affect any remedies or rights a Party may have against the other Party.

7.   Accounting; Payment; Audit Rights.

(a)     Accounting.  Each Party shall maintain accurate records and other evidence pertaining to the calculation of any consulting fees due to the other Party. Each Party shall preserve such records for twelve (12) months after termination of this Agreement.

(b)     Payment.  Within ninety (90) days after the last day of each calendar quarter during the Term, each Party shall submit to the other a detailed statement showing the total gross revenue received by it from Current Clients or Prospective Clients for which the other Party has provided consulting services in that calendar quarter, together with payment of the sum due to the other Party as a result of the provided consulting services. Such payment shall be made in immediately available funds and shall be paid via check or wire transfer.

(c)     Audit.  Each Party shall have the reasonable right to conduct one audit per calendar year during the term of this Agreement, and one audit within two years after the expiration of this Agreement, for the purposes of confirming the accuracy of the payments of consulting fees. The Party conducting the audit shall bear the cost of any such audit(s).

8.   Representations and Warranties; Indemnification.

(a)     Each Party represents, warrants and agrees that: (i) it has the right, power and authority to enter into this Agreement and to assume and perform all of its obligations hereunder; (ii) it is a duly formed entity in good standing and in compliance with all applicable statutory and administrative laws;

4

and (iii) it will comply with all applicable statutes, laws, rules and other governmental regulations in any dealings with or on behalf of each other. Each Party hereby further represents and warrants that the Results (other than those portions of the Results provided by the other Party) are and shall be original and do not and shall not infringe or violate the rights of any other person or entity under any laws, including, but not limited to any copyrights, trademark, trade secret and/or patent laws, rights of publicity, privacy or like or different rights anywhere in the world; and (2) have not been and will not be based upon any other works, information or material, the proprietary rights to which are held by any other person or entity or which would in any way require any additional license from such Party or any other person or entity in order for such Party to fully enjoy all rights in and to the rights and privileges contemplated under this Agreement.

(b)     Each Party shall indemnify, defend, and hold the other Party, such other Party's parents, affiliates, licensors, licensees, successors, subsidiaries and assigns, and the employees, agents, officers and directors of the foregoing, harmless from and against any and all claims, actions, liabilities, losses, costs, damages or expenses (including reasonable attorneys' fees and costs) arising out of or based upon (i) the indemnifying Party's breach or alleged breach of any term or condition of this Agreement, (ii) any action, omission, statement or other conduct by the indemnifying Party in the exercise of its rights or the performance of its duties and obligations hereunder, (iii) the services pursuant to the Principal Line of Business provided by the indemnifying Party to its Current Clients, Prospective Clients or Signed Clients.

(c)     Neither Party makes any representation, warranty or covenant regarding its ability to generate any revenue with respect to any of its clients or the other Party's ability to receive any revenue under this Agreement.

9.   Miscellaneous.

(a)     Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement, including the validity, interpretation, construction and performance of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in such state without regard to such state's conflicts of law principles. Each Party hereto irrevocably consents to the exclusive jurisdiction of the state and federal courts located in New York, New York. EACH PARTY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

(b)     Assignment and Transfer.  Neither Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party.

(c)     Other Obligations.  Each Party represents and warrants that neither the retention of it by the other Party, nor its performance of its obligations hereunder will conflict with or violate or otherwise are inconsistent with any other agreements to which it is or has been a party or with any other obligations, legal or otherwise, which it may have.

(d)     Entire Agreement.  This Agreement contains the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersedes, cancels and annuls any prior or contemporaneous written or oral agreements, understandings, commitments, and practices between them respecting the subject matter hereof.  In the event of any conflict between Section 1 through 7 of this Agreement and any Exhibit attached hereto, the terms contained in Section 1 through 7 shall control unless the Exhibit makes explicit reference to the term or condition being replaced with the conflicting provision of such Exhibit.

(e)     Amendment.  This Agreement may be amended only by a writing that makes express reference to this Agreement as the subject of such amendment and that is signed by each Party.

(f)     Severability.  If any term, provision, covenant or condition of this Agreement or part thereof, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant, or condition shall remain in full force and effect, and any such invalid, unenforceable or void term, provision, covenant or condition shall be deemed, without further action on the part of the parties hereto, modified, amended and limited to the extent necessary to render the same and the remainder of this Agreement valid, enforceable and lawful.

(g)     Construction.   Should any provision of this Agreement require interpretation or construction, it shall be interpreted or construed according to its fair meaning and not strictly for or against either Party, both agreeing that the presumption providing that a document or agreement is to be interpreted or construed more strictly against the Party who or which prepared such document or agreement shall not apply because both Parties have availed themselves of the opportunity to participate in the preparation of all provisions of this Agreement.

(h)     Non-waiver.  No failure or delay by either Party in exercising any right, option, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, option, power or privilege.  Neither any course of dealing nor any failure, delay, or neglect of either Party hereto in any instance to exercise any right, option, power, or privilege hereunder or under law shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, option, power, or privilege.  All waivers by either Party hereto must be contained in a written instrument signed by the Party to be charged.

(i)     Notices.  Any notice, request, consent, or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if in writing, and if and when sent by certified or registered mail, return receipt requested, to such Party's address as set forth in this Agreement and by email to the addresses: Nemerov@EnvyBranding.com or William@TheWilliamGerardGroup.com as applicable.  Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given as provided herein, shall be deemed to be receipt of the notice, request, consent, or approval sent.  A copy of all notices given to TWGG shall be sent to Andrea Geraghty, Meyer, Unkovic & Scott, LLP, Henry W. Oliver Building, Suite 1300, 535 Smithfield Street, Pittsburgh, PA 15222.  A copy of all notices given to Envy shall be sent to Dain Landon, Esq., 848 Old Quaker Hill Road, Pawling, New York 12564 and email to DainLandon@TheLandonFirm.com.

(j)     Independent Contractor.  Each Party is and shall be for all purposes independent contractors and not employees or partners of the other Party.  Neither Party shall have the authority to act for, represent, bind or obligate the other Party and nothing contained herein shall be deemed or construed to create a partnership or joint venture between Envy and TWGG.

(k)     Limitation of Liability.  No claim may be made by any Party hereunder against any other Party hereto or any affiliate, director, member, manager, officer, employee, attorney or agent thereof for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions or relationships contemplated by this Agreement or any other transaction, relationship, act, omission, or event arising or occurring in connection therewith.  Each Party waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; provided, however, that this provision shall not limit the liability of any Party to indemnify another Party under the indemnification requirements of this Agreement.

(l)     Survival.     The representations, warranties, acknowledgements, releases, and indemnification given by each of the Parties shall survive the termination of this Agreement.

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed on its behalf by a duly authorized officer as of the date and year first written above.

ENVY BRANDING, LLC

By: _____

Name: Sara Nemerov

Title: Managing Member


THE WILLIAM GERARD GROUP, LLC

By: _____

Name: William G. Dzombak

Title:  Managing Member

7

**Exhibit A**

**ENVY CLIENTS FOR WHOM TWGG CONSULTS**

| Client | Date | Revenue Share Due to TWGG (pursuant to Sections 3(c) and 4(c)) | |
|--------|------|-------------------------|----------------------|
| | | 3(c) Referral Fee | 4(c) Consulting Fee |
| Chelsea Houska | October 1, 2015 | 0% | 50% |
| Alex King | October 1, 2015 | 0% | 50% |
| | | | |
| | | | |

**TWGG CLIENTS FOR WHOM ENVY CONSULTS**

| Client | Date | Revenue Share Due to ENVY (pursuant to Sections 3(c) and 4(c)) | |
|--------|------|-------------------------|----------------------|
| | | 3(c) Referral Fee | 4(c) Consulting Fee |
| Chelsea Houska | October 1, 2015 | 0% | 50%* |
| Alex King | October 1, 2015 | 0% | 50%* |
| | | | |
| | | | |

* To prevent "double dipping", Envy's fee shall be calculated on gross revenue paid by a Signed Client to TWGG *less* any management fee earned as a result of any licensing or endorsement deal done by Envy under its representation deal with such Signed Client. For example, if Envy brings a licensing deal to Alex King that earns Alex King $100, Envy shall not share under this Agreement in any management fee paid to TWGG out of such $100.

Agreed to by:

**ENVY BRANDING, LLC**

By: _Sara Nemerov_
Name: Sara Nemerov
Title: Managing Member

**THE WILLIAM GERARD GROUP, LLC**

By: _____
Name: William G. Dzombak
Title: Managing Member

8

## INTER-COMPANY SERVICES AGREEMENT

This **Inter-Company Services Agreement** (together with all Exhibits attached hereto, this **"Agreement"**) is entered into as of _____ (the **"Effective Date"**) by and between **ENVY BRANDING, LLC**, a New York limited liability company with an address of 848 Old Quaker Hill Road, Pawling, NY 12564 (**"Envy"**), **THE WILLIAM GERARD GROUP, LLC**, a Pennsylvania limited liability company with an address of 6929 Rosewood Street, Pittsburgh, PA 15208 (**"TWGG"**) (each a **"Party"** and collectively, the **"Parties"**).

### <u>RECITALS</u>

Envy represents owners of intellectual property (**"IP"**) in negotiating and consummating deals for the use of such IP in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions (collectively, **"Licensing Opportunities"**).

TWGG, represents individuals, business entities and groups (collectively, **"Talent"**) in providing services commonly referred to as artist or talent management services; including but not limited to negotiating terms and preparing and approving contracts for Talent; developing and coordinating publicity campaigns; consulting on major business and creative decisions; assembling, directing and coordinating requisite professional advisors; coordinating, selecting and supervising staff and budgets; monitoring and collaborating with all others who have responsibilities for the career of Talent; and receiving, counseling and coordinating requests for endorsements, appearance, and charitable giving (collectively, **"Talent Management Services"**).

Each Party believes that its Principal Line of Business may benefit from certain consulting services of the other Party. For purposes of this Agreement, **"Principal Line of Business"** shall mean: (i) for Envy, pursuing Licensing Opportunities for IP Owners; and (ii) for TWGG providing Talent Management Services for Talent.

The Parties desire to set forth the terms and conditions of the provision of consulting services to each other through this Agreement.

1.  <u>Term</u>. The **"Term"** of this Agreement means the period of time from the Effective Date until December 31, 2019 unless extended by the mutual agreement of the Parties or terminated prior to such date in accordance with the terms herein.

2.  <u>Principal Lines of Business</u>. This Agreement shall not limit nor prohibit any Party, at its sole costs and expense, from pursuing its Principal Line of Business with Current Clients (as hereinafter defined) or with Prospective Clients (as hereinafter defined). Each Party shall be solely responsible for all costs and expenses it incurs in its performance of its Principal Line of Business.

3.  <u>Referral of Business between the Parties for Current and Future Clients</u>.

(a)   Except as otherwise provided for in this Agreement, with respect to its existing clients as of the Effective Date (**"Current Clients"**) and any prospective clients it negotiates with during the Term (**"Prospective Clients"**), each Party shall consider in good faith, the potential benefit to such clients from entering into an agreement with the other Party for the provision of services relating to the other Party's Principal Line of Business and shall, if it deems appropriate in its sole discretion, make referrals to the other Party. Except as set forth in Section 3(b) below, no Party shall have any obligation to refer a

Current Client or Prospective Client to the other Party nor shall it have any responsibility for such other Party's ability or inability to generate revenue in such other Party's Principal Line of Business.

(b)     Except as otherwise provided for in this Agreement, if, a Party (the **"Referring Party"**) determines in good faith that a Current Client or Prospective Client will benefit from entering into an Agreement with the other Party (the **"Servicing Party"**) for the Servicing Party's Principal Line of Business, the Referring Party:

(i) shall use commercially reasonable efforts to introduce the Prospective Client or Current Client to the Servicing Party and shall encourage the Prospective Client or Current Client to meet with the Servicing Party to discuss an opportunity for the Servicing Party to represent such Prospective Client or Current Client in the Servicing Party's Principal Line of Business; unless otherwise prohibited by the Referring Party's contractual obligations to Current Clients; and

(ii) shall encourage the Prospective Client or Current Client to directly enter into an agreement with the Servicing Party for the Servicing Party to represent such Prospective Client in the Servicing Party's Principal Line of Business, and

(iii) shall not itself enter into an agreement to provide services in the Servicing Party's Principal Line of Business with such Prospective Client or Current Client unless either (x) the Servicing Party has rejected in writing the opportunity to work with the Prospective Client or (y) the Prospective Client or Current Client has refused in writing to work with the Servicing Party

The Parties shall set forth each client referred to the Servicing Party pursuant to this Section 3(b) and the date such potential client is added on Exhibit A attached hereto.  Each potential client set forth under the Servicing Party's name on Exhibit A shall be a **"Referred Client"** of such Servicing Party.  If a Referred Client is rejected or rejects the opportunity to work with the Servicing Party under clause (iii) above, such Referred Client shall be removed from under the Servicing Party's name on Exhibit A and such potential client shall no longer be a Referred Client under this Agreement; provided such potential client may be added back to Exhibit A upon mutual written consent of the Parties.

(c)     In the event that any Referred Client introduced to the Servicing Party by the Referring Party enters into an agreement with the Servicing Party or makes any payment to the Servicing Party as a result of or in connection with services provided by the Servicing Party to such Referred Client, then such Referred Client shall become a **"Signed Client"** of the Servicing Party, and the Servicing Party shall pay to the Referring Party the sum of five percent (5%) of gross revenue paid by (and not refunded or returned to) the Signed Client to the Servicing Party (or any third party to which the Servicing Party directs such payment to be made) for a period of no less than five (5) years from the date set forth next to such Referred Client on Exhibit A hereto (unless a lower percentage is agreed by the Parties in their sole discretion).  For purposes of clarification, the gross revenue shall be based solely on amounts earned by the Servicing Party with respect to the applicable Signed Client and not on amounts collected by the Servicing Party on behalf of the Referred Client.

(d)     The Parties shall exchange and, subject to accuracy, execute updated versions of Exhibit A together with the accounting process set forth under Section 7 below.

4.   Consulting Services.

(a)   With respect to each Signed Client, during the term of the agreement between the Servicing Party and the Signed Client, each of the Servicing Party and the Referring Party shall keep the

other informed regarding its ongoing discussions and work with the and shall cooperate and consult with (**"Consulting Services"**) the other Party in connection with the work of each Party on behalf of the Client.; provided, however, no Party shall have an obligation to allow the other Party to provide any consulting services to its Current Clients or any of its Prospective Clients.

(b)   A Party providing Consulting Services under this Section 4 shall (i) use commercially reasonable efforts to assist the other Party as reasonably requested by such other Party from time to time, and (ii) shall bear all of its own costs and expenses in connection with its provision of Consulting Services.

(c)   In the event the Servicing Party desires additional assistance with respect to any Signed Client, the Parties may request additional assistance and the other Party may agree, in its sole discretion, to provide such enhanced consulting services and any additional fee paid to the consulting Party with respect to such Signed Client and such additional amount (which shall be a percentage of gross revenue calculated as set forth in Section 3(c) above) shall be set forth next to the Signed Client's name on Schedule A attached hereto. Any such additional amounts shall be paid for the Term of this Agreement.

(d)   Each Party covenants that it shall provide all services pursuant to its Principal Line of Business to the other Party, to Current Client and Prospective Clients, in compliance with all applicable federal, state and local laws, rules, statutes and ordinances.

5.   Confidential Information; Ownership of Results and Proceeds.

(a)   Each Party agrees at all times during the Term and thereafter in perpetuity to hold in strictest confidence, and not to use, except for the benefit of, and at the request of, the other Party, or to publish or disclose to any person, firm or corporation without written authorization of the other Party, any Confidential Information of that Party.   Each Party acknowledges that **"Confidential Information"** means any and all confidential information, proprietary information and data, trade secrets or know-how, including, but not limited to, research and development information, plans, products, services, licenses, methods, strategies, programs, source code, software, inventions, processes, formulas, theories, technology, designs, drawings, marketing information, costs, pricing, finances or other information of any nature collected by or having become known in the course of a Party's performance of this Agreement or provided or disclosed to the Party by or on behalf of a Party to this Agreement, either directly or indirectly in writing, orally, electronically, or by inspection, or otherwise, relating to such Party and/or its affiliates, companies, agents, executives and/or owners. Each Party further agrees that Confidential Information does not include any of the foregoing items which have become publicly known or made generally available through no wrongful act of the Party.   Each Party further agrees that all Confidential Information is and shall at all times remain the property of such Party.

(b)   Subject to Section 5(c) below, each Party providing Consulting Services (the **"Consultant"**) agrees that the Party receiving the benefit of the Consulting Services (the **"Recipient"**) shall own all results and proceeds of the performance of Consultant's Consulting Services (collectively, **"Results"**) and that all such Results which are protectable by copyright are "works made for hire", as that term is defined in the United States Copyright Act.   If the Results, or any portion thereof, are deemed not to be "work for hire", Consultant hereby irrevocably conveys, transfers and assigns to Recipient, all right, title and interest in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Results, including without limitation, all of Consultant's right, title and interest in and to the copyrights (and all renewals, revivals and extensions thereof and all past, present and future claims relating thereto) in the Results, including without limitation, all rights of any kind or any nature now or hereafter recognized, including without limitation, the unrestricted right to make modifications, adaptations and revisions to the Results, to exploit and allow others to exploit the Results and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Results, known or unknown, prior to or after the date hereof, including

3

without limitation the right to receive all proceeds and damages therefrom.  In addition, Consultant hereby waives any so-called "moral rights" with respect to the Results that Consultant may have.

(c)   Notwithstanding anything to the contrary contained in Section 5(b), the Parties agree that as between the Parties, all Results developed for a Signed Client for which each of Envy and TWGG provide Consulting Services under this Agreement shall be jointly owned by the Parties; provided, however, no Party shall use any such Results except in connection with services provided for the Signed Client without the prior written consent of the other Party and provided, further, no Party shall transfer, convey, assign, sell, license or lease its interests in any such Results to any other person or entity without the prior written consent on the other Party.

6.   Breach; Termination; Extension.

(a)   Each Party shall have the right at any time, by giving written notice to the other Parties, and without prejudice to such Party's other rights or remedies for breach, to terminate this Agreement if the other Party commits a material breach of any of the provisions of this Agreement; provided, however, such termination shall not be effective unless and until the Party requesting termination of this Agreement has given written notice to the other Parties and, if the reason for termination is curable and does not involve a breach of Section 5 above, the Party responsible for such breach has failed to cure such breach to the reasonable satisfaction of the Party requesting termination of this Agreement within thirty (30) calendar days of receiving such notice.

(b)   Upon request, each Party agrees to negotiate in good faith regarding the extension of the Term.

(c)   If this Agreement is terminated or expires, each Party shall return at its sole cost and expense to all other Parties all Confidential Information and all Results created through the date of termination.  Termination of this Agreement shall not affect any remedies or rights a Party may have against the other Party.

7.   Accounting; Payment; Audit Rights.

(a)   Accounting.  Each Party shall maintain accurate records and other evidence pertaining to the calculation of any consulting fees due to the other Party.  Each Party shall preserve such records for twelve (12) months after termination of this Agreement.

(b)   Payment.  Within ninety (90) days after the last day of each calendar quarter during the Term, each Party shall submit to the other a detailed statement showing the total gross revenue received by it from Current Clients or Prospective Clients for which the other Party has provided consulting services in that calendar quarter, together with payment of the sum due to the other Party as a result of the provided consulting services.  Such payment shall be made in immediately available funds and shall be paid via check or wire transfer.

(c)   Audit.  Each Party shall have the reasonable right to conduct one audit per calendar year during the term of this Agreement, and one audit within two years after the expiration of this Agreement, for the purposes of confirming the accuracy of the payments of consulting fees.  The Party conducting the audit shall bear the cost of any such audit(s).

8.   Representations and Warranties; Indemnification.

(a)   Each Party represents, warrants and agrees that: (i) it has the right, power and authority to enter into this Agreement and to assume and perform all of its obligations hereunder; (ii) it is a duly formed entity in good standing and in compliance with all applicable statutory and administrative laws;

4

and (iii) it will comply with all applicable statutes, laws, rules and other governmental regulations in any dealings with or on behalf of each other.  Each Party hereby further represents and warrants that the Results (other than those portions of the Results provided by the other Party) are and shall be original and do not and shall not infringe or violate the rights of any other person or entity under any laws, including, but not limited to any copyrights, trademark, trade secret and/or patent laws, rights of publicity, privacy or like or different rights anywhere in the world; and (2) have not been and will not be based upon any other works, information or material, the proprietary rights to which are held by any other person or entity or which would in any way require any additional license from such Party or any other person or entity in order for such Party to fully enjoy all rights in and to the rights and privileges contemplated under this Agreement.

(b)    Each Party shall indemnify, defend, and hold the other Party, such other Party's parents, affiliates, licensors, licensees, successors, subsidiaries and assigns, and the employees, agents, officers and directors of the foregoing, harmless from and against any and all claims, actions, liabilities, losses, costs, damages or expenses (including reasonable attorneys' fees and costs) arising out of or based upon (i) the Indemnifying Party's breach or alleged breach of any term or condition of this Agreement, (ii) any action, omission, statement or other conduct by the Indemnifying Party in the exercise of its rights or the performance of its duties and obligations hereunder, (iii) the services pursuant to the Principal Line of Business provided by the Indemnifying Party to its Current Clients, Prospective Clients or Signed Clients.

(c)    Neither Party makes any representation, warranty or covenant regarding its ability to generate any revenue with respect to any of its clients or the other Party's ability to receive any revenue under this Agreement.

9.  Miscellaneous.

(a)    Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement, including the validity, interpretation, construction and performance of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in such state without regard to such state's conflicts of law principles.  Each Party hereto irrevocably consents to the exclusive jurisdiction of the state and federal courts located in New York, New York. EACH PARTY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

(b)    Assignment and Transfer.  Neither Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party.

(c)    Other Obligations.  Each Party represents and warrants that neither the retention of it by the other Party, nor its performance of its obligations hereunder will conflict with or violate or otherwise are inconsistent with any other agreements to which it is or has been a party or with any other obligations, legal or otherwise, which it may have.

(d)    Entire Agreement.  This Agreement contains the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersedes, cancels and annuls any prior or contemporaneous written or oral agreements, understandings, commitments, and practices between them respecting the subject matter hereof.  In the event of any conflict between Section 1 through 7 of this Agreement and any Exhibit attached hereto, the terms contained in Section 1 through 7 shall control unless the Exhibit makes explicit reference to the term or condition being replaced with the conflicting provision of such Exhibit.

(e)    Amendment.  This Agreement may be amended only by a writing that makes express reference to this Agreement as the subject of such amendment and that is signed by each Party.

(f) <u>Severability</u>. If any term, provision, covenant or condition of this Agreement or part thereof, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant, or condition shall remain in full force and effect, and any such invalid, unenforceable or void term, provision, covenant or condition shall be deemed, without further action on the part of the parties hereto, modified, amended and limited to the extent necessary to render the same and the remainder of this Agreement valid, enforceable and lawful.

(g) <u>Construction</u>. Should any provision of this Agreement require interpretation or construction, it shall be interpreted or construed according to its fair meaning and not strictly for or against either Party, both agreeing that the presumption providing that a document or agreement is to be interpreted or construed more strictly against the Party who or which prepared such document or agreement shall not apply because both Parties have availed themselves of the opportunity to participate in the preparation of all provisions of this Agreement.

(h) <u>Non-waiver</u>. No failure or delay by either Party in exercising any right, option, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, option, power or privilege. Neither any course of dealing nor any failure, delay, or neglect of either Party hereto in any instance to exercise any right, option, power, or privilege hereunder or under law shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or the exercise of any other right, option, power, or privilege. All waivers by either Party hereto must be contained in a written instrument signed by the Party to be charged.

(i) <u>Notices</u>. Any notice, request, consent, or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if in writing, and if and when sent by certified or registered mail, return receipt requested, to such Party's address as set forth in this Agreement and by email to the addresses: Nemerov@EnvyBranding.com or William@TheWilliamGerardGroup.com as applicable. Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given as provided herein, shall be deemed to be receipt of the notice, request, consent, or approval sent. A copy of all notices given to TWGG shall be sent to Andrea Geraghty, Meyer, Unkovic & Scott, LLP, Henry W. Oliver Building, Suite 1300, 535 Smithfield Street, Pittsburgh, PA 15222. A copy of all notices given to Envy shall be sent to Dain Landon, Esq., 848 Old Quaker Hill Road, Pawling, New York 12564 and email to DainLandon@TheLandonFirm.com.

(j) <u>Independent Contractor</u>. Each Party is and shall be for all purposes independent contractors and not employees or partners of the other Party. Neither Party shall have the authority to act for, represent, bind or obligate the other Party and nothing contained herein shall be deemed or construed to create a partnership or joint venture between Envy and TWGG.

(k) <u>Limitation of Liability</u>. No claim may be made by any Party hereunder against any other Party hereto or any affiliate, director, member, manager, officer, employee, attorney or agent thereof for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions or relationships contemplated by this Agreement or any other transaction, relationship, act, omission, or event arising or occurring in connection therewith. Each Party waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; <u>provided</u>, <u>however</u>, that this provision shall not limit the liability of any Party to indemnify another Party under the indemnification requirements of this Agreement.

(l) <u>Survival</u>. The representations, warranties, acknowledgements, releases, and indemnification given by each of the Parties shall survive the termination of this Agreement.

6

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed on its behalf by a duly authorized officer as of the date and year first written above.

ENVY BRANDING, LLC

By:_____
Name: Sara Nemerov
Title: Managing Member

THE WILLIAM GERARD GROUP, LLC

By:_____
Name: William G. Dzombak
Title:  Managing Member

7

**Exhibit A**

**ENVY CLIENTS FOR WHOM TWGG CONSULTS**

| Client | Date | Revenue Share Due to TWGG (pursuant to Sections 3(c) and 4(c)) | |
|---|---|---|---|
| | | 3(c) Referral Fee | 4(c) Consulting Fee |
| Chelsea Houska | October 1, 2015 | 0% | 50% |
| Alex King | October 1, 2015 | 0% | 50% |
| | | | |
| | | | |

**TWGG CLIENTS FOR WHOM ENVY CONSULTS**

| Client | Date | Revenue Share Due to TWGG (pursuant to Sections 3(c) and 4(c)) | |
|---|---|---|---|
| | | 3(c) Referral Fee | 3(c) Referral Fee |
| Chelsea Houska | October 1, 2015 | 0% | 50%* |
| Alex King | October 1, 2015 | 0% | 50%* |
| | | | |
| | | | |

* To prevent "double dipping", Envy's fee shall be calculated on gross revenue paid by a Signed Client to TWGG *less* any management fee earned as a result of any licensing or endorsement deal done by Envy under its representation deal with such Signed Client.  For example, if Envy brings a licensing deal to Alex King that earns Alex King $100, Envy shall not share under this Agreement in any management fee paid to TWGG out of such $100.

Agreed to by:

**ENVY BRANDING, LLC**                    **THE WILLIAM GERARD GROUP, LLC**

By:_____            By:_____
Name: Sara Nemerov                      Name: William G. Dzombak
Title: Managing Member                  Title: Managing Member

8

# Exhibit 2

**Exhibit A**

**ENVY CLIENTS FOR WHOM TWGG CONSULTS**

| Client | Date | Revenue Share Due to TWGG (pursuant to Sections 3(c) and 4(c)) | |
|---|---|---|---|
| | | **3(c) Referral Fee** | **4(c) Consulting Fee** |
| Chelsea Houska | October 1, 2015 | 0% | 50% |
| Alex King | October 1, 2015 | 0% | 50% |
| Cole DeBoer | April 1, 2016 | 0% | 50% |
| | | | |

**TWGG CLIENTS FOR WHOM ENVY CONSULTS**

| Client | Date | Revenue Share Due to ENVY (pursuant to Sections 3(c) and 4(c)) | |
|---|---|---|---|
| | | **3(c) Referral Fee** | **4(c) Consulting Fee** |
| Chelsea Houska | October 1, 2015 | 0% | 50%* |
| Alex King | October 1, 2015 | 0% | 50%* |
| Cole DeBoer | April 1, 2016 | 0% | 50%* |
| | | | |

\* To prevent "double dipping", Envy's fee shall be calculated on gross revenue paid by a Signed Client to TWGG *less* any management fee earned as a result of any licensing or endorsement deal done by Envy under its representation deal with such Signed Client.  For example, if Envy brings a licensing deal to Alex King that earns Alex King $100, Envy shall not share under this Agreement in any management fee paid to TWGG out of such $100.

Agreed to by:

**ENVY BRANDING, LLC**                              **THE WILLIAM GERARD GROUP, LLC**


By:_____          By:_____
Name: Sara Nemerov                             Name:  William G. Dzombak
Title: Managing Member                         Title: Managing Member

# Exhibit 3



Ms. Chelsea Houska
26694 462ⁿᵈ Avenue
Hartford, South Dakota 57033

Re:   Memorandum of Understanding for Representation Rights for Chelsea Houska

Dear Chelsea:

This letter is in reference to that certain Memorandum of Understanding for Representation
Rights dated as of January 1, 2015 (the "Envy Deal").

In order to coordinate the Envy Deal with that certain Management Agreement you have signed
with The William Gerard Group, LLC, this letter serves as our agreement that the "Term" under
the Envy Deal shall initially be scheduled to expire on July 1, 2019.

This letter shall be a fully binding agreement and shall supersede any conflicting terms in the
original Envy Deal.  Except as modified by this letter, the Envy Deal shall remain in full force and
effect.  Unless and until such other agreement is signed by you and us expressly superseding the
Envy Deal, the Envy Deal, as amended by this letter shall be treated as Definitive Agreements
and shall be the binding agreement between you and us, and each of you and we shall perform in
accordance with its terms.  This letter shall be governed by and construed in accordance with the
laws of New York without reference to its conflicts of laws rules.

Please sign below to confirm your agreement with the terms of this letter.

Sincerely,

Envy Branding, LLC

By: _____
Name: Sara Nemerov
Title: CEO

Agreed to by:

_____
Chelsea Houska

**MEMORANDUM OF UNDERSTANDING**
ENVY BRANDING, LLC
AND
CHELSEA HOUSKA

As of January 1, 2015

Ms. Chelsea Houska
26694 462nd Avenue
Hartford, South Dakota 57033

Re:     Memorandum of Understanding for Representation Rights for Chelsea Houska

Dear Chelsea:

Thank you for contacting us and asking us to help.

We are pleased to submit this Memorandum of Understanding ("**MOU**") between ENVY BRANDING, LLC ("**Agent**") on the one hand and you, CHELSEA HOUSKA, ("**Licensor**") on the other hand. By signing this MOU, each of us is agreeing that these terms will form the basis of a long-form agreement regarding the exclusive license of certain representation rights by Licensor to Agent (the "**Rep Agreement**"). Each of the aforementioned parties hereto shall be individually referred to as a "**Party**" and collectively, as the "**Parties**".

1.      Preparation of Definitive Agreements.  Agent will prepare a definitive Rep Agreement and any other necessary ancillary agreements, all of which will be based on the basic terms set forth in the term sheet attached as Exhibit A hereto and reviewed by each Party and its counsel.  The Rep Agreement and any ancillary agreements shall be referred to as the "**Definitive Agreements.**"  The Definitive Agreements will contain standard and adequate representations and warranties, conditions to closing, indemnities, and other provisions customary in similar transactions.

2.      Fees

        (a)     Advance.  Upon execution of the MOU, Licensor shall pay Agent a non-refundable advance of $0 (the "**Advance**") which shall be recoupable against the Fees and Royalties due to Agent under the Section "Fees/Royalties" below.

        (b)     Retainer.  Upon execution of the MOU, Licensor shall begin paying Agent a non-refundable retainer of $0 per month (the "**Retainer**") which shall be payable on the 1st of each calendar month during the term of the Rep Agreement and shall be recoupable against the Fees and Royalties due to Agent under the Section "Fees/Royalties" below.

3.      General.  The MOU may be amended or modified only by a writing duly executed by each Party. The MOU shall be construed and governed by the laws of the State of New York, and without reference to the conflict of laws principles of any jurisdiction.  Licensor agrees that its representations and warranties set forth in the Section "Miscellaneous" below are hereby incorporated into this MOU by this reference.  The Parties agree that any and all claims or litigious matters arising under or with respect to the MOU or relating thereto shall be heard and determined by the state and federal courts located in the County and State of New York, and the Parties irrevocably agree to submit themselves to the exclusive and personal jurisdiction of those courts and irrevocably waive any and all rights any such Party may now or hereafter have to object to such jurisdiction.

[Remainder of page intentionally left blank]

We look forward to working with you.

Very truly yours,
ENVY BRANDING, LLC

By:_____

Name: Sara Nemerov
Title: Managing Member

The foregoing is agreed to and accepted by:

_____

Chelsea Houska

2

**EXHIBIT A**

**KEY TERMS FOR REPRESENTATION RIGHTS AND RESPONSIBILITIES**

**PARTIES:**   ENVY BRANDING, LLC (**"Agent"**) on the one hand and CHELSEA HOUSKA ("**Licensor**") on the other hand.

**PROPERTY:**   All names, likenesses, voices, signatures, copyrights, trade dresses, trademarks, trade names, service marks, logos, symbols, emblems, designs, artwork, colors, identifications, characters, elements, and designations and all other protectable ideas, discoveries and inventions of (or related to) Licensor in whatever form, including, without limitation, the SMITTEN trademark and all designs and marks associated with such trademark, whether now existing or created during the Term, and all derivative works thereof (collectively, the **"Property"**).

**LICENSE:**   Subject to the terms hereof, Licensor hereby licenses to Agent the exclusive worldwide right during the Term to represent the Property and to use the Property in any manner for the purpose of locating, negotiating and consummating Licensing Agreements. **"Licensing Agreements"** shall mean any and all licensing opportunities for the use of the Property in, in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions.  During the Term, you shall not use, or authorize any third party to use, the Property in with any Licensing Agreements other than through Agent.  Furthermore, during the Term, Licensor agrees that Licensor shall not create, license, promote, endorse, invest in, partner with or otherwise engage with any other brand, whether owned by Licensor or any other party except through Agent.

Agent shall have the right to retain and use subagents (each, a **"Subagent"**) in its sole discretion and at its sole cost and expense.  Agent shall provide Licensor with a term sheet containing the principal proposed deal terms of any Licensing Agreement (licensee, product categories/nature of sponsorship or endorsement, term, territory, royalty and guarantee) prior to Agent's execution of any Licensing Agreement, and Licensor shall have the right to approve such deal terms in its reasonable discretion; provided, if written disapproval is not received by Licensor in ten (10) business days from receipt of Agent's request, such request shall be deemed approved and Agent shall have the right to sign any required documents on Licensor's behalf as Licensor's attorney-in-fact.

**CONSULTANTS:**   Agent shall use commercially reasonable efforts to retain the services of The William Gerard Group, LLC (an entity in which William Dzombak is a principal), SMAC Entertainment, LLC (an entity in which Constance Schwartz is a principal) as independent contractors to consult on the services being provided by Agent hereunder and shall provide Licensor no less than thirty (30) days' advance written notice in the event such consulting services are terminated.

**CREATIVE APPROVALS:**   Agent shall be responsible for facilitating creative approval of all products and services designed, manufactured, advertised or sold under any Licensing Agreement by submitting materials to Licensor, and Licensor shall be responsible for the prompt approval of such materials.

**TERM:**   The **"Term"** shall run from January 1, 2015 (the **"Start Date"**) until December 31, 2019 (the **"Initial Expiration Date"**) unless extended in accordance with the terms and conditions of the Rep Agreement.  No later than six (6) months prior to the Initial Expiration Date, the Parties shall enter into good faith negotiations regarding the extension of the Term beyond the Initial Expiration Date and the terms of such extension.  Agent shall have the right to move the Initial Expiration Date forward (but not backward) in its sole discretion upon written notice to Licensor.  Notwithstanding

anything to the contrary contained in the Rep Agreement, the expiration or termination of the Rep Agreement shall not have any effect on any Licensing Agreements or definitive deal memos therefor presented prior to such expiration or termination (including, without limitation, any executed during the period following the termination notice and prior to the effectiveness of such termination) and Agent shall continue to receive payment on such Licensing Agreements including all extensions, renewals and modifications thereof for the life of any such deal.

Furthermore, in the event of termination or expiration of the Rep Agreement, for a period of one (1) year, Licensor shall not enter into any Licensing Agreement with any party to any Licensing Agreement or any prospective licensee named in any unconsummated License Agreement or term sheet prepared prior to such termination or expiration or Licensor shall compensate Agent on such deal as if the Rep Agreement had not expired or been terminated.

**LICENSES AND ACCOUNTING:** Agent shall be responsible for drafting and negotiating all Licensing Agreements, all of which shall be consistent with the terms and conditions of this Agreement. Licensor shall be responsible for approving and executing all Licensing Agreements submitted to it by Agent within seven (7) days of Agent's submission to Licensor of same for execution. Licensing Agreements shall require that payments thereunder be sent to Agent, and Agent shall account to Licensor on a calendar quarterly basis (within sixty (60) days of the end of each calendar quarter during the Term) with respect to any payments received from licensees (and not returned, refunded or returnable or refundable) under any Licensing Agreements during the applicable calendar quarter.

**DILIGENT EFFORTS:** During the Term, Agent shall use diligent efforts to exploit the representation rights granted hereunder in the Property during the Term; provided, however, Agent makes no representation or warranty about its ability to successfully license the Property and does not guarantee that its efforts will result in the generation of any revenue. During the Term, Licensor shall use diligent efforts to maintain and enhance the value of the Property and to promote the Property (e.g., making public appearances to support product launches under Licensing Agreements).

**FEES/ROYALTIES:** Upon execution of the MOU, Licensor shall have paid Agent an agreed upon Advance and shall begin paying Agent the agreed upon Retainer. Such Advance and all Retainer payments shall be recoupable against all other fees and royalties due to Agent under the Rep Agreement; provided, however, the Advance and all Retainer payments are non-refundable. Agent and Licensor shall share all money paid to and all cash credited to Agent or any affiliate of Agent (and not returned, refunded or returnable or refundable) under any Licensing Agreement, net of Approved Agent Expenses (as defined below), according to the split of 65% and 35% in favor of Licensor; provided, however, such split shall instead be 60% and 40% in favor of Licensor for deals where Agent uses a Subagent outside the United States. Without limiting the generality of the Section "Talent Fees" below, all fees and royalties paid to Licensor hereunder are inclusive of all third party fees, royalties and payments arising from, relating to or caused by the execution of any Licensing Agreement.

For purposes of clarification, no in-kind payment of any kind (including, without limitation, any advertising or marketing credit) received by or credited to a party shall be considered either "money paid to" or "cash credited to" such party.

**RECOUPMENT:** Notwithstanding anything to the contrary contained in the Rep Agreement, Agent shall have the right to recoup its direct, third party out of pocket expenses (excluding overhead) in connection with the exploitation of its rights under the Rep Agreement ("**Approved Agent Expenses**"), from any amounts paid to Agent under any Licensing Agreement hereunder provided that such expenses do not exceed, during any calendar year, the greater of (i) ten percent (10%) of the gross amounts payable to Agent, Licensor or their affiliates under all Licensing Agreements, or (ii) Five Thousand Dollars ($5,000), without Licensor's written approval.

4

**TALENT FEES:**    Other than Agent's payment of the royalty split to Licensor hereunder, Licensor shall bear all costs and expenses for all participation payments of any person or entity or to any guild with respect to or in connection with the use of any name, image, voice or likeness contained in the Property used on or in connection with the exploitation of the rights by Agent under the Rep Agreement and shall be solely responsible for accounting to any third party participants in such revenues.

**INDEMNIFICATION:**    The Rep Agreement shall contain standard indemnification provisions, to be agreed upon between the Parties, including, without limitation, indemnification covering (i) Licensor's representations, warranties and covenants under the Agreement (including, without limitation, Licensor's representation and warranty that it is free to enter into the Rep Agreement and that the Property (a) is original and does not and shall not infringe or violate the rights of any other person or entity under any laws, including but not limited to any copyright, trademark, trade secret and or patent laws, rights of publicity, privacy or the like or different rights anywhere in the world; and (b) have not been and will not be based upon any other works, information, or material, the proprietary rights of which are held by any other person or entity) and (ii) Agent's representations, warranties and covenants under the Rep Agreement, including, without limitation, Agent's representation and warranty that it shall provide all services provided under the Rep Agreement in a professional manner and in compliance with all applicable laws.

**INSURANCE:**    Licensor shall maintain liability insurance, E&O insurance and other insurance policies, naming Agent as an additional insured, in the form and at levels mutually agreed to by the Parties but in no event less than the levels standard for the owners of such intellectual property rights being represented by Agent.

**MISCELLANEOUS:**    No Party shall have any right to assign or transfer its rights under the Rep Agreement without the prior written consent of the other Parties except in connection with a sale of all or substantially all such Party's equity or assets (and in the case of Agent, except in the case where Sara Nemerov continues to oversee Licensing Agreements for the Property). Each Party hereby represents and warrants that it has the right and authority to enter into the Rep Agreement, to grant the rights it grants thereunder, and to perform the duties and obligations it assumes thereunder.

The Definitive Agreements shall have representations, warranties and covenants common to agreements of their size and scope and agreed to between the Parties in good faith negotiations. Licensor represents and warrants that it is not currently in negotiations with or under any obligation to Warner Music Group Inc. (**"WMG"**) or any affiliate of WMG with respect to any of the rights granted hereunder and has not been in any such negotiations or under any such obligation during the period of time in which it is exploring a relationship with Agent. Furthermore, Licensor represents and warrants that it is free to enter into this Rep Agreement and the Definitive Agreements and to grant any and all rights granted hereunder and that it is under no obligation to any other party that would be violated by this MOU or the Rep Agreement or that would prohibit it in any way from entering into the MOU or Rep Agreement or require the payment of any additional fees or require it to secure any additional approval or consent.

The Definitive Agreements shall be governed under New York law and the parties shall submit to the exclusive jurisdiction and venue of the courts located in New York state and New York county. Licensor's remedies for any breach of the Rep Agreement or of any representation or warranty made by Agent or covenant by Agent are limited to the termination of this Rep Agreement. Licensor waives any right it may have (except with respect to any unlawful use of the Property) to enjoin or interfere with any use by Agent, its licensees or assigns of the Property.

# Exhibit 4

**MEMORANDUM OF UNDERSTANDING**
ENVY BRANDING, LLC
AND
COLE DEBOER

As of April 28, 2016

Mr. Cole DeBoer
[REDACTED]462nd Ave Hartford, SD 57033

Re:   Memorandum of Understanding for Representation Rights for Name, Likeness and Other
      Intellectual Property Rights of and Relating to Cole DeBoer

Dear Cole:

Thank you for contacting us and asking us to help.

We are pleased to submit this Memorandum of Understanding ("**MOU**") between ENVY BRANDING, LLC
("**Agent**") on the one hand and you, COLE DEBOER, ("**Licensor**") on the other hand.  By signing this
MOU, each of us is agreeing that these terms will form the basis of a long-form agreement regarding the
exclusive representation rights granted by Licensor to Agent (the "**Rep Agreement**").  Each of the
aforementioned parties hereto shall be individually referred to as a "**Party**" and collectively, as the
"**Parties**".

1.      Preparation of Definitive Agreements.  Agent may determine to prepare a definitive Rep
Agreement and any other necessary ancillary agreements, all of which will be based on the basic terms
set forth in the term sheet attached as Exhibit A hereto and reviewed by each Party and its counsel.  The
Rep Agreement and any ancillary agreements shall be referred to as the "**Definitive Agreements**."  The
Definitive Agreements will contain standard and adequate representations and warranties, conditions to
closing, indemnities, and other provisions customary in similar transactions.  Unless and until Agent
determines to prepare and the Parties execute a replacement representation agreement, the Parties
agree that this MOU shall serve as the binding Rep Agreement.

2.      Fees.

        (a)      Advance.  Upon execution of the MOU, Licensor shall pay Agent a non-refundable
advance of $0 (the "**Advance**") which shall be recoupable against the Fees and Royalties due to Agent
under the Section "Fees/Royalties" below.

        (b)      Retainer.  Upon execution of the MOU, Licensor shall begin paying Agent a non-
refundable retainer of $0 per month (the "**Retainer**") which shall be payable on the 1st of each calendar
month during the term of the Rep Agreement and shall be recoupable against the Fees and Royalties due
to Agent under the Section "Fees/Royalties" below.

3.      General.  The MOU may be amended or modified only by a writing duly executed by each Party.
The MOU shall be construed and governed by the laws of the State of New York, and without reference
to the conflict of laws principles of any jurisdiction.  Licensor agrees that its representations and
warranties set forth in the Section "Miscellaneous" below are hereby incorporated into this MOU by this
reference.  The Parties agree that any and all claims or litigious matters arising under or with respect to
the MOU or relating thereto shall be heard and determined by the state and federal courts located in the
County and State of New York, and the Parties irrevocably agree to submit themselves to the exclusive
and personal jurisdiction of those courts and irrevocably waive any and all rights any such Party may now
or hereafter have to object to such jurisdiction.

[Remainder of page intentionally left blank]

We look forward to working with you.

Very truly yours,

ENVY BRANDING, LLC

By: _____

Name: Sara Nemerov

Title: Managing Member

The foregoing is agreed to and accepted by:

_____

COLE DEBOER

2

## EXHIBIT A

### KEY TERMS FOR REPRESENTATION RIGHTS AND RESPONSIBILITIES

**PARTIES:**      ENVY BRANDING, LLC ("**Agent**") on the one hand and COLE DEBOER ("**Licensor**") on the other hand.

**PROPERTY:**     All names, likenesses, voices, signatures, copyrights, trade dresses, trademarks, trade names, service marks, logos, symbols, emblems, designs, artwork, colors, identifications, characters, elements, and designations and all other protectable ideas, discoveries and inventions of (or related to) Licensor in whatever form whether now existing or created during the Term, and all derivative works thereof (collectively, the "**Property**").

**LICENSE:**      Subject to the terms hereof, Licensor hereby licenses to Agent the exclusive worldwide right during the Term to represent the Property and to use the Property in any manner for the purpose of locating, negotiating and consummating Licensing Agreements. "**Licensing Agreements**" shall mean any and all licensing opportunities for the use of the Property in, in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions.  During the Term, you shall not use, or authorize any third party to use, the Property in with any Licensing Agreements other than through Agent. Furthermore, during the Term, Licensor agrees that Licensor shall not create, license, promote, endorse, invest in, partner with or otherwise engage with any other brand, whether owned by Licensor or any other party except through Agent.

Agent shall have the right to retain and use subagents or consultants (each, a "**Subagent**") in its sole discretion and at its sole cost and expense.

Agent shall provide Licensor with a term sheet containing the principal proposed deal terms of any Licensing Agreement (licensee, product categories/nature of sponsorship or endorsement, term, territory, royalty and guarantee) prior to Agent's execution of any Licensing Agreement, and Licensor shall have the right to approve such deal terms in its reasonable discretion; provided, if written disapproval is not received by Licensor in ten (10) business days from receipt of Agent's request, such request shall be deemed approved and Agent shall have the right to sign any required documents on Licensor's behalf as Licensor's attorney-in-fact.

**CREATIVE APPROVALS:**      Agent shall be responsible for facilitating creative approval of all products and services designed, manufactured, advertised or sold under any Licensing Agreement by submitting materials to Licensor, and Licensor shall be responsible for the prompt approval of such materials.

**TERM:**      The "**Term**" shall run from the date of the MOU (the "**Start Date**") until the three year anniversary of the execution of this Agreement (the "**Initial Expiration Date**") unless extended in accordance with the terms and conditions of the Rep Agreement.  No later than six (6) months prior to the Initial Expiration Date, the Parties shall enter into good faith negotiations regarding the extension of the Term beyond the Initial Expiration Date and the terms of such extension. Notwithstanding anything to the contrary contained in the Rep Agreement, the expiration or termination of the Rep Agreement shall not have any effect on any Licensing Agreements or definitive deal memos therefor presented prior to such expiration or termination (including, without limitation, any executed during the

3

period following the termination notice and prior to the effectiveness of such termination) and Agent shall continue to receive payment on such Licensing Agreements including all extensions, renewals and modifications thereof for the life of any such deal. Furthermore, in the event of termination or expiration of the Rep Agreement, for a period of one (1) year, Licensor shall not enter into any Licensing Agreement with any party to any Licensing Agreement or any prospective licensee named in any unconsummated License Agreement or term sheet prepared prior to such termination or expiration or Licensor shall compensate Agent on such deal as if the Rep Agreement had not expired or been terminated. Subject to Agent's reasonable transition of existing matters to a replacement agent identified by Licensor, Agent shall have the right to terminate this Agreement upon ninety (90) days' prior written notice to Licensor in the event that Agent determines in good faith that it is unable to continue to provide adequate representation to Licensor.

**LICENSES AND ACCOUNTING:** Agent shall be responsible for drafting and negotiating all Licensing Agreements, all of which shall be consistent with the terms and conditions of this Agreement. Licensor shall be responsible for final review (including legal review) of all Licensing Agreements, and executing all Licensing Agreements submitted to it by Agent within seven (7) days of Agent's submission to Licensor of same for execution. Licensing Agreements shall require that payments thereunder be sent to Agent, and Agent shall account to Licensor on a calendar quarterly basis (within sixty (60) days of the end of each calendar quarter during the Term) with respect to any payments received from licensees (and not returned, refunded or returnable or refundable) under any Licensing Agreements during the applicable calendar quarter.

**DILIGENT EFFORTS:** During the Term, Agent shall use diligent efforts to exploit the representation rights granted hereunder in the Property during the Term; provided, however, Agent makes no representation or warranty about its ability to successfully license the Property and does not guarantee that its efforts will result in the generation of any revenue. During the Term, Licensor shall use diligent efforts to maintain and enhance the value of the Property and to promote the Property (e.g., making public appearances to support product launches under Licensing Agreements).

**FEES/ROYALTIES:** Upon execution of the MOU, Licensor shall have paid Agent an agreed upon Advance and shall begin paying Agent the agreed upon Retainer. Such Advance and all Retainer payments shall be recoupable against all other fees and royalties due to Agent under the Rep Agreement; provided, however, the Advance and all Retainer payments are non-refundable. Agent and Licensor shall share all money paid to and all cash credited to Agent or any affiliate of Agent (and not returned, refunded or returnable or refundable) under any Licensing Agreement, net of Approved Agent Expenses (as defined below), according to split 65% and 35% in favor of Licensor; provided, however, such split shall instead be 60% and 40% in favor of Licensor for deals where Agent uses a Subagent outside the United States. Without limiting the generality of the Section "Talent Fees" below, all fees and royalties paid to Licensor hereunder are inclusive of all third party fees, royalties and payments arising from, relating to or caused by the execution of any Licensing Agreement.

For purposes of clarification, no in-kind payment of any kind (including, without limitation, any advertising or marketing credit) received by or credited to a party shall be considered either "money paid to" or "cash credited to" such party.

**RECOUPMENT:** Notwithstanding anything to the contrary contained in the Rep Agreement, Agent shall have the right to recoup its direct, third party out of pocket expenses (excluding overhead) in connection with the exploitation of its rights under the Rep Agreement **("Approved Agent Expenses")**, from any amounts paid to

4

Agent under any Licensing Agreement hereunder provided that such expenses do not exceed, during any calendar year, the greater of (i) ten percent (10%) of the gross amounts payable to Agent, Licensor or their affiliates under all Licensing Agreements, or (ii) Five Thousand Dollars ($5,000), without Licensor's written approval.

**TALENT FEES:** Other than Agent's payment of the royalty split to Licensor hereunder, Licensor shall bear all costs and expenses for all participation payments of any person or entity or to any guild with respect to or in connection with the use of any name, image, voice or likeness contained in the Property used on or in connection with the exploitation of the rights by Agent under the Rep Agreement and shall be solely responsible for accounting to any third party participants in such revenues.

**REPRESENTATIONS, WARRANTIES & INDEMNIFICATION:** Licensor represents, warrants and covenants that (i) it owns all right and title in and to the Property and has the right to grant the rights granted hereunder to Agent, (ii) the Property and each element therein and thereof is original and does not and shall not infringe or violate the rights of any other person or entity under any laws, including but not limited to any copyright, trademark, trade secret and or patent laws, rights of publicity, privacy or the like or different rights anywhere in the world, and (iii) Licensor is free to enter into the Rep Agreement and doing so does not and will not violate any contractual obligation of Licensor.

Licensor shall indemnify, defend, and hold harmless Agent, the members and affiliates of Agent, any individuals associated with Agent, and each of the foregoing party's respective direct and indirect, past, present and future officers, directors, managers, members, partners, owners, employees, licensees, successors, and assigns (collectively, the **"Indemnitees"**) from and against all actions, causes of action, suits, debts, obligations, losses, damages, amounts paid in settlement, liabilities, costs, and expenses whatsoever, including reasonable attorneys' fees (collectively, **"Losses"**), whether arising out of a claim involving a third party or between the parties to this MOU, resulting to, imposed upon, asserted against, or incurred by any of the Indemnitees in connection with, or arising out of or relating to (i) any breach by Licensor of this MOU, the Rep Agreement, or any Licensing Agreement entered into by Licensor; or (ii) any breach by Licensor of any representation, warranty or covenant under this MOU, the Rep Agreement or any Licensing Agreement entered into by Licensor and any violation of any applicable law, statute, regulation or ordinance.

Agent represents, covenants and agrees that (i) it has the right and authority to execute this Agreement, and (ii) it shall provide all services provided under the Rep Agreement in a professional manner and in compliance with all applicable laws.

**INSURANCE:** Licensor shall maintain liability insurance, E&O insurance and other insurance policies, naming Agent as an additional insured, in the form and at levels mutually agreed to by the Parties but in no event less than the levels standard for the owners of such intellectual property rights being represented by Agent.

**MISCELLANEOUS:** No Party shall have any right to assign or transfer its rights under the Rep Agreement without the prior written consent of the other Parties except in connection with a sale of all or substantially all such Party's equity or assets (and in the case of Agent, except in the case where Sara Nemerov continues to oversee Licensing Agreements for the Property). Each Party hereby represents and warrants that it has the right and authority to enter into this MOU and the Rep Agreement, to grant the rights it grants thereunder, and to perform the duties and obligations it assumes thereunder.

Licensor represents and warrants that it is not currently in negotiations with or under any obligation to any third party with respect to any of the rights granted

5

hereunder and has not been in any such negotiations or under any such obligation during the period of time in which it is exploring a relationship with Agent. Furthermore, Licensor represents and warrants that it is free to enter into this MOU, the Rep Agreement and the Definitive Agreements and to grant any and all rights granted hereunder and that it is under no obligation to any other party that would be violated by this MOU or the Rep Agreement or that would prohibit it in any way from entering into the MOU or Rep Agreement or require the payment of any additional fees or require it to secure any additional approval or consent.

The Definitive Agreements shall be governed under New York law and the parties shall submit to the exclusive jurisdiction and venue of the courts located in New York state and New York county. Licensor's remedies for any breach of this MOU or the Rep Agreement or of any representation or warranty made by Agent or covenant by Agent are limited to the termination of this MOU or the Rep Agreement. Licensor waives any right it may have (except with respect to any unlawful use of the Property) to enjoin or interfere with any use by Agent, its licensees or assigns of the Property.