UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENVY BRANDING, LLC,

                                        Plaintiff,

              -against-

THE WILLIAM GERARD GROUP, LLC, et al.,

                                        Defendants.

Case No. 20-cv-03182 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

        In this contract dispute over money earned from a couple's appearances on reality television and subsequent deals with various brands, the latest drama features the couple, their talent manager, and former branding agent. Envy Branding, LLC ("Envy" or "Plaintiff") is a New York company that identifies opportunities for celebrities to generate revenue from licensing their image or brand. Envy brings this action against The William Gerard Group, LLC ("TWGG"), William G. Dzombak ("Dzombak" and, together with TWGG, the "TWGG Defendants"), Chelsea DeBoer née Houska ("Chelsea"), Cole DeBoer ("Cole" and, together with Chelsea, the "DeBoers"), C&A Enterprises ("C&A"), Dakota Ln LLC ("Dakota Ln"), Down Home DeBoer's LLC ("DHD"), DeBoer Holding Company LLC ("DeBoer Holding"), and Aubree Says LLC ("Aubree Says" and, together with C&A, Dakota Ln, DHD, and DeBoer Holding, the "DeBoer Companies"). Envy claims that the TWGG Defendants, the DeBoers, and the DeBoer Companies (together, "Defendants") violated a set of agreements by, among other things, withholding revenue from the DeBoers' appearances on television and instructing third-party brands not to work with Envy on sponsorship deals for the DeBoers.

Envy brings claims under New York common law for breach of contract, tortious interference with contractual and business relationships, and unjust enrichment/*quantum meruit*. *See generally* ECF No. 59 (the "First Amended Complaint" or "FAC"). In response, Defendants bring counterclaims for breach of contract under the same agreements, arguing that Envy first breached the agreements by withholding revenue collected from the DeBoers' branding deals. *See generally* ECF No. 60 ("Ans.").

The parties have filed cross-motions for summary judgment on all the claims at issue.[1] *See* ECF Nos. 83 ("Pl. Br."), 98 ("Df. Br."), 107 ("Df. Opp."), 119 ("Pl. Opp."), 121 ("Pl. Reply"), 122 ("Df. Reply"). In connection with its summary-judgment motion, Envy has also moved to preclude the report and testimony of Defendants' expert witness. ECF No. 82-1 ("Begakis Br.").

For the reasons that follow, the Court GRANTS in part and DENIES in part both motions for summary judgment, as well as Plaintiff's motion to preclude Defendants' expert.

---

[1] In support of its motion, Envy submitted, in redacted form, a Local Civil Rule 56.1 statement of facts (ECF No. 83-3) and a declaration from Matthew J. McDonald with attached exhibits (ECF No. 83). In opposition to Defendants' motion, Envy also submitted, again in redacted form, an additional declaration from McDonald with attached exhibits (ECF No. 119) and a response to Defendants' Rule 56.1 statement and counterstatement of material facts (ECF No. 119-1 ("Pl. RSOF")).

In support of their motion, Defendants submitted, in redacted form, a Rule 56.1 statement (ECF No. 99); a declaration from Peter T. Shapiro with attached exhibits (ECF No. 93); a declaration from Carolyn Menard with attached exhibits (ECF No. 94 ("Menard Decl.")); a declaration from William G. Dzombak with attached exhibits (ECF No. 95 ("Dzombak Decl.")); a declaration from Cole DeBoer with an attached exhibit (ECF No. 96); and a declaration from Chelsea DeBoer with attached exhibits (ECF No. 97 ("Chelsea Decl.")). In opposition to Envy's motion, Defendants also submitted additional unredacted declarations from the DeBoers (ECF Nos. 112-13), redacted declarations from Dzombak (ECF No. 115) and Menard (ECF No. 117), and a redacted response to Envy's Rule 56.1 statement (ECF No. 109 ("Df. RSOF")).

## BACKGROUND

### I.   Factual Background

Unless otherwise noted, the following facts are undisputed.

### A.   The Parties

Sara Nemerov is the founder and chief executive officer of Envy, a branding and licensing company whose "principal business is licensing intellectual property and identifying branding opportunities for celebrities to generate revenue from social media posts." Pl. RSOF ¶ 99; *see id.* ¶ 2. William G. Dzombak owns and operates TWGG, a talent-management company that manages, among others, Chelsea and Cole DeBoer. *Id.* ¶¶ 1, 16, 18. The DeBoers are a married couple living in South Dakota. Df. RSOF ¶ 1. Both Chelsea and Cole have appeared on Teen Mom 2, a reality television show that initially aired on MTV. *Id.* ¶ 2.

The DeBoers own and control several companies. C&A is a limited-liability company that Chelsea incorporated to, among other things, enter into licensing and branding deals. *Id.* ¶ 8. The DeBoers are the members of Dakota Ln, DHD, DeBoer Holding, and CCAS Holding LLC, all limited-liability companies formed under South Dakota law. *Id.* ¶¶ 10-11, 13, 15-16, 19. In 2020, the DeBoers created Dakota Ln to receive revenue from branding deals, Pl. RSOF ¶ 9, DHD to receive revenue from planned performance projects, including television shows, *id.* ¶ 10, and DeBoer Holding to hold their trademarks and other intellectual property, *id.* ¶ 12. Neither DHD nor DeBoer Holding receives revenue generated from the DeBoers' branding deals. *Id.* ¶¶ 11, 13. The DeBoers (through CCAS Holding LLC) and Dzombak are the members of Aubree Says, a limited-liability company formed in 2020 under Delaware law that sells home goods under its own Aubree Says label. *Id.* ¶ 14; Df. RSOF ¶¶ 17-18. Aubree Says also does not receive revenue from the DeBoers' branding deals. Pl. RSOF ¶ 15.

### B. Relevant Agreements

#### 1. The Viacom Contracts

On July 6, 2010, Chelsea executed her first agreement with Viacom International, Inc. ("Viacom") and New Remote Productions, Inc. ("New Remote") to appear on the show initially known as Teen Mom.  *Id.* ¶ 35; Df. RSOF ¶ 58; *see* ECF No. 83-6, Ex. 9 ("Chelsea Viacom Contract").  On February 18, 2011, and September 22, 2011, Chelsea amended this agreement to govern her appearances on cycles two through five of the show.  *See* ECF No. 83-6, Exs. 11-12. On November 15, 2014, Chelsea executed another amendment to the Chelsea Viacom Contract to appear on cycles six through eight of the show.  Pl. RSOF ¶ 37; *see* ECF No. 83-6, Ex. 13.

Under the Chelsea Viacom Contract, Chelsea granted the show's producer the right to use and license her likeness not only for the television show, but also "for the purpose of, and in connection with, the sale of certain third party products, goods and services."  Chelsea Viacom Contract § 4(i).  Chelsea also agreed that the producer could use, and license others to use, her likeness "in connection with the Programming, and for advertising, publicity, marketing, promotional and commercial tie-in purposes in connection with the Programming . . . (including, without limitation, merchandising and commercial tie-in rights)."  *Id.* at 31.

On December 11, 2014, Cole signed a release to appear on Teen Mom 2.  Df. RSOF ¶ 55; *see* ECF No. 83-7, Ex. 18.  On September 2, 2015, he entered an agreement to appear on cycles six through eight of the Teen Mom series.  *See* ECF No. 83-6, Ex. 10 ("Cole Viacom Contract"); Pl. RSOF ¶ 36.  Under this contract, Cole similarly agreed that the show's producer could use, and license others to use, his likeness in Teen Mom 2 and in "the advertising, marketing and promotion of the Programming . . . including but not limited to the merchandising of the

Programming, its related products and/or Company."  Cole Viacom Contract § 8; *see* Df. RSOF ¶ 66.

2.  Chelsea's and Cole's Agreements with Envy

As Chelsea's talent manager, Dzombak introduced Chelsea (and later Cole) to Nemerov in 2014.[2]  *See* Dzombak Decl. ¶ 4; Pl. RSOF ¶¶ 2, 23.  Envy and Chelsea entered a Memorandum of Understanding, dated January 1, 2015, in which Chelsea granted Envy an exclusive license to use her name, likeness, and other related property "in any manner for the purpose of locating, negotiating and consummating Licensing Agreements."  ECF No. 97-1 (the "Chelsea MOU") at 5; *see* Pl. RSOF ¶ 24.  The Chelsea MOU defined "Licensing Agreements" as:

> any and all licensing opportunities . . . in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions.

Chelsea MOU at 5.

Under the agreement, Envy was to pay Chelsea 65 percent of the money "credited to" Envy "under any Licensing Agreement" (or 60 percent where a subagent was involved).  *Id.* at 6; *see* Pl. RSOF ¶ 24.  For the term of the agreement, amended to expire on July 1, 2019, *see* Chelsea MOU at 2, Chelsea agreed not to "use, or authorize any third party to use," her likeness "in with any Licensing Agreements other than through [Envy]," or to "create, license, promote,

---

[2] Although Chelsea was already TWGG's client, TWGG and Chelsea formalized their relationship on June 24, 2015 through an "Exclusive Management Agreement."  ECF No. 83-5, Ex. 5 (further capitalization omitted); *see* Pl. RSOF ¶ 17.  Cole signed a similar agreement with TWGG on May 22, 2016.  Pl. RSOF ¶ 19.

endorse, invest in, partner with or otherwise engage with any other brand . . . except through

[Envy]," *id.* at 5.

The Chelsea MOU also contained a "tail" provision specifying the circumstances under

which Envy's fee for a given Licensing Agreement remained in effect after the Chelsea MOU's

termination.  *See* Df. RSOF ¶¶ 21, 31.  In particular, the Chelsea MOU provided that:

> the expiration or termination of the [Chelsea MOU] shall not have
> any effect on any Licensing Agreements . . . therefor presented
> prior to such expiration or termination . . . and Agent shall
> continue to receive payment on such Licensing Agreements
> including all extensions, renewals and modifications thereof for the
> life of any such deal.
>
> Furthermore, in the event of termination or expiration of the
> [Chelsea MOU], for a period of one (1) year, [Chelsea] shall not
> enter into any Licensing Agreement with any party to any
> Licensing Agreement or any prospective licensee named in any
> unconsummated License Agreement or term sheet prepared prior
> to such termination or expiration or Licensor shall compensate
> Agent on such deal as if the [Chelsea MOU] had not expired or
> been terminated.

Chelsea MOU at 6.

On April 28, 2016, Envy and Cole entered a Memorandum of Understanding that was

identical in all respects to the Chelsea MOU except for the parties and its term, which expired on

April 28, 2019.  Df. RSOF ¶¶ 22-23; *see* ECF No. 96-1 (the "Cole MOU").

3.   The TWGG Contract

On November 24, 2015, TWGG and Envy entered an Inter-Company Services

Agreement, by which they fixed the details of their working relationship as talent manager and

branding agent, respectively, for their shared clients.  *See* Df. RSOF ¶ 35; ECF No. 95-1 (the

"TWGG Contract").  The TWGG Contract was to run from November 24, 2015, through

December 31, 2019, unless terminated before that date.  *See* TWGG Contract § 1.  The parties

agreed to share certain revenue under two scenarios: (1) where one party had an existing client

enter into an agreement with the other party for the provision of services relating to that party's "Principal Line of Business," a referral fee was to be paid to the referring party; and (2) where a party provided consulting services within its Principal Line of Business to "Signed Clients" ("Consulting Services").  Pl. RSOF ¶ 21; *see* TWGG Contract §§ 3(c), 4(c).

Envy's Principal Line of Business was "pursuing Licensing Opportunities for IP Owners," which consisted of "negotiating and consummating deals for the use of such IP in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions."  TWGG Contract at 2.  TWGG's Principal Line of Business was "providing Talent Management Services for Talent," which included "negotiating terms and preparing and approving contracts for Talent; developing and coordinating publicity campaigns; consulting on major business and creative decisions; assembling, directing and coordinating requisite professional advisors; coordinating, selecting and supervising staff and budgets; monitoring and collaborating with all others who have responsibilities for the career of Talent; and receiving, counseling and coordinating requests for endorsements, appearance, and charitable giving."  *Id.*

Under the TWGG Contract, the parties agreed to share half of all revenue earned in connection with Consulting Services provided for the DeBoers.  Pl. RSOF ¶ 21; *see* TWGG Contract at 18.  Neither party, however, would owe the other any referral fees for the DeBoers. *See* TWGG Contract at 18.  Each party agreed to "bear all of its own costs and expenses in connection with its provision of Consulting Services."  *Id.* § 4(b).  And as relevant to this case, each party agreed to submit to the other, within 90 days of the end of each calendar quarter, "a

detailed statement showing the total gross revenue received" during that quarter, "together with payment of the sum due to the other Party as a result of the provided consulting services." *Id.* § 7(b). In the case of a "material breach" by one party, the other could terminate the TWGG Contract only if it had provided written notice of the breach and the breaching party had failed to cure the breach within 30 days of receiving that notice. *See id.* § 6(a).

4. Amendments to the Viacom Contracts

The DeBoers subsequently executed several amendments and extensions to their original agreements to appear on Teen Mom 2. On July 15, 2017, Chelsea signed an amendment, dated January 13, 2017, to the Chelsea Viacom Contract. *See* ECF No. 83-6, Ex. 14. The amendment revised the terms of Chelsea's exclusivity period, her ratings bonus, her availability during production, and liquidated damages for violations of her production-related obligations. *See id.* Chelsea entered another amendment, dated January 30, 2017, to the Chelsea Viacom Agreement that revised her compensation and reimbursement for travel in connection with her participation in television specials. *See* ECF No. 83-6, Ex. 15; Df. RSOF ¶ 69; Chelsea Decl. ¶ 8. Cole also entered amendments to his original agreement, dated January 13, 2017 and July 3, 2018, that revised his compensation for appearances on cycles eight through thirteen of Teen Mom 2. *See* ECF No. 83-7, Exs. 17, 19.

The parties dispute the extent to which Envy participated in negotiations for these amendments and extensions. *See* Df. RSOF ¶¶ 70-71; Pl. RSOF ¶¶ 41-42. Defendants claim that Envy had no significant involvement in the negotiations, Pl. RSOF ¶¶ 41-42, while Nemerov claims that she spent "hundreds, if not thousands, of hours of work" on these negotiations and on ensuring the parties' subsequent compliance with the agreements, ECF No. 83-7, Ex. 16 ("Nemerov Decl.") ¶ 4. The parties also dispute whether Nemerov requested to be paid a share

of revenue from the Viacom agreements, and whether Dzombak promised Nemerov that she would receive those payments. *See* Df. RSOF ¶¶ 72-76.

### C. Alleged Breaches

The parties agree that, for the first three quarters of 2016, Envy provided account statements to Defendants and paid them for the DeBoers' branding and licensing work. Pl. RSOF ¶ 46. However, for the fourth quarter of 2016 and all of 2017, Envy did not provide account statements or pay Defendants any share of revenue associated with Envy's Consulting Services. *Id.* ¶¶ 47, 58; *see* Menard Decl. ¶¶ 7-10. The parties offer competing characterizations of their conduct during this time. Defendants claim that TWGG and the DeBoers regularly requested, to no avail, that Envy send account statements and payments. Pl. RSOF ¶ 48. Envy denies that these requests were regular, *id.*, and counters that it withheld the money received for the DeBoers' branding deals as an offset against the money that it claims it was owed, primarily from the DeBoers' television earnings, *see id.* ¶¶ 95, 108; Df. RSOF ¶ 92. Envy also claims that, because "the DeBoers performed very little work during the referenced timeframe," Envy "received limited revenue on their behalf and faced frequent issues with the DeBoers failing to fulfill obligations to brands such that advances needed to be repaid." Pl. RSOF ¶ 47.

In 2017, the law firm of Haynes and Boone, LLP provided legal services in connection with an inquiry from the Federal Trade Commission as to some of Chelsea's social-media posts. *See* Df. RSOF ¶¶ 121-122; ECF No. 115-2 (email correspondence). The parties dispute who retained Haynes and Boone. Envy asserts that Chelsea made these social-media posts without its guidance and subsequently engaged the law firm on her own. Df. RSOF ¶¶ 121-123. Defendants claim that the posts in question were part of Envy's branding work, and that Nemerov both communicated with the firm about its work product and directed the firm to address its engagement letter to Envy. *Id.* ¶¶ 121-122; *see* ECF No. 115-2 at 2. TWGG

ultimately paid a "negotiated amount on Chelsea's behalf in satisfaction of the claim."  Pl. RSOF ¶ 98; *see* ECF Nos. 95-5, 95-6.

On July 9, 2018, Envy provided TWGG an account statement and made an accompanying payment with respect to Chelsea's branding work.  Pl. RSOF ¶ 49; *see* ECF No. 94-2 (the "2018 Statements") at 2.  However, the statement did not include the period covered or the amounts due to Cole, *see* 2018 Statements at 2, and contained mathematical errors, Pl. RSOF ¶ 49.  On August 21, 2018, Envy sent TWGG a wire payment, but the amount was for less than what TWGG believes it was owed.  *Id.* ¶ 50.  Envy also sent TWGG a revised account statement in August 2018, but that statement, like the one sent in July, had mathematical errors.  *Id.* ¶ 51.  TWGG never received a newly revised account statement from Envy or the money that it believes it was owed.  *Id.* ¶ 52.  After August 2018, Envy continued to receive payments from brands on behalf of the DeBoers that it did not distribute to TWGG and the DeBoers.  *Id.* ¶ 53; *see id.* ¶¶ 77-78 (Envy acknowledging that it withheld sums received in October and November 2018).

Eventually, TWGG sent letters to brands to explain that Envy was no longer the DeBoers' branding agent, request an accounting of any outstanding work or payment, and ask that brands send any pending payments to TWGG.  Df. RSOF ¶ 102; *see* ECF Nos. 97-5, 97-6 (providing examples of letters sent).  The parties dispute when TWGG started contacting these brands on the DeBoers' behalf.  Defendants claim this outreach began in August 2019 and continued into the following month.  Pl. RSOF ¶ 55.  Envy, for its part, claims that TWGG's "interfer[ence]" began "no later than January 2019," *id.*; *see also* Df. RSOF ¶ 48, and that, starting in May 2019, Defendants routed all of Envy's Licensing Agreements for the DeBoers through TWGG, *see* Df. RSOF ¶ 88.

10

On September 27, 2019, TWGG's counsel sent Envy a letter saying that TWGG was terminating both its relationship with Envy and Envy's representation of the DeBoers.  Pl. RSOF ¶ 57; *see* ECF No. 95-7 (the "Termination Letter").  On October 2, 2019, Envy's counsel sent TWGG a letter in which Envy (among other things) requested an audit of TWGG's records.  Df. RSOF ¶ 106; *see* ECF No. 83-8, Ex. 30 at 3 n.1.  TWGG's counsel responded on October 8, 2019, extending an opportunity for Envy to cure its alleged breaches by October 18, 2019.  Df. RSOF ¶ 108; *see* ECF No. 83-8, Ex. 32 at 3.

Around this time, TWGG took over the duties previously assumed by Envy and began entering into new branding agreements on the DeBoers' behalf.  Df. RSOF ¶¶ 94, 104.  TWGG received 25 percent of the revenue earned in connection with this work; the DeBoers received 75 percent.  *Id.* ¶ 95.

## II.    Procedural History

Envy brought this action in New York state court on March 5, 2020, and Defendants removed the case to this District on April 22, 2020.  *See* ECF No. 1.  As the case proceeded through discovery, it was reassigned to the undersigned on September 16, 2022.  *See* ECF No. 58.  Envy amended its complaint on September 26, 2022, asserting the following claims: (1) a breach of the TWGG Contract against the TWGG Defendants; (2) a breach of the Chelsea MOU against Chelsea; (3) a breach of the Cole MOU against Cole; (4) tortious interference against the TWGG Defendants; (5) tortious interference against the DeBoer Companies; and (6) unjust enrichment/*quantum meruit* against all Defendants.  FAC ¶¶ 87-159.  Defendants answered the First Amended Complaint on October 11, 2022, alleging two breach-of-contract

counterclaims against Envy for breaches of its contracts with TWGG and the DeBoers.  Ans. ¶¶ 224-233.

On June 16, 2023, both Envy and Defendants moved for summary judgment.  *See* Pl. Br.; Df. Br.  Plaintiff also moved to exclude proposed testimony from Defendants' expert witness, John M. Begakis ("Begakis"), on the same day.  *See* Begakis Br.  The parties filed their respective opposition briefs to all three motions on July 31, 2023.  *See* Pl. Br.; Df. Opp.; ECF No. 118 ("Begakis Opp.").  The parties filed their respective replies on August 18, 2023.  *See* Pl. Reply; Df. Reply.; ECF No. 120 ("Begakis Reply").  All three motions are thus fully briefed and presently before the Court.[3]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 56, a moving party is entitled to summary judgment if, on any claim or defense, that party demonstrates from the admissible evidence and pleadings "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute over an issue of material fact is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can

---

[3] Envy requested oral argument on the motions via notations on its briefs.  *See, e.g.*, Pl. Br.; Pl. Opp; Pl. Reply.  In an exercise of its discretion, the Court denies this request because oral argument would not be helpful to the Court.  *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) (noting that "a district court's decision whether to permit oral argument rests within its discretion").

point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  To defeat a motion for summary judgment, the non-moving party must advance more than "a scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  It is instead the parties' responsibility to "point out" contested facts for the Court, and "to clarify the elements of the substantive law which remain at issue because they turn on contested facts." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citation omitted).

If, as here, "both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublin, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Id.*; *accord Morales v. Quintel Ent. Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "Rather, each party's motion must be examined on its own merits, and in

each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121.

## DISCUSSION

The Court will first address the motion brought by Plaintiff to exclude expert testimony, also known as a *Daubert* motion, and then the cross-motions for summary judgment. *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## I. *Daubert* Motion

Defendants offer the expert testimony of John M. Begakis, who, based on his experience as a California-licensed entertainment attorney, concludes that: (1) the plain language of the DeBoers' MOUs precludes Envy from claiming any commission on money received by the DeBoers in connection with the Teen Mom series; and (2) "it is widely understood in the entertainment industry that brand managers are not entitled to commissions on non-branding related talent revenues." ECF No. 93-7 ("Begakis Rep.") at 5-6.[4] Envy has moved to exclude Begakis's testimony.

Under Federal Rule of Evidence 702 ("Rule 702"):

> A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[4] Begakis also concludes that New York's Employment Agency Law required Envy to be licensed by the New York State Commissioner of Labor before it could charge the DeBoers a fee for its services in procuring employment opportunities for them. Begakis Rep. at 5-6. Defendants, however, no longer seek to introduce that portion of Begakis's testimony. *See* Begakis Opp. at 1. Thus, the Court need not consider this portion of Begakis's testimony.

"The Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (quotation marks and citation omitted).  District courts serve as "gatekeep[ers]," responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  They have "broad discretion in the matter of the admission or exclusion of expert evidence." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)); *accord Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 38 (2d Cir. 2001) (summary order) ("The trial court's discretion is especially broad with respect to the admission or exclusion of expert evidence."). To testify as an expert under Rule 702, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "Any of the five forms of qualifications will satisfy the rule," and a court makes this determination by considering "the totality of the witness's background."  *In re Aluminum Warehousing*, 336 F.R.D. at 27 (brackets and citations omitted).

Begakis may interpret factual evidence but cannot offer opinions as to matters of law. *See United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions."); *Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, 287 F.R.D. 216 (S.D.N.Y. 2012) ("An expert's testimony on issues of law is inadmissible." (brackets and citation omitted)).  While an expert opinion "is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), it remains impermissible for

experts "to offer opinions embodying legal conclusions," *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)).

Here, Begakis purports to opine on the issue of whether Envy is entitled to a commission on revenue received by the DeBoers in connection with their appearance on the Teen Mom series. Begakis Rep. at 5. At least one basis for Begakis's opinion is his "review of the plain language" of the agreements at issue. *Id.* at 4. Begakis's textual analysis of these agreements plainly amounts to a legal opinion. *See Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 24 (2d Cir. 1994) (interpretation of a contract "is a legal judgment made by the court independently of the evidence presented by, or the arguments of, the parties" (quotation marks and citation omitted)). If admitted, such evidence would "undertake[] to tell the [factfinder] what result to reach." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Begakis's opinion on the plain text of the agreements therefore does not constitute expert testimony, and the Court will not rely on it to interpret either the DeBoers' MOUs or the TWGG Contract.

However, the Court will admit Begakis's testimony to the extent that he draws on his experience in the entertainment industry to opine on industry norms around whether brand managers are entitled to commissions on their clients' non-branding-related revenue. *See SEC v. Ripple Labs, Inc.*, No. 20-cv-10832 (AT), 2023 WL 5670711, at *14 (S.D.N.Y. Mar. 6, 2023) (allowing that "expert witness testimony may explain how a contract operates in the marketplace" (citation omitted)). The Court finds Begakis qualified as an expert based on his experience in the entertainment industry and agrees with Defendants that Begakis has adequately shown how his experience led to his conclusions or provided a basis for his opinions. Begakis testifies that he has over ten years of experience representing talent clients in entertainment-

related transactions, including as co-founder of an entertainment-law firm. Begakis Rep. at 4. He also explains that his "experiences as a fellow talent representative" and "intimate involvement with many brand managers and management companies regarding all aspects of their business" have informed his opinions, including his view on industry norms and expectations. *Id.*

Envy argues that Begakis's opinion on the entertainment industry is irrelevant because he is based in California, not New York. Begakis Br. at 11. The Court concludes that this critique goes to the weight of Begakis's opinion, not its admissibility. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (cross-examination and presentation of contrary evidence are the appropriate means of attacking otherwise admissible expert testimony). Because Begakis's testimony on entertainment-industry norms bears some relevance to Envy's unjust-enrichment claim (addressed below), the Court will admit it.

## II.   Summary Judgment Motions

Plaintiff and Defendants have brought breach-of-contract claims against each other as to the same set of agreements: the TWGG Contract and the Chelsea and Cole MOUs. The Court will address that set of claims before turning to Plaintiff's claims for tortious interference and unjust enrichment/*quantum meruit*.

### A.   Breach of Contract

The parties' agreements are governed by New York law. Both the Chelsea and Cole MOUs, as well as the TWGG Contract, contain New York choice-of-law clauses. Chelsea MOU at 7; Cole MOU at 7; TWGG Contract § 9(a). The parties also cite New York law in their briefs. *See generally, e.g.*, Pl. Br.; Df. Br. Under New York choice-of-law rules in diversity cases, this "implied consent" is "sufficient to establish choice of law." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) (citation omitted); *accord N.Y. Wheel Owner LLC v. Mammoet*

*Holding B.V.*, 481 F. Supp. 3d 216, 229 (S.D.N.Y. 2020).  To state a claim for breach of contract

under New York law, a plaintiff must show: (1) the existence of an agreement; (2) the plaintiff's

adequate performance of the contract; (3) the defendant's breach of contract; and (4) damages.

*34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022); *accord Martinez v.

Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023).

Envy argues that the DeBoers breached the Chelsea and Cole MOUs by failing to pay

Envy a share of the revenue that they received in connection with their appearances on Teen

Mom 2, Pl. Br. at 17; Pl. Opp. at 11, and by redirecting all branding deals after May 2019

through TWGG, Pl. Br. at 19.  Envy also claims that TWGG breached the TWGG Contract by

providing the DeBoers with licensing and branding services in January 2019, *id.*, refusing to

permit an audit, *id.* at 21, collecting revenue from the DeBoers without paying half to Envy, Pl.

Opp. at 13, and terminating the contract without providing Envy 30 days to cure, *id.*  Defendants

respond that Envy was the first to breach these agreements in 2017 by failing to make payments

for the DeBoers' branding deals and issue corresponding account statements.  Df. Br. at 8, 10.

They argue that, because of Envy's material breach, they had no duty to perform under the

TWGG Contract or Chelsea's and Cole's MOUs.  *Id.* at 8.

The Court untangles these claims by addressing the alleged breaches in chronological

order, starting with the DeBoers' failure to share revenue from Viacom, proceeding to Envy's

withholding of revenue from the DeBoers' branding deals, and ending with Defendants'

response in 2019.

1.  The Viacom Contracts

The Court first considers the DeBoers' alleged failure to pay Envy a share of revenue

collected from Viacom in connection with their appearances on Teen Mom 2.  The parties

dispute whether the DeBoers' contracts with Viacom were "Licensing Agreements" within the scope of Chelsea's and Cole's MOUs, entitling Envy to a share of revenue earned under those contracts.

A court may grant summary judgment on a contract claim "only when the contractual language is found to be wholly unambiguous and to convey a definite meaning." *Martinez*, 88 F.4th at 409 (ellipsis omitted) (quoting *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)). A contract is unambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011); *accord Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170-71 (N.Y. 2002). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Kennedy v. Basil*, 531 F. Supp. 3d 828, 841 (S.D.N.Y. 2021) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

"Whether contract terms are unambiguous presents 'a question of law that is resolved by reference to the contract alone.'" *Martinez*, 88 F.4th at 409 (quoting *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994)); *see Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011) (a court must assess ambiguity "within the four corners of the document"). Courts are to give the "words and phrases in a contract . . . their plain meaning" and construe the contract "so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (alterations adopted and citation omitted). "Only where a contract's terms are ambiguous can extrinsic evidence be used to aid interpretation." *Tang Cap. Partners, LP v. BRC Inc.*, 661 F. Supp. 3d 48, 61 (S.D.N.Y. 2023).

As previously stated, the Chelsea and Cole MOUs defined "Licensing Agreements" as:

> any and all licensing opportunities . . . in connection with or relating to the sale, rental, lease or license of products or services for public or private consumption or use, including, without limitation, for use in connection with merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions.

Chelsea MOU at 5; Cole MOU at 4.

The Court concludes that the DeBoers' Viacom contracts – under which Chelsea and Cole allowed Teen Mom 2 to use their likenesses for the show – are not "Licensing Agreements" because they bear no "connection with . . . the sale, rental, lease or license of products or services." Chelsea MOU at 5; Cole MOU at 4. Licensing one's likeness to appear on television, without more, does not amount to the sale, rental, lease, or license of a product or service such as "merchandise products, branded services, promotional and tie-in premium opportunities, sponsorships, endorsements, exhibitions, and event and permanent attractions." Chelsea MOU at 5; Cole MOU at 4; *cf. Brown v. Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 441 (S.D.N.Y. 2019) (dismissing right-of-publicity claim under Georgia law in part because the use of plaintiff's likeness in a documentary film was unrelated to the "manufacture, sale or advertising of any commercial products"); *Fuentes v. Mega Media Holdings, Inc.*, 721 F. Supp. 2d 1255, 1259 (S.D. Fla. 2010) (holding, in the context of a Florida right-of-publicity claim, that the use of a plaintiff's likeness on a television show had no commercial purpose where the show was "intended to entertain and/or inform the public" and the plaintiff did not allege that his "likeness was used to promote some other product or service on the show"). Envy offers little textual support for its argument that the Viacom Contracts are "Licensing Agreements" under the Chelsea and Cole MOUs; it merely states, erroneously, that Defendants admit this premise. *See*

Pl. Br. at 17; Pl. Reply at 1.  The Court finds troubling the degree to which Envy mischaracterizes Defendants' position on this point.  *See, e.g.*, Df. Opp. at 16-17.  In any event, the Court finds unconvincing Envy's attempt to construe the DeBoers' agreements to appear on a television show as "Licensing Agreements" that fall under the MOUs.

Elsewhere, Envy argues that the Viacom contracts "revolve around licenses for precisely the type of intellectual property covered by the DeBoer [MOUs] and expressly require the DeBoers to engage in the core conduct contemplated therein: product marketing, social media posting, and related appearances."  Pl. Opp. at 7; *see* Pl. Br. at 9 (noting that Chelsea's Viacom contract granted New Remote a license to use her and her children's likeness on a website to sell "Third Party Merchandise worn by, or similar to products worn by, Chelsea and her children", and excerpting Chelsea's agreement to participate in the production of additional content related to the show, including a book, gaming content, and graphics/wallpaper content).

Insofar as the DeBoers' Viacom contracts included licensing opportunities as to merchandise and other products covered by Envy's MOUs, the DeBoers negotiated and finalized those details well before entering into their contracts with Envy.  *Compare* Chelsea Viacom Contract at 2 (effective July 6, 2010), *and* Cole Viacom Contract at 2 (effective September 2, 2015), *with* Chelsea MOU at 3 (dated January 1, 2015), *and* Cole MOU at 2 (dated April 28, 2016).  Nothing in the MOUs suggests that Envy and the DeBoers intended for their agreements to apply retroactively before their effective dates.  *Cf. Kane Mfg. Corp. v. Partridge*, 533 N.Y.S.2d 948, 949 (2d Dep't 1988) ("[A] guarantee agreement cannot be held to have a retroactive effect unless by its express words or necessary implication it clearly appears to be the parties' intention to include past obligations.");  *Crisafulli Bros., Inc. v. Clanton*, 512 N.Y.S.2d 927, 964 (3d Dep't 1987) ("A contract of surety shall not be construed to have retroactive

operation unless express words or necessary implication dictate such effect.").  Envy argues that it is entitled to relief because it assisted with negotiations on subsequent amendments and extensions to the DeBoers' Viacom contracts.  *See* Pl. Br. at 11.  Even looking at those subsequent amendments, the Court concludes that they deal primarily with the DeBoers' compensation in later cycles of Teen Mom 2.  *See* ECF No. 83-6, Exs. 14-15; ECF No. 83-7, Exs. 17, 19.  The amendments do not reference or address new branding rights or any new rights or licenses that might qualify as a "Licensing Agreement" under Chelsea's and Cole's MOUs. Thus, even if Envy helped negotiate these amendments, their plain text lacks any details as to licensing opportunities for the DeBoers that would be "credited to" Envy under its agreements. Chelsea MOU at 6; Cole MOU at 5.

Further bolstering Defendants' position is the fact that the DeBoers granted Envy the right to use their likenesses only "for the purpose of locating, negotiating *and* consummating License Agreements."  Chelsea MOU at 5 (emphasis added); Cole MOU at 4 (emphasis added). That the word "and" is used – not "or" – suggests that Envy's contracts with the DeBoers applied only to Licensing Agreements for which Envy had taken all three steps of locating, negotiating, and consummating, rather than only one or two of those actions.  *See United States v. Lopez*, 998 F.3d 431, 436 (9th Cir. 2021) ("For the past fifty years, dictionaries and statutory-construction treatises have instructed that when the term 'and' joins a list of conditions, it requires not one or the other, but *all* of the conditions."); *id.* (collecting definitions).  Because Envy did not locate the amendments and extensions to the DeBoers' Viacom contracts, they are not "Licensing Agreements" for which Envy is entitled to a cut of the associated revenue.  In sum, regardless of whether the DeBoers' original Viacom contracts included "Licensing Agreements" covered by

Envy's MOUs, Envy cannot point to any that it "locat[ed], negotiat[ed] and consummat[ed]." Chelsea MOU at 5; Cole MOU at 4.

For all of these reasons, the Court holds that the DeBoers did not breach their MOUs with Envy by failing to share revenue earned under their Viacom contracts.

2. Defendants' Counterclaims

Next, the Court turns to Defendants' counterclaims that Envy breached (1) Chelsea's and Cole's MOUs by withholding revenue from the DeBoers' branding deals between late 2016 and 2019; and (2) the TWGG Contract by failing to share earnings from Consulting Services provided to the DeBoers, deliver the required account statements, and pay legal fees that Envy had incurred in connection with its work. *See* Df. Br. at 24. The parties agree that these agreements were enforceable – indeed, they seek to enforce their breach-of-contract claims under them. *See generally id.*; Pl. Br. However, Envy disputes whether Defendants adequately performed under their respective contracts. *See* Pl. Br. at 24. The Court addresses each of Defendants' breach-of-contract counterclaims in turn.

a. Chelsea's and Cole's MOUs

On Defendants' first counterclaim, the Court agrees with Defendants that Envy breached the DeBoers' MOUs. The Court has already concluded that the DeBoers did not breach their MOUs by failing to pay Envy a cut of their earnings from appearing on Teen Mom 2. Envy does not credibly suggest that the DeBoers otherwise failed to adequately perform under their MOUs before May 2019. Envy argues that Defendants failed to provide certain information needed for Envy to provide accurate accounting statements. *See* Pl. Opp. at 11; Pl. Reply at 2. Nemerov testified that Envy's licensing agreements "often included complicated payment frameworks in which the brand would advance sums against future work or sales. The precise amount the

DeBoers earned would often depend on the success of the posts they made based on certain metrics and/or sales. . . .  Envy therefore required information from the contracting brand to calculate the correct amount to distribute to the DeBoers."  ECF No. 119-3, Ex. 37 ¶ 9.  Yet Envy does not explain why, at least until May 2019, it needed Defendants, rather than the brands themselves, to provide this information.

As to Envy's alleged breach, Envy concedes that it withheld revenue from the DeBoers' branding deals but argues that it did so to offset money owed in connection with the DeBoers' appearance on Teen Mom 2.  *See* Pl. Br. at 13, 17; Pl. Opp. at 9, 11; Pl. Reply at 2.  However, as discussed above, Envy was never entitled to this money; therefore, it had no breach to offset by withholding revenue from the DeBoers' branding deals.[5]  And to the extent that Envy claims a breach from when the DeBoers allegedly redirected their branding deals through TWGG, the alleged conduct all occurred in 2019 – years after Envy first breached its agreements.  *See Evolution Mkts., Inc. v. Alpental Energy Partners, LLC*, 221 F. Supp. 3d 361, 371 (S.D.N.Y. 2016) ("[T]here is no authority whatever for the proposition that Party A's blatant breach of

---

[5] In any event, the cases on which Envy relies to claim a right to offset under New York common law are unavailing.  *See* Pl. Br. at 24 (citing *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13-cv-02581 (PKC) (JLC), 2019 WL 3334503 (S.D.N.Y. July 25, 2019), *objections overruled*, 2019 WL 12373602 (S.D.N.Y. Oct. 9, 2019)); Pl. Reply at 8 (citing *Olin Corp. v. Ins. Co. of N. Am.*, 218 F. Supp. 3d 212 (S.D.N.Y. 2016); and *Hulse v. Knapp*, 20 F. Supp. 137 (W.D.N.Y. 1937)).  *CBF Industria* concerned offset as an affirmative defense to state-law fraud claims raised in the context of a foreign arbitration award; its procedural posture did not implicate New York common law.  *See* 2019 WL 3334503, at *1-2, *8.  *Olin Corp.* stands only for the proposition that a party is excused from its further performance obligations when the other party commits a material breach.  218 F. Supp. 3d at 224 (citing *Wechsler v. Hunt Health Sys., Ltd.,* 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004)).  It does not allow Envy to continue receiving – and keeping – the benefits of the DeBoers' performance under the MOUs.  *Hulse* concerned the specific context of a bank's setoff rights.  20 F. Supp. at 137-38; *see In re Catalano*, 352 B.R. 361, 362 (Bankr. W.D.N.Y. 2006) ("In New York, . . .  banking institutions have a long established right of setoff where a borrower is indebted to the institution and also has money on deposit with the institution.").  Therefore, Envy's reliance on a supposed "right of offset" does not justify its nonperformance.  Pl. Br. at 17.

contract is excused if Party B breaches the contract *after* Party A does so; one looks to the situation at the time of [Party A's] breach.  At that moment, [Party B] had done nothing at all to breach the contract, so there was no justification for [Party A] to do so.  A subsequent breach by [Party B] might offset any damages suffered from [Party A's] earlier breach, but it does not excuse [Party A's] prior behavior.").  By continuing to receive payments from third-party brands while failing to remit 65 percent of that revenue to the DeBoers, Envy breached the MOUs.

However, issues of fact remain with respect to Defendants' damages.  For various branding deals, Envy disputes whether it received the alleged amount from a given brand, whether it received that amount on behalf of the DeBoers, or whether it failed to pay Defendants the full amount allegedly owed.  *See* Pl. RSOF ¶¶ 59, 66, 70, 72-74, 85.  The Court cannot grant summary judgment to Defendants on their counterclaim as to damages.  *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 708 (S.D.N.Y. 2016) (granting partial summary judgment on contractual liability but denying summary judgment as to damages because the "plaintiff ha[d] not provided a sufficient undisputed basis for the Court to make a determination as to the quantum of damages").  Therefore, the Court grants partial summary judgment to Defendants on this counterclaim as to Envy's contractual liability, but leaves for trial the issue of how much Envy owes the DeBoers in damages.

b.  The TWGG Contract

For substantially the same reasons as those raised above as to Defendants' first counterclaim, the Court holds that Envy breached the TWGG Contract by withholding TWGG's share of revenue earned in connection with Consulting Services provided for the DeBoers.  *See* TWGG Contract at 18.  The parties do not dispute that the payments at issue for consulting services fall squarely within Envy's "Principal Line of Business" as branding deals that Envy

secured for the DeBoers, and that Envy withheld those payments in full instead of distributing a share to TWGG.  Apart from revenue associated with the DeBoers' Viacom contracts, which the Court has already addressed, Envy does not claim that the TWGG Defendants otherwise failed to adequately perform under the TWGG Contract until January 2019, by which time Envy had already breached the agreement by withholding payments from the DeBoers' branding deals.[6]

Finally, as to Chelsea's legal fees from Haynes & Boone, the Court finds a genuine issue of material fact that precludes summary judgment. Although each party agreed to "bear all of its own costs and expenses in connection with its provision of Consulting Services," the Court cannot conclude as a matter of law that Envy retained the law firm in connection with its services to Chelsea.  TWGG Contract § 4(b).  That Nemerov both communicated with the firm about its work product and directed the firm to address its engagement letter to Envy – as Defendants claim – does not, on its own, suggest that it incurred these expenses for "its provision of Consulting Services."  *Id.*; *see* Df. RSOF ¶¶ 121-122; ECF No. 115-2 at 2 (Nemerov's emails with Haynes & Boone).  At trial, the parties can resolve whether Chelsea made certain social-media posts without Envy's guidance and who engaged the law firm.

In sum, the Court grants partial summary judgment to Defendants as to Envy's liability under the TWGG Contract for withholding payments.  The Court denies summary judgment as to the amount of those payments and the separate issue of whether Envy further breached the TWGG Contract by declining to pay Haynes & Boone's legal fees.

---

[6] Envy similarly breached the TWGG Contract by failing to provide TWGG with timely account statements on a quarterly basis.  However, the Court notes that Defendants have not tried to connect the damages claimed with this failure to provide account statements.  Therefore, to the extent that the Court grants partial summary judgment to Defendants on Envy's liability under the TWGG Contract, it does so based on Envy's failure to pay Defendants, not its failure to issue account statements.

3.   Defendants' Alleged Breaches in 2019

Finally, the Court turns to Envy's claims that Defendants (further) breached their

agreements in 2019.  The Court considers Envy's claims as to each set of Defendants.

a.   The DeBoers

Envy argues that the DeBoers breached their MOUs by redirecting all branding deals

after May 2019 through TWGG.  Pl. Br. at 19.  Defendants do not dispute that the DeBoers

funneled their branding deals through TWGG during this time.  *See* Df. Opp. at 5-6; ECF No.

83-7, Ex. 29 at 43:14-25; ECF No. 97-6 (notification letter dated May 7, 2019).  Instead, they

argue that Envy's previous breach of the contracts "removed any obligations . . . to continue the

relationship or to perform."  Df. Opp. at 5-6.  They further argue that "[t]he DeBoers had no

obligation to continue to retain Plaintiff as their branding agent when Plaintiff had stopped

fulfilling its duties."  *Id.* at 6.

"Under New York law, a party's performance under a contract is excused where the other

party has substantially failed to perform its side of the bargain or, synonymously, where that

party has committed a material breach."  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d

125, 136 (2d Cir. 2016) (citing *Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445, 450 n.9

(N.Y. 1974)); *see Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283,

291 (S.D.N.Y. 2005) ("A fundamental principle of contract law provides that the

material breach of a contract by one party discharges the contractual obligations of the non-

breaching party.").  "Whether a failure to perform constitutes a 'material breach' turns on several

factors, such as the absolute and relative magnitude of default, its effect on the contract's

purpose, willfulness, and the degree to which the injured party has benefitted under the contract."

*Process Am., Inc.*, 839 F.3d at 136.  "For a breach to be material, it must 'go to the root of the

agreement between the parties.'" *Id.* (quoting *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)); *see* 23 Williston on Contracts § 63:3 (Westlaw 4th ed. updated May 2023) ("[F]or a breach of contract to be material, it must go to the root or essence of the agreement between the parties, or be one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract, or affect the purpose of the contract in an important or vital way." (quotation marks and footnotes omitted)).  By contrast, a "partial breach may entitle the non-breaching party to damages for the breach, but does not entitle the party to simply treat the contract as at an end." *Process Am., Inc.*, 839 F.3d at 136-37.

For the DeBoers, Envy's breach of their MOUs was material.  *See Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 504 (S.D.N.Y. 2007) (failure to pay royalties under an agreement generally is deemed a material breach of contract).  Here, Envy withheld payments totaling tens, if not hundreds, of thousands of dollars received since the third quarter of 2016 for branding deals that the DeBoers performed.  *See* Pl. RSOF ¶¶ 59-64, 67-68, 73-82, 87-90, 93-94; *see also id.* ¶ 95 (calculating hundreds of thousands of dollars that Envy received from brands that it did not disclose or pay out to Defendants; Df. RSOF ¶ 92 (Envy acknowledging that it withheld this revenue received from Licensing Agreements as an "offset").  For many of these payments, including those from earlier in 2016, Envy either failed to disclose that it had received these payments or paid Defendants amounts suggesting that Envy had received less money from a given brand.  *See, e.g.*, Pl. RSOF ¶¶ 65-72, 91-92.  Except for one payment in August 2018, the DeBoers received no compensation for the branding work that they had done since September 2016.  *See* Menard Decl. ¶¶ 7-11; Pl. RSOF ¶ 58 (acknowledging that "Envy's relevant payments to Defendants are contained within" Menard's declaration).  Envy's failure to pay the DeBoers

for their work goes, quite plainly "to the root" of the MOUs, which was to allow Envy to enter

licensing and branding deals for the DeBoers in exchange for a fee. *Process Am., Inc.*, 839 F.3d

at 136 (citation omitted); *see ARP Films, Inc. v. Marvel Ent. Grp., Inc.*, 952 F.2d 643, 649 (2d

Cir. 1991) ("[F]ailure to tender payment is generally deemed a material breach of a contract.");

*accord Jordan*, 485 F. Supp. 2d at 504.  Concluding that Envy's breach was not material would

suggest that the DeBoers had to continue working without compensation.  By materially

breaching Chelsea's and Cole's MOUs, Envy effectively ended its contractual relationship with

the DeBoers.  Therefore, it cannot pursue its own breach-of-contract claim against the DeBoers

to enforce those contracts.[7]

Suggesting that its breach was not material, Envy describes Defendants' counterclaims as

a request for "nominal sums . . . derived from a period when Chelsea and Cole were barely

working."  Pl. Reply at 2; *see* Pl. RSOF ¶¶ 101-102 (asserting that the DeBoers "performed very

---

[7] While Envy does not raise this point, the Court notes that the DeBoers could have elected to continue their contracts with Envy by accepting payment from Envy in August 2018.  *See Wechsler v. Hunt Health Sys., Ltd.*, 186 F. Supp. 2d 402, 413 (S.D.N.Y. 2002) ("[W]hen one party to a contract materially breaches the contract during the course of a continuing performance, the non-breaching party has a choice presented to him of continuing the contract or of refusing to go on."); *Cary Oil Co. v. MG Refin. & Mktg., Inc.*, 90 F. Supp. 2d 401, 409 (S.D.N.Y. 2000) ("[I]f the party aggrieved by a material breach elects not to terminate, the breach is deemed partial, and the contract remains in force."); *ARP Films*, 952 F.2d at 649 (noting that plaintiff's "decision to continue receiving benefits pursuant to the . . . Agreement [after the other party's repudiation] was tantamount to an election to affirm the contract").  However, Envy's continued failure to make payments after August 2018, through 2019, amounted to more material breaches that would have discharged any revived obligations that the DeBoers may have had under their agreements with Envy.  *See* Pl. RSOF ¶¶ 77-78 (noting amounts withheld after August 2018); *ESPN, Inc. v. Off. of Comm'r of Baseball*, 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999) (if the non-breaching party is deemed to have elected to continue the contract, it cannot thereafter terminate the contract based on the earlier breach, but may still terminate the contract because of other subsequent breaches); *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 156 (1st Dep't 2007) ("[E]ven if Kinko's waived its remedy of terminating the agreement based on Inspire's late payments by accepting them, it retained its right to terminate for Inspire's failure to make timely payments in the future."), *aff'd*, 925 N.E.2d 926 (N.Y. 2010).

little work from January 2017 through the middle of 2018," and that Envy paid them the full amount owed, $44,528.75, by August 21, 2018). But the "few hundred dollars" that "remained at issue" after Envy's August 2018 statement refer only to the revenue paid for the previous quarter. Pl. Reply at 2; *see* Pl. Opp. at 11 n.5 (noting that much of the revenue paid to Defendants – approximately $40,000 – "was contemporaneously earned and thus was never even arguably past due"). As discussed above, Envy's August 2018 payment to Defendants does not account for the payments received from September 2016 through 2019 that Envy continues to withhold. Such sums are hardly nominal. Therefore, the Court grants summary judgment to Defendants on – and thus dismisses – Envy's breach-of-contract claims as to the DeBoers and the DeBoer Companies.

      b.  The TWGG Defendants

Envy argues that the TWGG Defendants breached the TWGG Contract by providing the DeBoers with licensing and branding services in January 2019, Pl. Br. at 19, refusing to permit an audit, *id.* at 21, and terminating the contract without providing Envy 30 days to cure, Pl. Opp. at 13. As discussed above, the Court concludes that Envy materially breached the TWGG Contract by withholding payments due to TWGG and Dzombak. However, the Court declines to hold that this breach excused the TWGG Defendants' performance.

Unlike the DeBoers' agreements with Envy, the TWGG Contract contained a notice-and-cure provision. *See* TWGG Contract § 6(a). In the case of a material breach, each party could terminate the agreement, "provided, however, such termination shall not be effective unless and until the Party requesting termination of this Agreement has given written notice to the other Parties and . . . the Party responsible for such breach has failed to cure such breach . . . within thirty (30) calendar days of receiving such notice." *Id.* (emphasis omitted). Therefore, the Court

will address what effect, if any, this provision has on Envy's breach-of-contract claim against the TWGG Defendants.

"[A] party's termination is ineffective where the relevant contract provides for a notice-to-cure and notice is not provided." *E. Empire Constr. Inc. v. Borough Constr. Grp. LLC*, 156 N.Y.S.3d 148, 152 (1st Dep't 2021); *see Point Prods. A.G. v. Sony Music Ent., Inc.*, No. 93-cv-04001 (NRB), 2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000) ("Generally, a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract." (quotation marks and citation omitted)). "[T]he exception to the general rule favoring enforcement of notice and cure provisions is a narrow one." *Point Prods.*, 2000 WL 1006236, at *4. The "limited circumstances where . . . notice to cure is not necessary" include instances "where the other party expressly repudiates the contract or abandons performance," *E. Empire Constr.*, 156 N.Y.S.3d at 152 (collecting cases), or "where the breach is impossible to cure, or so substantial that it 'undermines the entire contractual relationship such that it cannot be cured,'" *id.* (quoting *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209-10 (2d Cir. 2014)).

Defendants do not dispute that Envy never received a 30-day opportunity to cure after receiving the Termination Letter on September 27, 2019. Df. Opp. at 6-9; *see* Df. RSOF ¶ 108 (TWGG's counsel extended Envy's opportunity to cure only to October 18, 2019); ECF No. 83-8, Ex. 32 at 3 (same). Rather, Defendants argue that any notice and opportunity to cure would have been futile given Envy's continued failure to provide payments and accounting statements between late 2016 and 2019. *See* Df. Opp. at 7. In another variation of this argument, they assert, without citation, that Envy had effectively terminated its agreements with Defendants by refusing to make payments or issue accurate account statements, leaving the parties' relationship

"irretrievably broken." *Id.* at 7-8.  However, the proffered facts do not meet the standard of futility set out in Defendants' cited cases or, indeed, in New York common law more generally. *See id.* (citing *Giuffre*, 756 F.3d at 209; and *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 522 N.Y.S.2d 292, 293 (3d Dep't 1987)).  *Giuffre* concerned fraud by the breaching party that left it "incapable of cure." 756 F.3d at 211.  *Sunshine Steak* concerned a dispute over a lease agreement that the defendant had repudiated in writing.  *See* 522 N.Y.S.2d at 293.  No such fraud or repudiation occurred here.  Defendants urge the Court to find futility from Envy's failure to perform despite Defendants' continued outreach.  *See* Df. Opp. at 6-7.  These facts, without more, do not suggest that Envy's breach was impossible to cure, or that Envy had openly repudiated or abandoned the TWGG Contract.

Defendants also argue that Envy's breaches obviated any obligation to provide written notice.  *Id.* at 7.  Yet at least one court in this Circuit has declined to excuse a party's failure to provide the required notice and cure even when confronted with the other party's material breach.  *See, e.g.*, *Process Am., Inc. v. Cynergy Holdings, LLC*, No. 12-cv-00772 (BMC), 2014 WL 3844626, at *12 (E.D.N.Y. Apr. 30, 2014) (concluding that, despite a material breach, the defendant was not entitled to withhold residuals under the terms of the contract without giving the plaintiff notice and an opportunity to cure), *aff'd*, 839 F.3d 125 (2d Cir. 2016).

Finally, Defendants argue that, even if TWGG did not properly terminate the TWGG Contract, Envy cannot show that it suffered any damages from that premature termination.  Df. Opp. at 8-9.  The Court does not agree.  If the TWGG Defendants breached their contract by providing branding services independent of Envy or by telling brands not to work with Envy, they could be liable for damages approximating the fees that Envy otherwise would have earned under the TWGG Contract for its work on behalf of the DeBoers.

The Court's conclusion that the TWGG Defendants improperly terminated their contract with Envy implicates a question of material fact as to whether the TWGG Defendants' conduct between January and August 2019 breached the TWGG Contract.  Viewed in the light most favorable to Defendants, the facts do not suggest that "Defendants began interfering with Envy's relationships with brands and issuing the directions not to deal with Envy no later than January 2019."  Pl. RSOF ¶ 55.  The only evidence offered by Envy on this point is a conclusory statement from Nemerov's declaration and a January 26, 2019 email from Dzombak to the DeBoers and Chelsea's father, stating that Nemerov "isn't fielding deals anymore but we need to collect the money from her."  ECF No. 83-8, Ex. 31 at 2; *see* Nemerov Decl. ¶ 15.  Nor is it clear from the facts, viewed in the light most favorable to Envy, that the TWGG Defendants did *not* breach the TWGG Contract when they sent pre-termination letters to brands notifying them that Envy no longer represented the DeBoers.  *See* Df. RSOF ¶ 102; ECF Nos. 97-5, 97-6.

Therefore, the Court denies summary judgment for both parties as to Envy's breach-of-contract claim against the TWGG Defendants.[8]  The evidence presented at trial will clarify the

---

[8] Defendants also argue that Envy's breach-of-contract claim fails under Section 172 of New York's General Business Law (the "GBL") because it is not licensed as an employment agency in New York.  *See* Df. Br. at 13-14.  Although Defendants acknowledge in-District case law holding that the statute provides no private right of action for its enforcement, they argue these cases were wrongly decided.  *Id.* at 14 (citing *Columbia Artists Mgmt., LLC v. Swenson & Burnakus, Inc.*, No. 05-cv-07314 (LBS), 2008 WL 4387808, at *8 (S.D.N.Y. Sept. 24, 2008); and *Agerbrink v. Model Serv. LLC*, No. 14-cv-07841 (JPO), 2015 WL 3750674, at *5 (S.D.N.Y. June 16, 2015)).  Defendants provide little reasoning for their assertion and no authority to the contrary.  In any event, *Agerbrink* cited several cases, including one from the First Department, in concluding that "recent cases are all but unanimous in rejecting a private right of action under" Section 172.  2015 WL 3750674, at *3 (collecting cases including *Rhodes v. Herz*, 920 N.Y.S.2d 11, 12 (1st Dep't 2011)).  Federal courts applying state law are "bound to apply the [state] law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion."  *V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010); *see Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199-200 (2d Cir. 2005) ("As a federal court applying state law, we are generally obliged to follow the state law decisions of state intermediate appellate courts." (citation omitted)).  Absent any support to the contrary from

details of the TWGG Defendants' conduct throughout 2019 and whether any portion of that conduct breached the TWGG Contract.  That the Court has already granted partial summary judgment to Defendants as to Envy's breach of the same contract is relevant only to the damages that the parties would owe each other.  *See, e.g.*, *Process Am., Inc.*, 2014 WL 3844626, at *20 (concluding, after holding that both parties breached their agreement, that "[b]oth parties are thus entitled to recover damages from the other . . . . The amount of damages owed by each party is a disputed issue of fact that requires trial.").  The Court notes, however, that any damages against the TWGG Defendants would be limited to the damages that Envy would have received before the date of a proper termination – that is, by October 27, 2019.  *See Yarmy v. Conte*, 513 N.Y.S.2d 21, 21 (2d Dep't 1987) (holding that a notice of termination of the contract that failed to meet the contract's technical requirements nevertheless "served to terminate the contract after the lapse of the full amount of time provided for in the contract"); *TNT USA Inc. v. DHL Express (USA), Inc.*, No. 09-cv-00481 (JS), 2012 WL601452, at *8 (E.D.N.Y. Feb. 23, 2012) (suggesting that damages from the untimely termination of an agreement "are allowed only up to the time the contract would have terminated if notice had been given" (citation omitted)).

## B. Tortious Interference

Envy brings two claims against Defendants for "tortious interference with contractual and business relationships": one against the TWGG Defendants, and the other against the DeBoer Companies.  FAC ¶¶ 134-151.  The Court addresses each claim in turn.

### 1. The TWGG Defendants

Envy claims that the TWGG Defendants tortiously interfered with the DeBoers' MOUs by inducing the DeBoers to terminate their relationship with Envy, including by "sending letters

---

Defendants, the Court agrees with the state court in *Rhodes* – and other courts in this District – that Section 172 of the GBL provides no private right of action.

to Brands directing them to stop dealing with Envy and to direct all future communications and revenue to TWGG."  Pl. Br. at 22; *see* FAC ¶ 138.

To prevail on a claim for tortious interference with a contract under New York law, a plaintiff must show "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (alterations adopted) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).  The plaintiff must also show that "the contract would not have been breached 'but for' the defendant's conduct."  *Id.* at 127 (further quotation marks omitted) (quoting *Burrowes v. Combs*, 808 N.Y.S.2d 50, 53 (1st Dep't 2006)).

Envy's claim against the TWGG Defendants for tortious interference with a contract fails because, as discussed above, the DeBoers did not breach their MOUs.  "[A]n essential element of tortious interference with contractual relations claim is an actual breach of contract."  *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 627 (S.D.N.Y. 2014); *see Baylis v. Marriott Corp.*, 906 F.2d 874, 877 (2d Cir. 1990) ("Under traditional principles of New York law, a party may not recover for tortious inducement of breach of a contract without proving that the underlying contract has been breached.").  "Consequently, if the claims for breach of contract . . . are futile, as here, so too must be the claim for tortious interference."  *Ferring B.V.*, 4 F. Supp. 3d at 627 (citation omitted).

Nor can Envy prevail on its claim against the TWGG Defendants for tortious interference with business relations.  Under New York law, a plaintiff must show that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations;

(3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and

(4) the defendant's acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247,

261 (2d Cir. 2015) (citation omitted).  "Unlike a claim for tortious interference with contract,

which requires a plaintiff to show no more than that the defendant intentionally and without

justification procured a breach of a valid contract of which he was aware, a claim for tortious

interference with business relations requires a plaintiff to show, 'as a general rule,' that 'the

defendant's conduct amounted to a crime or an independent tort.'" *Id.* at 262 (brackets, ellipsis,

and internal citation omitted) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y.

2004)).  "New York courts have recognized an exception to this rule where a defendant engages

in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* (quotation marks

and citation omitted).  Here, Envy has offered no allegations, much less evidence, indicating that

the TWGG Defendants acted with wrongful means in directing third-party brands to stop dealing

with Envy.  Therefore, the Court grants summary judgment to Defendants on Envy's tortious-

interference claim against the TWGG Defendants.

    2. The DeBoer Companies

    Envy brings another tortious-interference claim against the DeBoer Companies "in the

alternative to the extent that [the DeBoer Companies] are not deemed to be alter egos of Chelsea

and/or [Cole] which are thus primarily liable for breaches of the [DeBoer MOUs]."  FAC ¶ 143.

This claim fails because, as Defendants note, the DeBoers are in privity with the DeBoer

Companies as their principals and owners.  *See* Df. Br. at 17; *Bradbury v. Israel*, 168 N.Y.S.3d

16, 18 (1st Dep't 2022) (holding that defendant's wholly owned and operated LLC was not a

third-party stranger to the defendant's contract and therefore could not be liable for tortious

interference); *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02-cv-04635 (RPP), 2003 WL

1961636, at *5 (S.D.N.Y. Apr. 25, 2003) (dismissing tortious-interference claim as to contract between plaintiff and defendant's wholly owned subsidiary because "a party cannot tortiously interfere with its own contract" (quotation marks and citation omitted)).  Envy does not contest this point.  *See* Pl. Opp.; *P.C.R. v. Fla. Union Free Sch. Dist.*, No. 16-cv-09778 (KMK), 2022 WL 337072, at *22 (S.D.N.Y. Feb. 4, 2022) ("The plaintiff's opposing memorandum of law does not respond to this argument, and effectively concedes these arguments by his failure to respond to them." (brackets and citation omitted)).  Therefore, the Court grants summary judgment to Defendants on Envy's tortious-interference claim against the DeBoer Companies.

### C.  Unjust Enrichment/*Quantum Meruit*

Finally, Envy asserts a claim against Defendants for unjust enrichment/*quantum meruit*. Envy brings this claim "in the alternative to [its] breach of contract claims, to the extent any revenue or deal is deemed to be outside of the scope of the relevant contract."  Pl. Br. at 23.

"The Court analyzes quantum meruit and unjust enrichment together as a single quasi contract claim."  *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, --- F. Supp. 3d ----, 2023 WL 4211035, at *7 (S.D.N.Y. June 27, 2023) (brackets, quotation marks, and citation omitted).  "In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'"  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)).  "The basic elements of an unjust enrichment claim in New York require proof that (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what the plaintiff is seeking to recover."  *Cooper*

*v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021) (alterations adopted) (quoting *Briarpatch Ltd., L.P. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)).

While "[t]he basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff, . . . unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (citation omitted).  Rather, recovery for unjust enrichment "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff," such as where "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled."  *Id.*; *accord In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 222 (S.D.N.Y. 2019).  "Notably, in order to state an unjust enrichment claim, a plaintiff must show that the defendant actually received a benefit," which "must be both 'specific' and 'direct.'"  *Regnante v. Sec. & Exch. Offs.*, 134 F. Supp. 3d 749, 772 (S.D.N.Y. 2015) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).

Envy may not recover revenue from branding deals covered by its agreements with Defendants under a theory of unjust enrichment.  *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) ("Where the parties [have] executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."); *accord Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 837 F.3d 146, 150 (2d Cir. 2016) (per curiam) ("[W]here a valid and enforceable contract governs the relevant subject matter of the parties' dispute, the contract – rather than principles of restitution – should determine the measure of a party's recovery for events arising from that subject matter.").

However, Envy's unjust-enrichment claim raises an issue of material fact to the extent that Envy seeks compensation for its work on the DeBoers' Viacom contracts.  Envy claims that it contributed to negotiations for amendments and extensions to those contracts, and that – despite assurances from Dzombak – it received no payment for that work.  *See* Df. RSOF ¶¶ 70-76; Pl. RSOF ¶¶ 41-42.  Envy cannot pursue its claim against the TWGG Defendants, who received no commissions from the DeBoers in connection with their appearances on Teen Mom 2.  *See* Pl. RSOF ¶ 38; *Regnante*, 134 F. Supp. 3d at 772 (plaintiff must show that the defendant actually received a "specific" and "direct" benefit (citation omitted)).  But Envy has raised at least a triable issue of fact as to whether Envy worked on negotiations for the Viacom contracts with the expectation that it would be paid for its efforts.  *See* ECF Nos. 115-1 (Nemerov's texts with Dzombak), 115-3 (email from Nemerov seeking compensation for work on amendments to Chelsea's Viacom contract).  Therefore, the Court grants summary judgment to Defendants on Envy's unjust-enrichment claim as to the TWGG Defendants and as to the DeBoers' non-Viacom branding revenue; it denies summary judgment on the claim as to the DeBoers for revenue under their Viacom contracts.

## CONCLUSION

For the reasons stated above, Plaintiff's motion to exclude Begakis's testimony is GRANTED in part and DENIED in part.  Plaintiff's summary-judgment motion is GRANTED in part and DENIED in part.  Defendants' summary-judgment motion is GRANTED in part and DENIED in part.

This case will now proceed to a bench trial on all outstanding issues.  These issues include (1) the amount of revenue from the DeBoers' branding deals that Envy withheld from Defendants; (2) the dispute over the Haynes & Boone legal fees; (3) Envy's breach-of-contract

claim as to the TWGG Defendants for their conduct in 2019; and (4) Envy's unjust-enrichment claim against the DeBoers as to its work on the Viacom amendments.

The Court directs the parties promptly to confer, and, within three weeks of this decision, to submit a joint pretrial order consistent with the Court's Individual Rules governing nonjury trials.  Any motions *in limine* are due on the same date as the joint pretrial order; opposition briefs are due one week later.  There shall be no replies.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 82, 83, and 84.

Dated: February 29, 2024
      New York, New York

                                SO ORDERED.

                                *Jennifer Rochon*

                                JENNIFER L. ROCHON
                                United States District Judge